1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                                   NORTHERN DISTRICT OF CALIFORNIA

10                                            San Francisco Division

11    AMERICAN CIVIL LIBERTIES UNION
      OF NORTHERN CALIFORNIA,                          Case No. 16-cv-03539-LB

12                       Plaintiff,

13                                                     ORDER DENYING THE DEFENDANTS'
              v.                                       MOTION TO DISMISS

14                                                     Re: ECF No. 20
      SYLVIA MATHEWS BURWELL, et al.,

15                       Defendants.

16

17                                              INTRODUCTION

18           The ACLU of Northern California challenges financial grants that the Department of Health

19    and Human Services ("HHS") — through the Office of Refugee Resettlement ("ORR") — awards

20    to religious organizations to provide care for unaccompanied immigrant minors.[1] By statute, the

21    government must provide for the "care and custody of all unaccompanied minor children."[2] 8

22    U.S.C. § 1232(b)(1); see 6 U.S.C. § 279(b). To achieve that objective, the statute authorizes ORR

23    to make grants to organizations to care for the children.[3] See 8 U.S.C. § 1232(i). ORR makes

24    grants to organizations, including religious organizations, which allegedly restrict the minors'

25    _____

26    [1] Compl. — ECF No. 1. Citations refer to material in the Electronic Case File ("ECF"); pinpoint
      citations are to the ECF-generated page numbers at the top of documents.

27    [2] See id. ¶¶ 20–22.

28    [3] Id. ¶¶ 4–5.

United States District Court
Northern District of California

access to reproductive health-care services that are contrary to the organizations' religious beliefs.[4] The ACLU claims that the restrictions violate the Establishment Clause of the First Amendment to the U.S. Constitution.[5]

The issue is whether the ACLU has Article III standing to sue the federal government. The ACLU asserts taxpayer standing under *Flast v.* Cohen, 392 U.S. 83 (1968).[6] Generally, taxpayers do not have standing to sue the government, but *Flast* established that taxpayers may challenge a statute that involves an exercise of congressional power under the taxing and spending clause on the ground that it violates the Establishment Clause. *Id.* at 105–06. The government contends that the ACLU lacks taxpayer standing because it challenges only a federal agency's discretionary award of grants and does not challenge — as *Flast* requires — specific congressional action.[7] The ACLU counters that *Flast* establishes its standing to challenge ORR's grant of federal funds — appropriated by Congress to carry out the government's statutory obligation for the care and custody of unaccompanied minor children — to religious organizations on the ground that the money is spent in violation of the Establishment Clause.[8]

The court holds that the ACLU has taxpayer standing to raise its Establishment Clause challenge to the agency's grants to religious organizations. Congress mandated that the agency provide care to unaccompanied minors, and it authorized disbursements to provide that care. Under *Flast*, the ACLU may challenge the statute as applied.

### LEGAL FRAMEWORK FOR THE CARE OF THE CHILDREN

The Secretary of HHS is responsible for "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate . . . ." 8 U.S.C. § 1232(b)(1). An "unaccompanied alien child" is a child who (1) is under age 18, (2) has no lawful

[4] *See id.* ¶¶ 24–25, 30–41.

[5] *Id.* ¶¶ 58–62.

[6] *Id.* ¶ 58; *see* Opposition to Motion to Dismiss — ECF No. 22 at 10–17.

[7] Motion to Dismiss — ECF No. 20 at 10, 17–21.

[8] Opposition at 5, 10–11.

United States District Court
Northern District of California

immigration status in the United States, and (3) has no parent or legal guardian in the United States available to provide care and physical custody. 6 U.S.C. § 279(g)(2). Generally, an unaccompanied alien child who is in federal custody must be transferred to HHS custody within 72 hours. 8 U.S.C. § 1232(b)(3). Then, HHS — through ORR, which coordinates the care and placement of children — must place the child in the least restrictive setting that is in the best interest of the child. *Id.* § 1232(c)(2)(A); 6 U.S.C. § 279(b)(1)(A).

ORR must "ensur[e] that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child." 6 U.S.C. § 279(b)(1)(B). It must "identify[] a sufficient number of qualified individuals, entities, and facilities to house" the children. *Id.* § 279(b)(1)(F). It must "conduct[] investigations and inspections of facilities and other entities in which unaccompanied alien children reside, including regular follow-up visits to such facilities, placements, and other entities to assess the continued suitability of such placements." *Id.* § 279(b)(1)(L).

The parties cite other legal requirements for the health care of the unaccompanied alien children.

First, as required by statute, the Secretary of HHS promulgated final rules with national standards for the "detection, prevention, reduction, and punishment of rape and sexual assault in facilities that maintain custody of unaccompanied minor alien children. . . ." 42 U.S.C. § 15607(d); *see* 45 C.F.R. §§ 411.91−.93. Among other things, "[if] the assessment pursuant to § 411.41 indicates that a UC [unaccompanied child] experienced prior sexual victimization or perpetrated sexual abuse, the care provider facility must ensure that the UC is immediately referred to a qualified medical or mental health practitioner for medical and/or mental health follow-up as appropriate." 45 C.F.R. § 411.91(a). "Care provider facilities must provide UC victims of sexual abuse timely, unimpeded access to emergency medical treatment, crisis intervention services, emergency contraception, and sexually transmitted infections prophylaxis, . . . where appropriate under medical or mental health professional standards." *Id.* § 411.92(a). The C.F.R. requires ongoing medical and mental-health care to children victimized by sexual abuse while in ORR care and custody. *Id.* § 411.93(a). Also,

> Care provider facilities must ensure that female UC [unaccompanied children] victims of sexual abuse by a male abuser while in ORR care and custody are offered pregnancy tests, as necessary. If pregnancy results from an instance of sexual abuse, [the] care provider facility must ensure that the victim receives timely and comprehensive information about all lawful pregnancy-related medical services and timely access to all lawful pregnancy-related medical services.

*Id.* § 411.93(d).

Second, according to the complaint, "[t]he federal government is legally obligated to ensure that all programs that provide care to [unaccompanied immigrant minors] comply with the minimum requirements detailed in the *Flores v. Reno* Settlement Agreement . . . ."[9] The "agreement requires the government to provide or arrange for, among other things, 'appropriate routine medical . . . care,' including specifically 'family planning services[] and emergency health care services.'"[10]

HHS "may award grants to, and enter into contracts with, voluntary agencies to carry out" the requirements of 8 U.S.C. § 1232 and 6 U.S.C. § 279. 8 U.S.C. § 1232(i). The funding for the grants comes from separate Congressional lump-sum appropriations.[11] In 2014, 2015, and 2016, Congress appropriated on average roughly $1.57 billion per year to the Administration for Children and Families ("ACF"), which is the component of HHS that houses ORR.[12] The appropriations provide ACF with funding for the following:

> For necessary expenses for refugee and entrant assistance activities authorized by section 414 of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980, and for carrying out section 462 of the Homeland Security Act of 2002, section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, the Trafficking Victims Protection Act of 2000 ("TVPA"), section 203 of the Trafficking Victims Protection Reauthorization Act of 2005, and the Torture Victims Relief Act of 1998 . . . .

---

[9] *Id.* ¶ 27.

[10] *Id.* (quoting *Flores v. Reno* Settlement Agreement, CV-85-4544-RJK (C.D. Cal. Jan. 17, 1997)).

[11] Motion to Dismiss at 12−13 (citing the Consolidated Appropriations Acts for 2014 through 2016); Opposition at 7 (citing Compl. ¶ 56).

[12] Motion to Dismiss at 12−13 (citing the Consolidated Appropriations Acts for 2014 through 2016); *accord* Opposition at 7 (citing Compl. ¶ 56 and the approximate appropriation in 2016 of $1.6 billion).

United States District Court
Northern District of California

1    Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. H, Tit. II, 129 Stat. 2242, 2612

2    (Dec. 18, 2015).[13]

3

4                                        **STATEMENT**

5    **1.   Unaccompanied Alien Children in Federal Custody**

6           The federal government currently has thousands of unaccompanied immigrant minors in its

7    legal custody.[14] Many come to the United States fleeing abuse and torture, "many have been

8    sexually abused or assaulted," and "some have also been trafficked for labor or prostitution."[15]

9    The government apprehends many near the border and apprehends others through the juvenile

10   justice system or immigration enforcement activities.[16] Most minors who are referred to ORR are

11   eventually released to parents or sponsors in the United States but often are held in short-term

12   facilities or shelters while they await release.[17] Others who are not released spend longer times in

13   custody and sometimes are transferred to group homes or a foster facility.[18]

14

15   **2.   Grants To Religiously Affiliated Entities**

16          ORR uses a "network of ORR-funded facilities and shelters — including a number of

17   religiously affiliated entities" such as the United States Conference of Catholic Bishops

18   ("USCCB") and others.[19] "USCCB does not provide services directly to unaccompanied minors,

19   but instead issues subgrants to Catholic Charities and other organizations around the country."[20]

20

21   _____

     [13] *See* Motion to Dismiss at 12−13 (citing the Consolidated Appropriations Acts for 2016); Comp. ¶ 56
22   (same). Section 462 of the Homeland Security Act of 2002 and Section 235 of the William
     Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 created the statutory
23   mandates at issue here. Compl. ¶¶ 15, 20−22.

24   [14] Compl. ¶ 1.

     [15] *Id.*
25
     [16] *Id.* ¶ 19.
26
     [17] *Id.* ¶ 23.
27
     [18] *Id.*
28
     [19] *Id.* ¶ 24 (listing organizations).

     [20] *Id.* ¶ 25 (listing organizations).

United States District Court
Northern District of California

The defendants "knowingly permit religiously affiliated grantees with religious objections to abortion and contraception to impose restrictions on unaccompanied immigrant minors' access to these forms of reproductive healthcare."[21] The defendants

> allow these grantees to flout . . . their [statutory, regulatory, and *Flores*] obligations . . . , including by: allowing objecting programs to refuse to provide young women in their care with information about, referrals for, or access to contraception and abortion; transferring young women who seek access to contraception or abortion out of objecting programs; and refusing to place young women who are seeking access to emergency contraception or abortion in objecting programs, even if that placement would otherwise be in the young woman's best interest.[22]

For example, the defendants approved grants to USCCB — including nearly $10 million in 2014 — even though ORR knew "that USCCB's agreement with its subgrantees explicitly prohibits them from providing, referring, encouraging, or in any way facilitating access to contraceptives and abortion services."[23] USCCB's agreement prohibits the sub-grantee from providing services "contrary to the authentic teaching of the Catholic Church" and prohibits the facilitation of "access to contraceptives or abortion services."[24] In 2011, ORR had family-planning language in its agreements, including:

> Family planning services are already required by the Flores settlement agreement, and therefore this cooperative agreement . . . . The grantees will refer female [unaccompanied immigrant minors] to medical care providers who offer pregnant [unaccompanied immigrant minors] the opportunity to be provided information and counseling regarding prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination.[25]

ORR removed this language because USCCB objected to "the contraception and abortion requirements."[26] "USCCB has made quite clear that they refuse to provide access to these reproductive healthcare services for the young people in their care."[27]

---

[21] *Id.* ¶ 30.

[22] *Id.*

[23] *Id.* ¶ 5.

[24] *Id.* ¶ 35.

[25] *Id.* ¶ 32.

[26] *Id.* ¶ 33.

[27] *Id.* ¶ 34.

The defendants similarly approved grant applications to other religiously affiliated grantees "even though the grant applications explicitly state that the grantees will not provide family planning information or services to the young people in their care."[28] For example, the defendants approved a direct application and awarded more than $8 million to the Catholic Charities of the Archdiocese of Galveston-Houston.[29] The defendants awarded these funds "despite [the organization's] explicit refusal to provide the young people in its charge with legally required access to reproductive healthcare."[30] At the grantees' request, the government also transferred to other providers "young women who requested access to abortion," which delays access to services, stigmatizes women for requesting an abortion, and uproots them from their support networks.[31] The defendants also made "decisions about where to initially place a young person based on whether she had an abortion or is seeking an abortion," "allowing religiously affiliated programs to prevent them from making a placement in the young person's best interest."[32]

### 3.  Other Allegations in the Complaint About Unaccompanied Children

The complaint references four children specifically.

Rosa, age 17, was raped in 2014 in Mexico by one of her "guides" to the United States.[33] She learned that she was pregnant while in custody at Catholic Charities in Miami.[34] Distraught at the possibility of being denied an abortion, she was hospitalized for suicidal ideation.[35] When she was released, Catholic Charities and His House (another religiously affiliated ORR grantee) refused to

---

[28] *Id.* ¶ 36.

[29] *Id.* ¶¶ 37–38.

[30] *Id.* ¶ 38.

[31] *Id.* ¶ 39.

[32] *Id.* ¶ 40.

[33] *Id.* ¶ 42.

[34] *Id.* ¶ 43.

[35] *Id.*

United States District Court
Northern District of California

allow her into their programs because she was seeking an abortion.[36] Ultimately, ORR approved her request for an abortion.[37]

Maria, age 14, also was raped on her way to the United States from her home country in 2014 and became pregnant.[38] She was placed in an ORR shelter in Texas; the agency looked into the possibility of transferring her to a shelter in Florida to be near her family but was unable to do so because "both of the shelters in Florida are faith-based and will not take the child to have this procedure."[39] Another ORR email said that "Maria's post-release social worker should not work for a 'religion-based agency' because of the abortion."[40]

Laura, age 17, was 17 or 18 weeks pregnant when she was placed at a Texas shelter; after 20 weeks, abortion is illegal in Texas.[41] ORR sought to transfer her to the East Coast to be near her brothers and sisters.[42] One ORR official sought to transfer her to Youth for Tomorrow ("YFT"), a faith-based program in Virginia; another official rejected that transfer, noting that the program was pro-life and that he recently had to transfer someone else from there "due to YFT position on abortion."[43]

Zoe was placed at YFT in 2015, when she was roughly 16, and found out there that she was pregnant.[44] After counseling, she maintained her desire for an abortion.[45] "Although Zoe was thriving at YFT, YFT asked ORR to transfer Zoe to another program where she would be permitted to terminate her pregnancy."[46]

---

[36] *Id.* ¶ 44.

[37] *Id.* ¶¶ 45–46.

[38] *Id.* ¶ 47–48.

[39] *Id.* ¶¶ 48–49.

[40] *Id.* ¶ 49.

[41] *Id.* ¶ 50.

[42] *Id.*

[43] *Id.*

[44] *Id.* ¶¶ 51–52.

[45] *Id.* ¶ 52.

[46] *Id.* ¶ 53.

United States District Court
Northern District of California

### 4.   The Lawsuit and the Motion to Dismiss

The defendants are the Secretary of HHS, the Acting Assistant Secretary for ACF, and the Director of ORR.[47] The ACLU claims that they "violated the Establishment Clause . . . by permitting USCCB and its subgrantees (such as Catholic Charities), His House, Youth for Tomorrow, and similar organizations to impose religiously based restrictions on the use of taxpayer funds."[48] The ACLU brings the lawsuit on behalf of its members and asserts taxpayer standing because its members pay federal taxes.[49]

The defendants moved to dismiss the complaint on three grounds: (1) the ACLU lacks standing as an organization; (2) it lacks taxpayer standing to sue on behalf of its members; and (3) the government did not waive sovereign immunity for nominal damages.[50] The ACLU opposed only the second ground: whether the ACLU has taxpayer standing to sue on behalf of its members.[51] The court held a hearing on November 21, 2016.[52]

## GOVERNING LAW

The government moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing and thus for lack of federal subject-matter jurisdiction.

### 1.   Rule 12(b)(1) Standard

A complaint must contain a short and plain statement of the ground for the court's jurisdiction (unless the court already has jurisdiction and the claim needs no new jurisdictional support). Fed. R. Civ. P. 8(a)(1). The plaintiff has the burden of establishing jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Farmers Ins. Exchange v. Portage La*

---

[47] *Id.* ¶¶ 16–18.

[48] *Id.* ¶ 58.

[49] *Id.* ¶ 15.

[50] *See* Motion to Dismiss at 8–9.

[51] *See* Opposition.

[52] Minute Entry — ECF No. 24.

United States District Court
Northern District of California

1    *Prairie Mut. Ins. Co.*, 907 F.2d 911, 912 (9th Cir. 1990). A defendant's Rule 12(b)(1)

2    jurisdictional attack can be either facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

3    2000). "A 'facial' attack asserts that a complaint's allegations are themselves insufficient to

4    invoke jurisdiction, while a 'factual' attack asserts that the complaint's allegations, though

5    adequate on their face to invoke jurisdiction, are untrue." *Courthouse News Serv. v. Planet*, 750

6    F.3d 776, 780 n.3 (9th Cir. 2014). This is a facial attack; the court thus "accept[s] all allegations of

7    fact in the complaint as true and construe[s] them in the light most favorable to the plaintiffs."

8    *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *see also Chandler v.*

9    *State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("Because standing . . .

10    pertain[s] to federal courts' subject matter jurisdiction, [it is] properly raised in a Rule 12(b)(1)

11    motion to dismiss.").

12

13    **2.   Standing Generally**

14      Federal-court jurisdiction extends only to "cases" and "controversies": "[n]o principle is more

15    fundamental to the judiciary's proper role in our system of government than the constitutional

16    limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S.

17    811, 818 (1997). "Standing to sue is a doctrine rooted in the traditional understanding of a case or

18    controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The law of standing "serves to

19    prevent the judicial process from being used to usurp the powers of the political branches, and

20    confines the federal courts to a properly judicial role." *Id.* (internal quotations and citations

21    omitted).

22      To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly

23    traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

24    favorable judicial decision." *Id.* (citing *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

25    An association has standing to sue on behalf of its members when "[(1)] its members would

26    otherwise have standing to sue in their own right, [(2)] the interests at stake are germane to the

27    organization's purpose, and [(3)] neither the claim asserted nor the relief requested requires the

28    participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl.*

United States District Court
Northern District of California

1    *Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). As the party invoking the court's jurisdiction, the

2    plaintiff has the burden of establishing standing. *Spokeo*, 136 S. Ct. at 1547.

3

4                                                **ANALYSIS**

5         The parties agree that the ACLU does not have traditional Article III standing. But they

6    dispute whether it has taxpayer standing to sue because its members pay federal taxes. The

7    government argues that the ACLU is challenging executive action, not congressional action, and

8    thus lacks taxpayer standing, which requires a nexus to a specific congressional statute.[53] The

9    ACLU responds that it has taxpayer standing to challenge an agency's disbursement of funds to

10   fulfill its statutory mandate.[54] The court holds that the ACLU has taxpayer standing to challenge

11   the agency's disbursement of funds as an Establishment Clause violation.

12        Generally, a person cannot sue the government — as a citizen or a taxpayer — based on a

13   generalized grievance that the government is not following the law. Thus, a person cannot

14   establish standing by claiming a right to have the government follow the law. *Ex parte Leavitt*,

15   302 U.S. 633, 634 (1937). And generally, a federal taxpayer's interest "in seeing that Treasury

16   funds are spent in accordance with the Constitution does not give rise to the kind of redressable

17   'personal injury' required for Article III standing." *Hein v. Freedom from Religion Found., Inc.*,

18   551 U.S. 587, 599 (2007); *see Frothingham v. Mellon*, 262 U.S. 447, 487 (1923). In *Frothingham*,

19   for example, the plaintiff — suing as a taxpayer — challenged expenditures under a federal statute

20   providing grants to states to reduce maternal and infant mortality. 262 U.S. at 479, 487. This was

21   not direct injury sufficient to confer standing and instead was merely an allegation that the

22   plaintiff "suffers in some indefinite way in common with the people generally." *Id.* at 488–89.

23        *Flast v. Cohen* defined an exception to this rule by holding that a taxpayer had standing to

24   challenge federal subsidies to parochial schools as a violation of the Establishment Clause. 392

25   U.S. at 102–03, 105–06. A taxpayer must establish two factors to sue as a taxpayer:

26

27   [53] Reply — ECF No. 23 at 7.

28   [54] Opposition at 11.

United States District Court
Northern District of California

> First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure in the administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8.

*Id.* at 102–03. Thus, a taxpayer has Article III standing "when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions [such as the Establishment Clause] which operate to restrict the exercise of the taxing and spending power." *Id.* at 105–06.

In *Flast*, federal taxpayers challenged federal subsidies to parochial schools under the Elementary and Secondary Education Act of 1965. *Id.* at 85–88. Title I of the Act "establishe[d] a program for financial assistance to local educational agencies for the education of low-income families." *Id.* at 86. Title II "establishe[d] a program of federal grants for the acquisition of school library resources, textbooks, and other printed and published instructional materials 'for the use of children and teachers in public and private elementary and secondary schools.'" *Id.* at 86–87. The taxpayers complained that federal funds appropriated under the Act were financing educational instruction and materials in religious schools. *Id.* at 85–86. This complaint satisfied the two-prong test: first, the challenge was "made to an exercise by Congress of its power under Art. I, § 8, to spend for the general welfare"; and second, the taxpayers "alleged that the challenged expenditures violate[d] the Establishment . . . Clause[]." *Id.* at 103. The plaintiffs thus had standing as taxpayers to sue. *Id.* at 106.

*Flast* governs the analysis here. The statute in *Flast* and the statutory scheme here both are neutral on their faces; neither mentions religion. Thus, both cases involve challenges to the statutes as applied. The ACLU — based on its members' status as taxpayers — challenges the exercise of congressional power under its taxing and spending power and thus meets the first *Flast* factor. It also meets the second *Flast* factor because it challenges a federal agency's disbursement of funds pursuant to the challenged statute as a violation of the Establishment Clause. Similarly,

the *Flast* taxpayers challenged a federal agency's disbursement of funds under the challenged statute to state agencies, which granted funds to local agencies, which in turn funded educational instruction and materials in religious schools. *Flast*, 392 U.S. at 90–91, 103 n.23.

Subsequent Supreme Court cases do not change this outcome. Generally, they limit the application of the *Flast* exception to the facts in *Flast*, meaning, taxpayers can challenge government expenditures pursuant to statutes under the taxing and spending clause as violations of the Establishment Clause. *See Hein*, 551 U.S. at 609. Which is what the ACLU challenges here.

For example, in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, the Court denied taxpayer standing to plaintiffs who challenged an agency's transfer of real property to a religious school as a violation of the Establishment Clause. 454 U.S. 464, 466–70, 477–82 (1982). *Valley Forge* involved a federal statute that allowed the government to transfer surplus property that outlived its usefulness to other public or private entities and specifically allowed the Department of Health, Education, and Welfare to "assume responsibility for disposing of surplus real property 'for school, classroom, or other educational use.'" *Id.* at 466–67. The agency gave land valued at $577,500 to Valley Forge Christian College. *Id.* at 468. The Court denied standing for two reasons. First, the plaintiffs challenged executive action, not an exercise of congressional power. *Id.* at 479. "*Flast* limited taxpayer standing to challenges directed 'only [at] exercises of congressional power.'" *Id.* (quoting *Flast*, 392 U.S. at 102 and citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 228 (1974)). Second, the challenged government action was an exercise of authority under the property clause, Article IV, § 3, and was not — as in *Flast* — an exercise of authority under the taxing and spending clause, Article I, § 8. *Id.* at 480.

Unlike *Valley Forge*, and like *Flast*, this case is a direct challenge to an agency's disbursement of funds pursuant to a congressional mandate under the taxing and spending clause as an Establishment Clause violation.

In *Bowen v. Kendrick*, the Supreme Court reaffirmed a taxpayer's standing to challenge government grants under a federal statute — the Adolescent Family Life Act — as a violation of the Establishment Clause. 487 U.S. 589, 620 (1988). The statute provided grants to public or

nonprofit agencies for the care and prevention of adolescent pregnancy. *Id.* at 593. HHS had discretion to define the services a grantee must provide, but the statute listed "'necessary services' that may be funded," such as "pregnancy testing and maternity counseling, adoption counseling and referral services, . . . [and] educational services relating to family life and problems associated with adolescent premarital sexual relations." *Id.* at 594 (quotations omitted). The statute mentioned four times the role that religious organizations could play to accomplish the statute's goals. *Id.* at 606. In considering whether the statute was unconstitutional as applied,[55] the Court held that the taxpayers had standing because the statute was "at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and [the plaintiffs'] claims call[ed] into question how the funds authorized by Congress [were] being disbursed pursuant to the statutory mandate." *Id.* at 619–20.

The government distinguishes *Kendrick*, arguing that the ACLU challenges executive action only and thus falls outside of the narrow *Flast* exception, which requires a challenge to congressional action. But in *Kendrick*, the Court rejected the government's argument that the lawsuit fell outside of *Flast* because the plaintiffs were challenging executive action. The plaintiffs' case was not "any less a challenge to congressional taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the [agency]." *Id.* at 619. "Indeed, *Flast* itself was a lawsuit against . . . [an agency that] had been given the authority under the challenged statute to administer the spending program that Congress had created." *Id.* Here, too, the ACLU challenges funding authorized by Congress that flows through an agency, which administers it pursuant to its congressional mandate to provide for the custody and care of unaccompanied children.

The Court's plurality opinion in *Hein v. Freedom from Religion Foundation, Inc.* gives more insight into the difference between a challenge to executive action that falls outside of *Flast* and a challenge to an agency's administration of funds pursuant to a congressional mandate. 551 U.S. 587 (2007). In *Hein*, the Court denied taxpayer standing to challenge President Bush's Faith-

---

[55] The statute had a valid secular purpose and thus was not unconstitutional on its face. *Id.* at 617–18.

United States District Court
Northern District of California

Based and Community Initiatives program as an Establishment Clause violation, holding that the plaintiffs challenged only executive action. *Id.* at 592, 608.

By executive order, President Bush created a White House office for the program "to ensure that 'private and charitable community groups, including religious ones . . . have the fullest opportunity permitted by law to compete on a level playing field.'" *Id.* at 593–94 (quoting Exec. Order No. 13199, 3 CFR 752 (2001 Comp.)). He "also created Executive Department Centers for Faith-Based and Community Initiatives within several federal agencies and departments." *Id.* at 594. "No congressional legislation specifically authorized the creation of the White House Office or the Executive Department Centers." *Id.* at 595. And Congress did not specifically appropriate money for the entities' activities; "their activities [were] funded through general Executive Branch appropriations." *Id.*

In a plurality opinion, Justice Alito — joined by Chief Justice Roberts and Justice Kennedy — concluded that the plaintiffs lacked standing and distinguished *Flast*: "The expenditures at issue in *Flast* were made pursuant to [(1)] an express congressional mandate and [(2)] a specific congressional appropriation." *Id.* at 603. By contrast, the White House funded its initiative by general Executive Branch appropriations for day-to-day activities (and not by expenditures made pursuant to an act of Congress). *Id.* at 605. The opinion explained:

> The link between congressional action and constitutional violation that supported taxpayer standing in *Flast* is missing here. Respondents do not challenge any specific congressional action or appropriation; nor do they ask the Court to invalidate any congressional enactment or legislatively created program as unconstitutional. That is because the expenditures at issue here were not made pursuant to any Act of Congress. Rather, Congress provided general appropriations to the Executive Branch to fund its day-to-day activities. These appropriations did not expressly authorize, direct, or even mention the expenditures of which respondents complain. Those expenditures resulted from executive discretion, not congressional action.

*Id.* at 605.

Justice Alito also explained that *Kendrick* — where the Court found a sufficient nexus between taxpayer standing and congressional exercise of the taxing and spending power, even though the Congressional funding flowed through and was administered by an agency — did not

United States District Court
Northern District of California

compel a different result. *Id.* at 607. The key to the outcome there was the Court's recognition that the statute was "'at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers,' and that the plaintiffs' claims 'call[ed] into question how the funds authorized by Congress [were] being disbursed *pursuant to the . . . statutory mandate*." *Id.* (quoting *Kendrick*, 487 U.S. at 619–20) (emphasis in original). The act there "not only expressly authorized and appropriated specific funds for grantmaking, it also expressly contemplated that some of those moneys might go to projects involving religious groups." *Id*. Unlike the White House initiative, *Kendrick* "involved a 'program of disbursement of funds pursuant to Congress' taxing and spending powers' that 'Congress had created,' 'authorized,' and 'mandate[d].'" *Id.* (quoting *Kendrick*, 487 U.S. at 619–20). By contrast, the plaintiffs in *Hein* could "cite no statute whose application they challenge[d]. The best they [could] do [was] to point to unspecified, lump-sum 'Congressional budget appropriations' for the general use of the Executive Branch." *Id.* at 607–08.

In sum, because the allocation of those general appropriations was committed to agency discretion, the plaintiffs lacked standing to challenge the expenditure of funds from general executive revenue as an Establishment Clause violation. *Id.* at 608–09. The opinion emphasized that the *Flast* exception "has a narrow application in our precedent, that only slightly lowered the bar on taxpayer standing, and that must be applied with rigor." *Id.* at 609 (internal citations and quotations omitted).

In contrast to the taxpayers in *Hein*, and like the taxpayers in *Flast*, the ACLU challenges expenditures made pursuant to an express congressional mandate — to provide for the care and custody of all unaccompanied minor children — and a specific congressional appropriation to carry out that mandate. *See id.* at 603. The statutory scheme is "at heart" an exercise of Congress's taxing and spending power. *Id.* at 607. Because ORR makes grants under that statutory mandate, the ACLU — through its taxpayer members — has standing.

The government distinguishes the statutory schemes in *Flast* and *Kendrick* on the ground that in both cases, Congress knew that the statute's intended beneficiaries were religious

organizations.[56] In *Flast,* "private schools" were predominately religious schools. *See Hein*, 551

U.S. at 604, n.3. And in *Bowen v. Kendrick*, the statute mentioned the role that religious

organizations might play and — as Justice Alito said in *Hein* — the Act contemplated that money

might go to projects involving religious groups. *Id.* at 607.

This argument does not change the outcome. It is not apparent here that religious organizations

are not intended beneficiaries. The ACLU alleges Congress's knowledge that funds go to religious

organizations;[57] it appears reasonably understood that grants might find their way to religious

organizations. *See id.* at 604 n.3 (discussing *Flast*). Moreover, regardless of the *Hein* plurality's

characterization about religious organizations as beneficiaries, *Hein* leaves *Flast* intact: "the

present case does not require us to reconsider that precedent. . . . We do not extend *Flast*, but we

also do not overrule it. We leave *Flast* as we found it." *Id.* at 614−15. Viewing the plurality and

dissenting opinions as a whole, *Flast* remains the standard[58] and establishes that the ACLU has

taxpayer standing. *Id.* at 603, 607.

Finally, a taxpayer may challenge statutes as applied if they create, authorize, and mandate the

challenged disbursement program. *See id.* at 607 (discussing *Kendrick*). One more plausibly reads

*Hein* as reinforcing *Flast* as a narrow rule that permits taxpayer challenges only to statutes that are

an exercise of Congress's spending power and to challenges — like the challenge here to ORR's

grants — to an agency's use of specifically appropriated funds to satisfy Congress's statutory

mandate. *See ACLU of Massachusetts v. Sebelius*, 697 F. Supp. 2d 200, 210 (2010) (holding that

the Trafficking Victims Protection Act is "at heart a program of disbursement of funds pursuant to

Congress' taxing and spending powers, and [plaintiff's] claims call into question how the funds

---

[56] *See* Motion to Dismiss at 19−21; Reply at 8−12.

[57] Compl. ¶¶ 54−55.

[58] Justice Scalia — joined by Justice Thomas — wrote that either *Flast* "should be applied to (at a minimum) *all* challenges to the governmental expenditure of general tax revenues in a manner alleged to violate a constitutional provision specifically limiting the taxing and spending power, or *Flast* should be repudiated." *Id.* at 618 (emphasis in original). He would repudiate *Flast* as inconsistent with Article III restrictions embodied in the doctrine of standing. *Id.*

United States District Court
Northern District of California

1    authorized by Congress are being disbursed pursuant to the . . . statutory mandate"), *vacated as*

2    *moot*, 705 F.3d 44 (1st Cir. 2013).

3       The government points to post-*Hein* circuit cases that narrowly apply taxpayer standing when

4    the statutes did not authorize disbursement of funds to support religious activity.[59] The cases do

5    not alter the court's conclusion. In the cases — and by contrast to the lawsuit here — the

6    challenged statutes did not contemplate or mandate disbursement of funds that supported religious

7    organizations.

8       For example, *Murray v. U.S. Dep't of Treasury* involved a taxpayer's challenge to the

9    Treasury Department's use of TARP funds to bail out the financial institution AIG after the 2008

10    financial crisis. 681 F.3d 744, 745–47 (6th Cir. 2012). AIG had Sharia-compliant financing

11    products; the taxpayer challenged the bail-out as a violation of the Establishment clause. *Id.* at

12    746–47. The court held that the statute did not expressly contemplate disbursement of

13    congressional appropriations to support religious programs and that there was no reasonable

14    inference that the regulatory responsibilities had a religious nexus. *Id.* at 751–52.

15       In *In re Naval Chaplaincy*, Protestant chaplains alleged that the Navy operated its retirement

16    system to favor Catholic chaplains. 534 F.3d 756, 758 (D.C. Cir. 2008). The legislation

17    established the chaplaincy but made no reference to denomination and did not authorize or

18    mandate the salary and retirement benefits. *Id.* at 762. Similarly, in *Freedom From Religion*

19    *Found., Inc. v. Nicholson*, the plaintiff challenged aspects of the VA's Chaplain Service. 536 F.3d

20    730, 733 (7th Cir. 2008). It conceded that chaplains could perform religious activities but

21    challenged the chaplains' clinical focus, the VA's spiritual assessments of its patients, its

22    provision of pastoral care to outpatients, and its integration of spirituality and religion into

23    treatment programs. *Id.* The Seventh Circuit rejected the challenge because — while Congress

24    mandated that the VA provide medical care to eligible veterans — the statute did not authorize or

25    direct the specific expenditures. *Id.* at 741–42.

26

27

28    [59] Motion to Dismiss — ECF No. 20 at 20–21.

United States District Court
Northern District of California

1

2          In sum, *Flast* drives the outcome here. The government argues that *Hein* illuminates that

3   Congress must authorize the use of federal funds for religious beneficiaries, and that this case —

4   like *Hein* — is a challenge only to agency discretion.[60] But despite the *Hein* plurality's description

5   of Congress's obvious knowledge about religious beneficiaries, the straight application of *Flast*

6   establishes taxpayer standing and the ACLU's ability here to challenge the statute as applied.

7   Also, in the end, the court sees no meaningful difference between *Flast*'s "grants to private

8   schools" and the statutory authorization here for "grants to, and contracts with, voluntary agencies

9   to carry out the requirements" of 8 U.S.C. § 1232 and 6 U.S.C. § 279. 8 U.S.C. § 1232(i).

10

11                                          **CONCLUSION**

12          The court holds that the ACLU had taxpayer standing and denies the government's motion to

13   dismiss.

14          This disposes of ECF No. 20.

15          **IT IS SO ORDERED.**

16          Dated:  November 29, 2016          _____

17                                             LAUREL BEELER
                                               United States Magistrate Judge
18

19

20

21

22

23

24

25

26

27

28   _____
     [60] Reply  at 7–12.