# Exhibit A

Funding Opportunity Announcement:
Residential Services
for Unaccompanied Alien Children
HHS-2014-ACF-ORR-ZU-0608

Case 3:16-cv-03539-LB   Document 120-1   Filed 05/31/18   Page 2 of 173



**Administration for Children and Families**

Office of Refugee Resettlement

Residential Services for Unaccompanied Alien Children
HHS-2014-ACF-ORR-ZU-0608
Application Due Date: 08/13/2013

PRICE_PROD_00001702

Residential Services for Unaccompanied Alien Children
HHS-2014-ACF-ORR-ZU-0608
TABLE OF CONTENTS

Overview
Executive Summary
Section I. Funding Opportunity Description
Section II. Award Information
Section III. Eligibility Information

    1.  Eligible Applicants

    2.  Cost Sharing or Matching

    3.  Other - (if applicable)

Section IV. Application and Submission Information

    1.  Address to Request Application Package

    2.  Content and Form of Application Submission

    3.  Submission Dates and Times

    4.  Intergovernmental Review

    5.  Funding Restrictions

    6.  Other Submission Requirements

Section V. Application Review Information

    1.  Criteria

    2.  Review and Selection Process

    3.  Anticipated Announcement and Award Dates

Section VI. Award Administration Information

    1.  Award Notices

    2.  Administrative and National Policy Requirements

    3.  Reporting

Section VII. Agency Contact(s)
Section VIII. Other Information

**Department of Health & Human Services**
**Administration for Children and Families**

| | |
|---|---|
| **Program Office:** | Office of Refugee Resettlement |
| **Funding Opportunity Title:** | Residential Services for Unaccompanied Alien Children |
| **Announcement Type:** | Initial |
| **Funding Opportunity Number:** | HHS-2014-ACF-ORR-ZU-0608 |
| **Primary CFDA Number:** | 93.676 |
| **Due Date For Letter of Intent:** | **06/24/2013** |
| **Due Date for Applications:** | **08/13/2013** |

**Executive Summary**

**Notices:**

- **On January 1, 2012, the Administration for Children and Families implemented required electronic application submission via www.grants.gov for discretionary grant applications. Please see *Section III.3. Disqualification Factors*, *Section IV.2. Content and Form of Application Submission* and *Application Submission Options*, and *Section IV.3. Explanation of Due Dates and Times* for information on electronic application submission and the availability of exemptions allowing applicants to submit applications in paper format.**

- **This Fiscal Year (FY 2013) ACF has implemented a new application upload requirement. Each applicant applying electronically via www.grants.gov is required to upload only two electronic files, excluding Standard Forms and OMB-approved forms. No more than two files will be accepted for the review, and additional files will be removed. Standard Forms and OMB-approved forms will not be considered additional files. Please see Section IV.2** *Content and Form of Application Submission* **for detailed information on this requirement.**

The Office of Refugee Resettlement/Division of Children's Services (ORR/DCS) provides temporary shelter care and other related services to Unaccompanied Alien Children (UAC) in ORR custody. Shelter care services begin once ORR accepts a UAC for placement and ends when the minor is released from ORR custody, turns 18 years of age, or the minor's immigration case results in a final disposition of removal from the United States. Shelter care and other related services are provided by State-licensed residential shelter care programs in the least restrictive setting appropriate for the UAC's age and special needs. The majority of UAC are expected to remain in ORR custody between 30-35 days, but some will have a longer or shorter length of stay.

ORR is announcing this funding opportunity to seek residential care providers of basic shelters, group homes, staff secure, secure, and other specialized types of care.

**I. Funding Opportunity Description**

**Statutory Authority**

This program is governed by: Section 462 of the Homeland Security Act (6 USC 279); the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (8 USC 1232); the Violence Against Women Reauthorization Act of 2013 (Pub. L. 113-4); the Flores Settlement Agreement; Case No. CV 85-4544RJK (C.D. Cal. 1996); and the Perez-Olano Settlement Agreement, Case No. CV 05-3604 (C.D. Cal., 2010).

All grantees must comply with the pertinent laws, regulations and settlement agreements, and with ORR policies, procedures, and instructions.

**Description**

**BACKGROUND**

The primary function of ORR/DCS is to provide temporary shelter care and other related services to UAC in ORR custody. The Homeland Security Act of 2002 defines UAC as minors:

- Who have no lawful immigration status in the United States;
- Who have not attained 18 years of age; AND
- For whom:
  - There is no parent or legal guardian in the United States; OR
  - No parent or legal guardian in the United States is available to provide care and physical custody.

While the UAC population generally consists of adolescents 12 to 17 years of age with males representing a higher percentage of the overall population, ORR is looking for applicants who can provide services for a diverse population of UAC of all ages and genders as well as pregnant teens. UAC come from all over the world, but the majority is from El Salvador, Honduras, Mexico, and Guatemala. Unless otherwise specified, successful applicants are expected to provide services for UAC from any country.

UAC are in the legal custody of the Federal Government throughout their stay in ORR care but will be in the physical custody of the residential care provider. The majority of UAC are expected to stay in ORR custody between 30-35 days, but a UAC's length of stay with a residential care provider can vary. The size of the entire UAC population in ORR custody will fluctuate depending on the number of UAC the U.S. Department of Homeland Security (DHS) apprehends and UAC immigration case dispositions.

**PROGRAM STRUCTURE**

Each of the program facilities listed is expected to provide all the services under *Program Requirements* unless otherwise noted. The majority of UAC are placed in Basic Shelter and/or Group Home Care. Other levels of care include Therapeutic Group Home; Staff Secure; Therapeutic Staff Secure Group Home; Secure; Residential Treatment Facilities; and Long Term Foster Care.

Residential care providers are required to provide proper physical care and shelter for UAC that includes but is not limited to

suitable living accommodations (e.g., bed, chair, desk, storage for clothing and other personal items), culturally appropriate meals and snacks, several sets of new clothing, and personal grooming items. The facilities are required to have designated common areas, including space for education, recreation, and case management as well as space to hold confidential services, such as health services and counseling.

Services are required to be delivered in an open setting without the need for extraordinary security measures, unless otherwise noted, but care providers are required to also design programs and strategies to discourage runaways and prevent the unauthorized absence of UAC in their care. Residential care providers are required to be located in areas easily accessible to immigration courts, pro bono legal services, national airports, and community mental health and medical service providers.

During an emergency influx of UAC, residential care providers are required to have a plan to safely house *'Basic Shelter Care and/or Group Home'* eligible UAC until beds are available in *Basic Shelter and/or Group Home* care (with the exception of *Secure, Long Term Foster Care, and Residential Treatment Center* providers).

**Basic Shelter Care and/or Group Home**:

Residential care providers operating basic shelters and group homes are required to provide UAC with a child-friendly, least restrictive setting that is appealing to UAC of all ages.

Basic shelter care facilities typically house between 16 and 200 children, depending on State licensing requirements, and group homes typically house between 6 and 18 children. Basic shelters are required to be designed to serve UAC of all ages and backgrounds but with an emphasis on serving a particular subset of UAC, such as young children, pregnant and parenting teens, and UAC with special needs.

The residential care provider's facility are required to be licensed by the State in which it is located and designed to serve UAC of all ages and backgrounds for 30-35 days. Residential care providers are required to anticipate that UAC who require a home study will have a longer length of stay in order to complete the home study process and ensure a safe release. A home study is an in-depth investigation of the UAC's needs and the safety issues related to the UAC.

**Note**: Residential care providers can also apply for ORR/DCS Post Release and Home Study (HHS-2014-ACF-ORR-ZU-0632) Funding Opportunity Announcement.

Residential care providers are required to have a security system to monitor the facility from unauthorized entrance and egress, including the use of alarm systems and video monitoring. All security measures are required to be in compliance with State licensing standards and not pose a threat to the safety of UAC in the event a UAC attempts to run from the facility.

**Therapeutic Group Home**:

Residential care providers operating a therapeutic group home will serve a subset of the UAC population that would benefit from placement in a small, supervised, structured therapeutic environment but do not require the intensive mental health placement services of a residential treatment center (RTC). Therapeutic group homes are required to be an independent cottage or facility that houses up to 12 UAC with 24-hour staffing and provides intensive supervision and structured daily programming. It is preferred that the educational services for UAC in Therapeutic Group Homes be provided in-house in designated classrooms that prevent UAC from commingling with children or adolescents from other programs. More information regarding educational services can be found in *Program Requirements.*

UAC who may qualify for placement in a therapeutic group home include:

- UAC discharged from a residential treatment center or a psychiatric hospital;
- UAC requiring more structure and supervision than what is available in a foster home or shelter care setting in addition to significant mental health services;
- UAC with learning disabilities, mild cognitive impairments, and/or developmental disabilities;
- UAC with a history of alcohol and drug use;
- UAC with documented mental health issues, such as depression, Post Traumatic Stress Disorder (PTSD), and anxiety but whose symptoms do not produce a gross impairment in functioning;
- UAC on psychotropic medication;
- UAC with behavior management concerns but do not warrant a staff-secure or secure placement, particularly young UAC; and/or
- UAC requiring more intensive supervision and therapeutic services because of a history of family violence, sexual abuse/assault, and/or physical/emotional abuse with acute symptoms of trauma that cannot be managed in a regular shelter.

During an emergency influx of UAC, *Therapeutic Group Home* providers are required to have a plan to safely house '*Basic Shelter Care and/or Group Home*' eligible UAC until beds are available in *Basic Shelter and/or Group Home* care.

**Staff-Secure Care**:

PRICE_PROD_00001705

Residential care providers operating a Staff-Secure Care facility will operate a structured, State licensed shelter care facility designed to serve a unique population to include:

- UAC who require close supervision but do not require placement in secure juvenile detention facilities;
- UAC with delinquent behavior, including gang involvement;
- UAC with serious behavior problems; and/or
- UAC who present a low to moderate flight risk.

Staff-secure care providers provide a heightened level of staff supervision, communication, and services for a small population of youth in a basic shelter-like environment. Staff-secure care providers are required to maintain stricter security measures and higher staffing ratios than shelters/group homes in order to control disruptive behavior and discourage flight but should not have lock-down procedures typically associated with juvenile detention facilities. The staff-secure care provider, for example, cannot have strip searches, use of mechanical restraints, cell-like sleeping rooms, or razor wire, but there should be effective monitoring so that entry to and egress from the building is controlled. A staff-secure facility may have a security fence and secure entrance(s) and exit(s).

Staff-secure care providers should provide a heightened level of staff supervision for any and all required community trips (medical, dental, immigration court, etc.). Security and accountability are maintained during transport through procedures, staffing patterns, and effective communication rather than bars, locks, and restraints associated with typical juvenile detention facilities.

Staff-secure care providers should have the capability to control UAC behavior, discourage the flight of high-risk UAC, and maintain constant and continuous supervision of all UAC. For example, staff-secure care providers should have the capability to upgrade to 'one-on one' supervision in the event a UAC is a danger to himself and/or others, and/or a flight risk. In order to prevent flight and/or protect the safety of staff and UAC, the use of physical (hands-on) restraint is authorized in cases where UAC are attempting to flee or cause harm to self or others; but the facility should not exceed the level of restraint permitted by the staff-secure care provider's shelter license. Staff should be trained and competent in the use of behavioral management techniques and other alternatives to mechanical restraints.

Staff-secure care providers should provide specialized services for UAC with substance abuse problems, anger management issues, and/or other special behavioral needs in addtition to the services under *Program Requirements*. As part of case management services, the residential care provider will have to research UAC's delinquent history and community supervision status, if any, of adjudicated delinquents. Finally, staff-secure care providers will monitor the length of stay of all UAC, timely family reunification and releases, and regularly evaluates the UAC's progress for transfer to a less restrictive setting. UAC with extremely disruptive behavior and/or attempts to flee may also be considered for transfer to a secure care provider.

During an emergency influx of UAC, *Staff Secure* providers are required to have a plan to safely house '*Basic Shelter Care and/or Group Home*' eligible UAC until beds are available in *Basic Shelter and/or Group Home* care.

**Therapeutic Staff-Secure Group Home**:

Residential care providers operating a therapeutic staff-secure group home will serve a subset of the UAC population who require a staff-secure placement. This therapeutic staff secure group home will serve UAC who would benefit from placement in a small, supervised, structured therapeutic staff-secure environment but who do not require the intensive mental health placement services of a residential treatment center (RTC). The therapeutic staff-secure group home is required to be an independent cottage or facility that houses up to 12 UAC with 24-hour staffing and provides intensive supervision and structured daily programming. Therapeutic Staff-Secure Group Home educational services are required to be provided in-house and in designated classrooms that prevent the UAC from commingling with children or adolescents from other programs.

UAC who may qualify for placement in a therapeutic staff-secure group home include:

- UAC adjudicated and non-adjudicated delinquents, flight risks, attempts to escape or threats to escape, disruptive behavior in a shelter setting, credible threats to commit a violent act or harm another person, inappropriate sexual behavior, arsonists, and/or a criminal or gang history that does not merit placement in a secure facility;
- UAC being discharged from a residential treatment center or a psychiatric hospital;
- UAC requiring more structure and supervision than what is available in a foster home, shelter care setting, or traditional staff secure;
- UAC with learning disabilities, mild cognitive impairments, and/or developmental disabilities;
- UAC with a history of alcohol and drug use;
- UAC with documented mental health issues, such as depression, PTSD, and anxiety but whose symptoms do not produce a gross impairment in functioning;
- UAC on psychotropic medication;

PRICE_PROD_00001706

- UAC with behavior management concerns, particularly UAC ages 14 and under, but who do not warrant a traditional staff-secure or secure placement; and/or
- UAC requiring more intensive supervision and therapeutic services because of a history of family violence, sexual abuse/assault; and/or physical/emotional abuse with acute symptoms of trauma that cannot be managed in a shelter or traditional staff-secure placement.

All therapeutic staff-secure group home staff should have child welfare experience and key staff positions, as described under *Program Staffing Requirements*, should be filled with individuals with professional mental health experience working with children with criminal backgrounds. The therapeutic staff-secure group home environment should be designed to look and feel like a home. Therapeutic services, at a minimum, should include bi-lingual individual psychotherapy, group counseling, psychiatric/psychological evaluation and care, medication management, and crisis intervention services.

During an emergency influx of UAC, *Therapeutic Staff-Secure Group Home* providers are required to have a plan to safely house '*Basic Shelter Care and/or Group Home*' eligible UAC until beds are available in *Basic Shelter and/or Group Home* care.

**Residential Treatment Center**:

Residential care providers operating a Residential treatment centers (RTC) are required to be licensed as a residential treatment facility in the State in which they are located and are required to also be accredited by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) or an equivalent accreditation agency. RTCs are required to provide services in a highly structured clinical program and have the ability to provide services to UAC with various diagnoses that include, but are not limited:

- Depressive Disorders;
- Oppositional Defiant Disorders;
- Bipolar Disorders;
- Conduct Disorder; and/or
- Attention Deficit Hyperactivity Disorder.

RTCs are required to also be able to treat UAC with a history of psychological, physical, sexual or emotional trauma that usually results in depression, dissociative disorders, or PTSD.

**Secure Care**:

Residential care providers operating a secure facility are required to be licensed in the State in which it is located to provide secure care. The secure care provider manages a specialized population of UAC who have exhibited the following behavior:

- violent or criminal behavior that endangers others (e.g. serious assault; carrying weapons in support of violence; sexual predator offenses);
- serious escape history/risk;
- extremely disruptive/dangerous behavior in a shelter; and/or
- disruptive/dangerous behavior in a staff-secure setting.

Secure care providers should provide or have access to specialized services for UAC with substance abuse problems, anger management issues, and/or other special behavior needs. The provider should also have in-house bilingual mental health/clinician services, including psychiatric evaluations and medication assessment and management. Secure care provider does not need to routinely provide recreational or educational outings outside the secure perimeter of facility. However, any special exceptions for outside trips may be approved by the Project Officer in consultation with the Federal Field Specialist. As part of case management services, the provider will have to research the UAC's delinquent history and community supervision status, if any, of adjudicated delinquents. Finally, the provider will monitor the length of stay of all UAC, timely family reunification and releases, and regularly evaluates the UAC's progress for transfer to a less restrictive setting.

Secure care providers are required to be in full compliance with the U.S. Department of Justice's regulations on National Standards to Prevent, Detect, and Respond to Prison Rape (28 CFR Part 115).

**Long Term Foster Care**:

Residential care providers operating long term foster care programs are required to be licensed in the State in which they are located to provide long term foster care services and are required to meet the needs of UAC by providing quality care in a community setting. ORR recognizes that implementation of ORR instructions and procedures for the care of UAC in a community setting may differ from shelter care settings, specifically in the areas of residential structure, education, recreation, etc. As a community-based form of care, not all services will be provided directly by the long term foster care provider. UAC who may qualify for placement in long term foster care include UAC:

PRICE_PROD_00001707

- with special mental, emotional or physical health needs;
- without an eligible sponsor; and/or
- whose pending immigration case is expected to exceed more than six months.

UAC will access different elements of care in various locations, including but not limited to, public schools, counseling centers, and foster homes. Long term foster care providers, however, remain responsible for ensuring that all required services are properly provided and documented.

## PROGRAM REQUIREMENTS

Residential care providers are required to provide services in a structured, safe, and productive environment that meets or exceeds respective State guidelines, the *Flores Settlement Agreement*, and ORR service requirements.

Residential care providers are required to comply with the United States Department of Health and Human Services (HHS) policy and procedures, regulations, unless otherwise expressly waived in the approved application, and all other applicable Federal statutes and regulations in effect during the time that applicant receives grant funding.

Residential care providers are required to provide or arrange for the program required services in a manner that is sensitive to the age, culture, religion, dietary needs, native language, sexual orientation, gender identity, and other important individual needs of each UAC. All critical services and assessments are required to be administered for all UAC even if they are in ORR custody for a short period of time. Residential care providers are required to have the capacity to provide services in the language the majority of UAC in their facility speak.

**Medical Services**:

Residential care providers are required to provide:

- a complete medical examination (including a screening for infectious diseases) within 48 hours of admission, excluding weekends and holidays, unless the UAC was recently examined at another ORR facility;
- appropriate immunizations in accordance with the U.S. Public Health Service and the Centers for Disease Control and Prevention;
- family planning services
- other appropriate and routine medical and dental care;
- emergency health care services;
- administration of prescribed medication and special diets; and
- appropriate mental health interventions when necessary.

**Mental Health Services**:

Residential care providers are required to provide clinical services, including regular on-site individual and group counseling sessions and an ability to access community mental health services for UAC with special needs. Community mental health services include psychiatric evaluations, treatment, medication assessments and management, crisis intervention, in-patient acute psychiatric care, and other clinical interventions as identified by ORR.

**Individualized Needs Assessments**:

Residential care providers are required to provide an individualized assessment for each UAC, which includes:

1. initial intake and assessment forms (initial intake assessment, psychosocial summary, trauma, and human trafficking assessment) to gather initial information relating to the UAC's journey; the UAC and family's psychosocial assessment; trauma and substance abuse history; information about a UAC's work history or concerns about working to pay off debt; exploitation or trafficking concerns; and other essential data relating to the identification and history of the UAC and his/her family;
2. assessment of the UAC's mental health and identification of any special medical needs, including any specific issues that may require immediate intervention;
3. an educational assessment and plan;
4. ongoing assessment of a UAC's behavioral issues and any previous juvenile justice or criminal involvement;
5. a statement of religious preference and practice;
6. an assessment of the UAC's personal goals, strengths, and weaknesses;
7. identifying information regarding the UAC's immediate family members, other relatives, godparents or friends who may be residing in the U.S. and able to assist in completing a family reunification for the UAC; and
8. completing a staff secure, secure and special secure assessment, where applicable, within two weeks of the UAC's arrival.

**Individual Service Plan**:

PRICE_PROD_00001708

Residential care providers are required to complete a comprehensive and realistic Individual Service Plan for each UAC in accordance with the UAC's needs as determined by the Individualized Needs Assessment, and assessment of any trafficking concerns.  Individual Service Plans are implemented and closely coordinated through an operative clinical assessment and intervention plan as well as a case management system.  In cases where human trafficking is suspected or confirmed, the residential care provider is required to refer the UAC to ORR's Anti-Trafficking in Persons (ATIP) division and provide or refer the UAC for other services to ensure the UAC has access to all services guaranteed by the Trafficking Victims Protection Act of 2008.

**Case Management Services**:

Residential care providers are required to implement and administer a case management system that tracks and monitors a UAC's progress on a regular basis to ensure that each UAC receives the full range of program services in an integrated and comprehensive manner. The residential care provider's case management team is also responsible for maintenance of the ORR/DCS database.  All placement, transfer, and family reunification requests as well as all significant incident reports are processed through this web-based system.  When necessary, the residential care provider's case management staff are required to also work collaboratively with agencies that conduct home studies.

**Individual Counseling**:

Residential care providers are required to provide at least one individual counseling session per week for each UAC.  A qualified and trained mental health clinician conducts the counseling session with the specific objective of assessing and responding to the UAC's mental health needs, reviewing the UAC's progress, establishing new short-term objectives, and addressing the developmental progress, immediate concerns, and crisis-related needs of each UAC.

**Group Counseling**:

Residential care providers are required to provide either two group counseling sessions or one group counseling session and one community meeting every week by a qualified and trained staff member.  Community meetings usually involve the participation of all UAC and provide new UAC with the opportunity to get acquainted with the staff, other UAC, and the rules of the program.  Community meetings provide an open forum for all UAC to discuss and provide input regarding program services, such as recreational activities, food, leisure activities, and program procedures.  Group counseling sessions are required to be provided according to a psycho-educational curriculum that may be adjusted according to the needs of the population.

The topics of group counseling sessions are required to include developmentally appropriate educational and skill-building topics.

**Family Reunification and Release Services**:

Residential care providers are required to develop family reunification and release services to identify appropriate and safe UAC sponsors living in the U.S.  Residential care providers will be responsible for accurately documenting their prompt and continuous efforts to reunify and release UAC to U.S. sponsors in accordance to ORR policies and procedures.  The provision of reunification services will be monitored and evaluated by ORR, and poor performance may result in corrective actions, a high-risk designation, or termination of the agreement.

**Education**:

Educational services are required to be provided daily, Monday through Friday and appropriate to the UAC's level of development, education, and communication skills. Educational services are required to be administered in a structured classroom setting and concentrate primarily on the development of basic academic competencies and secondarily on English Language Training. The educational program should include instruction and educational and other reading material in such languages as needed. The educational program consists of instruction, educational materials, and other reading materials in the following basic academic areas: Science, Social Studies, Mathematics, Reading, Writing, and Physical Education. Educational services are required to serve both short-and long-term needs of UAC. Residential care providers are encouraged to partner with local school districts for the provision of educational services and/or for curriculum.

**Activities**:

Residential care providers are required to ensure that UAC participate in activities according to a recreation and leisure time plan that includes daily outdoor activities, weather permitting, of at least one hour per day of large muscle activity and one hour per day of structured leisure time activities.  (This should not include time spent watching television.)  Activities are required to be increased to a total of 3 hours daily on weekends and other days when school is not in session.

**Acculturation and Adaptation Services**:

Residential care providers are required to provide acculturation and adaptation services that include the development of social and interpersonal skills that contribute to the ability to live independently and responsibly in the community.  Acculturation

and adaptation services may be incorporated into other aspects of the program.

**Orientation**:

Upon admission, residential care providers are required to provide every UAC with a comprehensive orientation that covers the program's intent, services, rules (written and verbal), expectations, and the availability of free legal assistance.

**Religious Access**:

Whenever possible, residential care providers must provide or arrange for access to religious services of the minor's choice.

**Visitation/Phone Calls**:

UAC have the right to make phone calls to family members regardless of the family's immigration status and includes family members located in the UAC's country of origin. UAC also have a right to receive visitors. Attorneys of record are required to have reasonable access to UAC according to ORR/DCS instructions and procedures. Visitations, though, may need to occur off the premises of the residential care provider's facility to ensure the safety and well-being of the UAC and other UAC at the facility.

**Right to Privacy**:

UAC have a reasonable right to privacy that includes the right to: (a) wear his or her own clothes, when available; (b) retain a private space in the residential facility, group, or foster home for the storage of personal belongings; (c) talk privately on the phone, as permitted by the house rules and regulations; (d) visit privately with guests, as permitted by the house rules and regulations; and (e) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

**Legal Services Orientation**:

Residential care providers are required to inform UAC of the availability of free legal assistance, the right to be represented by counsel at no expense to the Federal Government, and the rights victims of trafficking have under the Trafficking Victims Protect Reauthorization Act of 2008. A private space for the UAC and his/her attorney to meet and confer on legal matters should be made available.

**Rules/Behavior Management**:

Residential care providers' program rules and discipline standards are required to be formulated with consideration for the range of ages and maturity levels of UAC in the program and with cultural sensitivity towards all UAC. Residential care providers are required to utilize a positive, strength-based behavior management approach, and shall never subject UAC to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping. Any sanctions employed should not: (a) adversely affect a UAC's health, physical, or psychological well-being; or (b) deny a UAC regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance.

**Transportation/Escort**:

Residential care providers are required to have the capacity to transport UAC to and from local airports and appointments (court, legal, medical, and mental health).

**Vocational Educational Training Program and/or Activities**:

Residential care providers are required to have structured vocational trainings in useful and appropriate skills, such as computer and other technological training, small engine repair, gardening, carpentry, or cooking skills is encouraged. All vocational training is required to be equally available to boys and girls.

**The following is not required but an optional service residential care providers can provide.**

**Digital and Ink-less Fingerprint Services**:

Residential care providers implement and administer digital and/or ink-less fingerprint services for UAC sponsor (sponsor and required adult household member). This service is available to sponsors within a four-hour drive of residential care provider's designated service location. This service includes the following: checking sponsor identification; completing required ORR/DCS background check authorization forms; taking digital fingerprints or ink-less fingerprints; if digital, transmitting digital prints on dedicated phone (land line);faxing routing template, authorization forms/copy of ID to ORR/DCS's security representative; expedited mailing of ink-less prints (two sets) with authorization forms, copy of ID; routing template to ORR/DCS security representative; maintaining log of sponsors served; establish effective bilingual (Spanish) message/phone line to accept appointments; appointments provided no later than three business days from sponsor or case worker's request, preferably sooner; follow guidance and direction from ORR/DCS and ORR/DCS security representative.

**Note**: Budgeting for digital fingerprint equipment and ink-less fingerprint equipment is not necessary. Digital and/or ink-less fingerprint equipment is provided to care providers by ORR/DCSs security representative. Additionally, ORR/DCS security

PRICE_PROD_00001710

representative provides required equipment maintenance and operational supplies. However, applicant provides staff support time; dedicated phone line (land line); copy/faxing services; expedited mailing of ink-less prints.

## PROGRAM STAFFING REQUIREMENTS

Residential care providers are required to hire and retain direct care staff with experience in child welfare, youth work, child care, or a related field. The majority of staff who are responsible for delivering direct care is required to be bilingual in English and the language of the majority of UAC under their care. While Spanish is the primary language of the majority of UAC, access to other languages should be available when necessary. Residential care providers are encouraged to identify direct care staff with a minimum level of education equivalent to a high school diploma or higher.

Residential care providers must conduct criminal background checks for all employees that include past convictions of child and sexual abuse. Residential care providers must also demonstrate a commitment to comply with mandatory State reporting requirements for child abuse and neglect. This includes but is not limited to UAC who have been victims of commercial sexual exploitation.

Because State licensing requirements may differ in each state, ORR has established a minimum standard that includes a national criminal history fingerprint check prior to unsupervised access to UAC. Residential care providers should utilize their established licensing process to complete these background checks. However, if State licensing does not require fingerprint checks, the residential care provider should utilize alternative public or private vendors.

Residential care providers are required to ensure that facilities are staffed 24 hours a day. Staffing ratios and plans follow State licensing requirements and ORR policies and procedures but staff to child ratio recommendations should be no more than 1 to 20 for Clinicians and 1 to 15 for Case Workers.

Residential care providers are also encouraged, when feasible, to dedicate staff positions (full-time and/or part-time) for the following responsibilities: Transportation, Recreation, Health/Medical, and Training.

Residential care providers are required to provide direct training or training opportunities to all staff in accordance with state and/or local licensing requirements and ORR instructions and procedures. Required training topics include but are not limited to behavior management, cultural sensitivity, the applicant's zero tolerance policy towards sexual abuse and sexual harassment, and mental health and child welfare best practices. In addition, staff should receive training on the requirements set forth under: ORR/DCS instructions and policies and procedures; the *Flores Settlement Agreement*; Section 462 of the Homeland Security Act of 2002; Section 235 of the Trafficking Victims Protection Reauthorization Act of 2008; the *Perez-Olano Settlement Agreement*; and the Violence Against Women Reauthorization Act of 2013 (Pub. L. 113-4). ORR will assist by providing opportunities for applicants to attend trainings on identifying victims of human trafficking.

ORR approval is required for hiring the Program Director, Assistant Program Director (if applicable), Lead Clinician, Clinician, and Lead Case Manager. Exceptions to the required minimum qualifications listed require ORR approval.

**Program Director**: The Program Director is responsible for the entirety of the program and its outcomes and is the primary liaison to ORR. The Program Director's primary responsibilities include:

- Overall management of the programmatic, administrative, financial, and operational systems related to the provision of care and services to UAC in accordance with all applicable local, State, and Federal standards, instructions and procedures, regulations, laws, and settlement agreement;
- Provision of regular and timely reports to ORR regarding the care provider's operations, services, and finances in accordance with the care provider's cooperative agreement or statement of work;
- Establishing a workplace environment that is respectful and supportive UAC, staff, and external stakeholders; and
- Elevating any issues or concerns to the designated ORR/PO for the program.

At a minimum, all Program Directors are required to have at least a master's degree in social work (MSW) or an equivalent degree in education, psychology, sociology, or other relevant behavioral science. Alternatively, a Program Director may also qualify with a bachelor's degree in one of the aforementioned behavioral sciences plus five years of experience in child welfare administration, child protective services, program management, or in a director position of a licensed childcare program.

**Assistant Program Director**: The need for an Assistant Program Director will vary depending on the number of UAC served at a care provider facility. The Assistant Director provides support to the Program Director and is required to have a relevant bachelor's degree plus five years of progressive employment experience within a social services or childcare agency or organization.

**Lead Clinician**: Lead Clinicians have all the responsibilities of a Clinician with the added responsibilities of coordinating clinical services, training new clinicians, and supervising the clinical staff. Lead Clinicians are designated when there is more than one Clinician on staff at a care provider. Lead Clinicians are required to have a master's degree in social work (MSW) and two years of postgraduate direct service delivery experience or a master's degree or Ph.D. in psychology, sociology, or

other relevant behavioral science in which clinical experience is a program requirement plus two years of postgraduate direct service delivery experience. Alternatively, a Lead Clinician may also qualify with a bachelor's degree in one of the aforementioned behavioral sciences plus five years of clinical employment experience in the behavioral sciences. Lead Clinicians are also required to have supervisory experience and current licensure.

**Clinicians**: Clinicians conduct mental health assessments for all UAC in care as well as provide ongoing individual and group counseling, screening for human trafficking concerns, and crisis intervention. Clinicians are required to be permanent staff members, unless prior authorization is received from the designated ORR/PO for smaller programs to obtain such services through community-based providers. Clinicians are required to have a master's degree in social work (MSW) and have clinical experience as a part of the master's program requirements. Alternatively, a Clinician may have a Master's degree in psychology, sociology, or other relevant behavioral science in which clinical experience is a program requirement or a bachelor's degree in one of the aforementioned sciences plus five years of clinical employment experience in this area. Clinicians are required to be licensed or license-eligible. License-eligible Clinicians are required to be actively pursuing licensure, and shall obtain licensure as soon as possible.

**Lead Case Worker**: The Lead Case Worker is responsible for coordinating case management and family reunification services, training new case workers, and supervising the work of other case workers. The Lead Case Worker also serves as a Case Worker, who is responsible for assessing the needs of each UAC in care, developing an Individual Service Plan, screening for human trafficking concerns, facilitating the timely release or discharge of the UAC, and documenting the provision of services in each UAC's case file. Case Workers maintain direct contact with each UAC and, to the extent possible, with the UAC's family. Although Case Workers are primarily focused on completing safe and efficient family reunification, they are also responsible for general case management duties regardless of the UAC's release options. Lead Case Workers are required to have a master's degree in the behavioral sciences, human services, or social services fields or, alternatively, a minimum of a bachelor's degree and three years of progressive employment experience in the aforementioned fields that demonstrates supervisory and case management experience. All Case Worker staff are required to be computer proficient.

## BUDGET STRUCTURE

To allow flexibility in the capacity infrastructure, a two-tiered budget is used for this program. The program structure should separate grantee fixed costs from those that would be directly impacted by an increase in capacity.

### Fixed Costs

Fixed Costs would include facility/space, utilities, and core personnel/fringe costs to include administrative staff, licensed administrators, clinical staff and case managers. It would also include additional clinical staff and case managers (at 50 percent of required ratios) so that these staff would already be trained and on board if the emergency expanded level of capacity was requested. Fixed Costs would be detailed by line-item and would support the overall infrastructure to facilitate increases in capacity. For example: Facility/Space-the budget line-item would request funding to support the physical facility with licensed capacity to 96 beds; however, ORR may actually only request 48 beds to be on-line at a particular point in time.

### Child Per Capita Costs

Child Per Capita Costs would include food, clothing, medical needs, stipends, toiletries and child care workers (positions that are ratio-based). These costs would be calculated based on the number of beds actually used at any given time to care for UAC. It would also include the additional 50 percent of clinical staff and case management staff (not included in the fixed costs) to meet required ratios for the expansion capacity. These costs would be totaled into a per capita cost per child. For example: $80 per child X 48 beds X 365 days per year.

Based on apprehension rates, if ORR requested the number of children to increase to 96, fixed costs would already be covered in the budget, and per capita costs which would be calculated at the $80 per child per day rate X the number of days requested. These costs would be covered in a supplemental award.

## II. Award Information

| | |
|---|---|
| Funding Instrument Type: | Cooperative Agreement |
| Estimated Total Funding: | $300,000,000 |
| Expected Number of Awards: | 60 |
| Award Ceiling: | $70,000,000 Per Budget Period |
| Award Floor: | $700,000 Per Budget Period |
| Average Projected Award Amount: | $4,000,000 Per Budget Period |

**Length of Project Periods:**

36-month project with three 12-month budget periods

**Additional Information on Awards:**
**Awards made under this announcement are subject to the availability of federal funds.**

Applications requesting an award amount that exceeds the *Award Ceiling* per budget period or per project period, as stated in this section, will be disqualified from competitive review and from funding under this announcement. This disqualification applies only to the *Award Ceiling* listed for the first 12-month budget period for projects with multiple budget periods. If the project and budget period are the same, the disqualification applies to the *Award Ceiling* listed for the project period. Please see *Section III.3. Application Disqualification Factors.*

**Note:** For those programs that require matching or cost sharing, grantees will be held accountable for projected commitments of non-federal resources in their application budgets and budget justifications by budget period or by project period for fully funded awards, even if the projected commitment exceeds the required amount of match or cost share. **A grantee's failure to provide the required matching amount may result in the disallowance of federal funds.**

Awards will be for the first budget period of the 36-month project period.

Applications for continuation grants funded under these awards beyond the one-year budget period may be awarded on a non-competitive basis, subject to availability of funds, satisfactory performance of the project, capacity needs and a determination that continued funding is in the best interest of the Federal Government.

Based on the availability of funds, ORR anticipates the possibility of supplemental awards based on the need for additional capacity. This program is designed to respond to fluctuations in capacity and must have complete flexibility to expand and reduce beds based on the current needs and immigration patterns. As long as quality services are provided by residential care providers and there is a need for beds, continuations/renewals may apply every budget year until the end of the project period.

**Description of ACF's Anticipated Substantial Involvement Under the Cooperative Agreement**

ORR may issue new UAC policies and procedures in accordance with its legal authority. Each ORR grantee will have 30 days to review the new policy and notify ORR, in writing, that it will comply with the new policy or that it elects to terminate the Cooperative Agreement with the UAC program. If a grantee elects to terminate the relationship with ORR, the grantee must continue to provide services for 60 days from the date of notification under the UAC agreement and policies that were in place prior to the policy change unless ORR elects to terminate the agreement in a shorter time frame.

ORR supports grantees in the following areas:

- The design, implementation, and modification of program activities, services and facilities;
- The design of protocols or procedures;
- The evaluation of contractors (if applicable);
- The approval of key program staff;
- The provision of guidance in the collection and analysis of data;
- The provision of training and technical assistance to shelter staff;
- Select decisions regarding individual case management related activities; and
- The approval of all reunifications for UAC.

ORR monitors grantees reviewing of budgets, mandatory reports, and overall program performance outlined by the ORR/DCS policies and procedures manual.

Please see *Section IV.5 Funding Restrictions* for limitations on the use of federal funds awarded under this announcement.

## III. Eligibility Information
## III.1. Eligible Applicants

- Unrestricted (i.e., open to any type of entity subject to exceptions specified below.)

Care providers are required to be appropriately licensed (at the time of submission of the application) as facilities for the provision of shelter care and other related services to dependent children.

Individuals, foreign entities, and sole proprietorship organizations are not eligible to compete for, or receive, awards under this announcement. See *Section III.3. Other.*

Faith-based and community organizations that meet the eligibility requirements are eligible to receive awards under this funding opportunity announcement. Faith-based organizations are encouraged to review the ACF Policy on Grants to Faith-Based Organizations at: http://www.acf.hhs.gov/acf-policy-on-grants-to-faith-based-organizations.

PRICE_PROD_00001713

### III.2. Cost Sharing or Matching

Cost Sharing / Matching Requirement: No

## III.3. Other

### DUNS Number and System for Award Management Eligibility Requirements (SAM.gov)

All applicants must have a DUNS number (www.dnb.com) and be registered with the System for Award Management (SAM, www.sam.gov) and maintain an active SAM registration until the application process is complete, and should a grant be made, throughout the life of the award. Finalize a new, or renew an existing, registration at least two weeks before the application deadline. This action should allow you time to resolve any issues that may arise. Failure to comply with these requirements may result in your inability to submit your application or receive an award. Maintain documentation (with dates) of your efforts to register or renew at least two weeks before the deadline. See the SAM Quick Guide for Grantees at: https:// www.sam.gov /sam /transcript /SAM_Quick_Guide_Grants_Registrations-v1.6.pdf.

HHS requires all entities that plan to apply for, and ultimately receive, federal grant funds from any HHS Agency, or receive subawards directly from recipients of those grant funds to:

- Be registered in the SAM prior to submitting an application or plan;
- Maintain an active SAM registration with current information at all times during which it has an active award or an application or plan under consideration by an OPDIV; and
- Provide its active DUNS number in each application or plan it submits to the OPDIV.

ACF is prohibited from making an award until an applicant has complied with these requirements. At the time an award is ready to be made, if the intended recipient has not complied with these requirements, ACF:

- May determine that the applicant is not qualified to receive an award; and
- May use that determination as a basis for making an award to another applicant.

### APPLICATION DISQUALIFICATION FACTORS

Applications from individuals, foreign entities, or sole proprietorship organizations will be disqualified from competitive review and from funding under this announcement.

#### Award Ceiling Disqualification

Applications that request an award amount exceeding the *Award Ceiling* per budget period, or per project period, as stated in *Section II. Award Information,* will be disqualified from competitive review and from funding under this announcement. This disqualification applies only to the *Award Ceiling* listed for first 12-month budget period for projects with multiple budget periods. If the project and budget period are the same, the disqualification applies to the *Award Ceiling* listed for the project period.

#### Application Submission Disqualifications

ACF requires electronic submission of applications at www.Grants.gov. Applicants that do not have an Internet connection or sufficient computing capacity to upload large documents to the Internet may contact ACF for an exemption that will allow these applicants to submit an application in paper format. Information on requesting an exemption from electronic application submission is found in *Section IV.2. Application Submission Options.*

**The deadline for electronic application submission is 11:59 p.m., ET, on the due date listed in the *Overview and in Section IV.3. Submission Dates and Times.*** Electronic applications submitted to www.Grants.gov after 11:59 p.m., ET, on the due date, as indicated by a dated and time-stamped email from www.Grants.gov, will be disqualified from competitive review and from funding under this announcement. That is, applications submitted to www.Grants.gov, on or after 12:00 a.m., ET, on the day after the due date will be disqualified from competitive review and from funding under this announcement.

Applications submitted to www.Grants.gov at any time during the open application period, and prior to the due date and time, which fail the Grants.gov validation check, will not be received at or acknowledged by ACF.

Each time an application is submitted via www.Grants.gov, the application will receive a new date and time-stamp email. Only those applications with on-time date and time stamps that result in a validated application, which is transmitted to ACF, will be acknowledged.

The deadline for receipt of paper applications is 4:30 p.m., ET, on the due date listed in the *Overview* and *in Section IV.3. Submission Dates and Times.* Paper applications received after 4:30 p.m., ET, on the due date will be disqualified from competitive review and from funding under this announcement. **Paper applications received from applicants that have not received approval of an exemption from required electronic submission will be disqualified from competitive review and from funding under this announcement.** See "Request an Exemption from Required Electronic Application Submission" in *Section IV.2. Content and Form of Application Submission.*

Applications that are disqualified under any of these circumstances will receive written notification by letter or by email.

# IV. Application and Submission Information

## IV.1. Address to Request Application Package

Shannon McGhee
U.S. Deptarment of Health and Human Services
Administration for Children and Families
Office of Refugee Resettlement
Aerospace Building-370 L'Enfant Promenade SW
8th Floor
Washington, DC 20447
Phone: (202) 205-9513
Fax: (202) 401-1022
Email: shannon.mcghee@acf.hhs.gov

### Electronic Application Submission:
The electronic application submission package is available at www.Grants.gov.

### Applications in Paper Format:
For applicants that have received an exemption to submit applications in paper format, Standard Forms, assurances, and certifications are available at the ACF Funding Opportunities Forms webpage at http://www.acf.hhs.gov/grants-forms. See *Section IV.2.Request an Exemption from Required Electronic Application Submission* if applicants do not have an Internet connection or sufficient computing capacity to upload large documents (files) to www.Grants.gov.

**Standard Forms that are compliant with Section 508 of the Rehabilitation Act (29 U.S.C. § 794d):** Available at the Grants.gov Forms Repository website and at http://www.whitehouse.gov/omb/grants_forms.

### Federal Relay Service:
Hearing-impaired and speech-impaired callers may contact the Federal Relay Service for assistance at 1-800-877-8339 (**TTY** - Text Telephone or **ASCII** - American Standard Code For Information Interchange).

### Section IV.2. Content and Form of Application Submission

### FORMATTING ACF APPLICATIONS

#### *FOR ALL ACF APPLICATIONS:*

#### Authorized Organizational Representative (AOR)

The AOR is an individual(s), named by the applicant/recipient organization, who is authorized to act for the applicant/recipient and to assume the obligations imposed by the federal laws, regulations, requirements, and conditions that apply to grant applications or awards. Each applicant must designate an AOR.

AOR authorization is part of the registration process at www.Grants.gov, where the AOR will create a short profile and obtain a username and password from the Grants.gov Credential Provider. AORs will only be authorized for the DUNS number registered in the System for Award Management (SAM).

#### Point of Contact

In addition to the AOR, a point of contact on matters involving the application must also be identified. The point of contact, known as the Project Director or Principal Investigator, should not be identical to the person identified as the AOR. The point of contact must be available to answer any questions pertaining to the application.

PRICE_PROD_00001715

**Application Checklist**

Applicants may refer to *Section VIII. Other Information* for a checklist of application requirements that may be used in developing and organizing application materials. Details concerning acknowledgment of received applications are available in *Section IV.3. Submission Dates and Times* of this announcement.

**Follow the instructions provided in this application formatting section to ensure that your application does not exceeded the page limitations and can be printed efficiently and consistently for the competitive review.**

**Accepted Font Styles:**

All applicants must use 12-point font in Times New Roman (TNR).

**Page Limitations for Application Submissions**

Applicants must observe the page limitations listed later in this section. Page limitations do not include OMB-approved Standard Forms (SFs) and OMB-approved forms

**All applications must be double-spaced and in Times New Roman, 12-point font.** An application that exceeds the cited page limitation for double-spaced pages in the Project Description file or the Appendices file will have the extra pages removed and these pages will not be reviewed.

Page limitations apply to electronically submitted and paper format applications. For applications that are single-spaced and/or one-and-a-half spaced (in whole or in part, except for the exempted elements listed later in this section) and/or use a font smaller than TNR, 12-point, ACF will use a formula to determine the actual number of pages. The formula counts the number of characters an applicant uses when following the instructions and using 12-point TNR and then compares the resulting number with that of the submitted application. For example, an applicant using TNR, 11-point font, with 1-inch margins all around, and single-spacing, would have an additional 26 lines, or 1500 characters, which is equal to 4/5 of an additional page. Extra pages resulting from this formula will be removed and will not be reviewed.

Be sure to print the Project Description and Appendices documents on paper and count the number of pages for each file before submission. Keep the printed copy as a hard copy of your application for your files.

**Copies Required**

Applicants must submit one complete copy of the application package electronically. Applicants submitting electronic applications need not provide additional copies of their application package.

Applicants submitting applications in paper format must submit one original and two copies of the complete application, including all Standard Forms and OMB-approved forms. The original copy must have original signatures.

**Signatures**

Applicants submitting electronic applications must follow the AOR Authorization and E-Biz POC instructions provided at www.Grants.gov.

The original of a paper format application must include original signatures.

**Accepted Application Format**

With the exception of the required Standard Forms and OMB-approved forms, all application materials must be formatted so that they will print out onto 8 ½" x 11" white paper with 1-inch margins all around. **The Project Description and Appendices files must be numbered separately.** The font size on any scanned documents must be large enough so that it is readable. Do not scan more than one page of a document on a single page. Application pages with two or more pages of a document scanned to it will be removed and will not be reviewed.

**Elements Exempted from Double-Spacing Requirements**

The following elements of the application submission are exempt from the double-spacing requirements listed earlier in this section: the one-page Project Summary/Abstract, required Assurances and Certifications, required Standard Forms, required OMB-approved forms, resumes, logic models, proof of legal status/non-profit status, contracts, and the Budget Justification. These items may be single-spaced. The Project Summary/Abstract is required to be one single-spaced page in 12-point font with 1-inch margins. The Budget Justification may be single-spaced but must be in 12-point font. Resumes must be in 12-point font, but are not required to be double-spaced. The font size on any scanned documents must be large enough so that it is readable.

**ELECTRONIC APPLICATION SUBMISSION INSTRUCTIONS**

Applicants are required to submit their applications electronically unless they have requested and received an exemption that will allow submission in paper format. See *Section IV.2. Application Submission Options* for information about requesting an

exemption.

Electronic applications will only be accepted via www.Grants.gov. **ACF will not accept applications submitted via email or via facsimile.**

**Application Upload Requirements**

**Each applicant is required to upload ONLY two electronic files, excluding Standard Forms and OMB-approved forms. No more than two files will be accepted for the review, and additional files will be removed.  Standard Forms and OMB-approved forms will not be considered additional files.**

ACF strongly recommends that electronic applications be uploaded as Portable Document Files (PDFs). One file must contain the entire Project Description and Budget Justification; the other file must contain all documents required in the Appendices. Details on the content of each of the two files, as well as page limitations for each, are listed later in this section.

To adhere to the two file requirement, applicants may need to convert and/or merge documents together using a PDF converter software. Many recent versions of Microsoft Office include the ability to save documents to the PDF format without need of additional software. Applicants using the Adobe Professional software suite will be able to merge these documents together.  ACF recommends merging documents electronically rather than scanning multiple documents into one document manually, as scanned documents may have reduced clarity and readability.

However, ACF understands that all applicants may not have access to this software. Grants.gov offers a listing of several free PDF conversion programs. These programs can be found on Grants.gov by clicking on 'Applicant Resources' on the far left side of the home page, and then by following the link to 'Download Software' near the top of the screen, or by clicking HERE . Free PDF software is available on this page that will allow users to convert and merge PDF documents. As an example, ACF is providing written instructions on downloading and using one type of free software listed at Grants.gov at the following link: https:// www.acf.hhs.gov/ sites/default/ files/assets/ pdf995_instructions_ for_video.pdf.  A video demonstrating this process is also available at: http://www. youtube.com/ watch?v=lOlv0HwXPsA. ACF does not endorse any of the software listed on Grants.gov, and applicants are not required to use a specific type of PDF conversion software to submit an application.

**NOTE:** Applications submitted via www.Grants.gov will undergo a validation check. See *Section IV.2. Application Submission Options* for more information. The validation check can affect whether the application is accepted for review. If an application fails the Grants.gov validation check and is not resubmitted by 11:59 p.m., ET, on the due date, it will not be transmitted to ACF and will be excluded from the review. If an applicant resubmits their application to Grants.gov by 11:59 p.m., ET, on the due date and the application does not pass the validation check, it will not be transmitted to ACF and will be excluded from the review.

**Required Standard Forms (SFs) and OMB-approved Forms**

Standard Forms (SFs) and OMB-approved forms, such as the SF-424 application and budget forms and the SF-P/PSL (Project/Performance Site Location), are uploaded separately at Grants.gov. These forms are submitted separately from the Project Description and Appendices files. See *Section IV.2. Required Forms, Assurances, and Certifications* for the listing of required Standard Forms, OMB-approved forms, and required assurances and certifications.

**Carefully observe the file naming conventions required by www.Grants.gov**
Limit file names to 50 characters and do not use special characters (example: &,-,*,%,/,#) including periods (.), blank spaces, and accent marks, within application form fields, and file attachment names. An underscore (_) may be used to separate a file name.

**Use only file formats supported by ACF**
It is critical that applicants submit applications using only the supported file formats listed here. While ACF supports all of the following file formats, **we strongly recommend that the two application submission files (Project Description and Appendices) are uploaded as PDF documents in order to comply with the two file upload limitation.** Documents in file formats that are not supported by ACF will be removed from the application and will not be used in the competitive review. This may make the application incomplete and ACF will not make any awards based on an incomplete application.

**ACF supports the following file formats:**

- Adobe PDF – Portable Document Format (.pdf)
- Microsoft Word (.doc or .docx)
- Microsoft Excel (.xls or .xlsx)
- Microsoft PowerPoint (.ppt)
- Corel WordPerfect (.wpd)

PRICE_PROD_00001717

- Image Formats (.JPG, .GIF, .TIFF, or .BMP only)

**Do Not Encrypt or Password-Protect the Electronic Application Files**

If ACF cannot access submitted electronic files because they are encrypted or password protected, the affected file will be removed from the application and will not be reviewed. This removal may make the application incomplete and ACF will not make awards based on an incomplete application.

**FORMATTING FOR PAPER APPLICATION SUBMISSIONS:**

The following requirements are only applicable to applications submitted in paper format. Applicants must receive an exemption from ACF in order for a paper format application to be accepted for review. See *Section IV.2. Request an Exemption from Required Electronic Application Submission* later in this section under *Application Submission Options* for more information.

**Signatures**

An original signature of the AOR is required only on the original copy of paper format application submissions. A point of contact on matters involving the application must be identified on the SF-424 at item 8f. The point of contact, known as the Project Director or Principal Investigator, should not be identical to the person identified as the AOR.

**Format Requirements for Paper Applications**

All application materials must be submitted on 8 ½" x 11" white paper with 1-inch margins. Applications must be in two sections. The first section must contain the entire Project Description and Budget Justification, and the second section must contain all required Appendices. The pages of the two sections must be separately and sequentially numbered.

All copies of mailed or hand-delivered paper applications must be submitted in a single package. If an applicant is submitting multiple applications under a single FOA, or multiple applications under separate FOAs, each application submission must be packaged separately. The package(s) must be clearly labeled for the specific FOA it addresses by FOA title and by Funding Opportunity Number (FON).

Because each application will be duplicated, do not use or include separate covers, binders, clips, tabs, plastic inserts, maps, brochures, or any other items that cannot be processed easily on a photocopy machine with an automatic feed. Do not bind, clip, staple, or fasten in any way separate sections of the application. Applicants are advised that the copies of the application submitted, not the original, will be reproduced by the federal government for review. All application materials must be one-sided for duplication purposes.

Instructions on the order of assembly for paper application submissions are available later in this formatting section.

**Addresses for Submission of Paper Applications**

See *Section IV.6. Other Submission Requirements* for addresses for paper format application submissions.

**Page Limitations and Content of the Application for All Submission Formats:**

ORR is particularly interested in specific factual information and statements of measurable goals in quantitative terms. Project descriptions are evaluated on the basis of substance, not length. Extensive exhibits are not required. Cross-referencing should be used rather than repetition. With the exception of the Standard Forms and OMB-approved forms, the application submission in its entirety (Project Description and Appendices) is limited to 100 pages.

This limitation of 100 pages should be considered a maximum, and not necessarily a goal. Each page should be numbered sequentially.

The Project Description (Narrative) should include the following:

- A one page Project Summary/Abstract;
- Table of Contents;
- Approach;
- Outcomes Expected;
- Organizational Capacity;
- Logic Model;
- Line-item Budget and Budget Justifications; and
- Program Performance Evaluation Plan.

The Appendices should include the following:

- Required Certifications and Assurances;
- Proof of Legal Status;

- A List of Organization's Board of Directors;
- Third-Party Agreements;
- Resumes of Current Staff, and/or Position Descriptions;
- Organizational Chart of Applicant Entity and the Project;
- Letter of Agreement with a Cognizant Federal Agency on Indirect Charges, if applicable;
- Letters of Support; and
- Any Other Information the Applicant Deems Relevant and Necessary.

**Required Forms, Assurances, and Certifications**
**Applicants seeking grant or cooperative agreement awards under this announcement must submit the listed Standard Forms (SFs), assurances, and certifications with the application.** All required Standard Forms, assurances, and certifications are available at ACF Funding Opportunities Forms or at the Grants.gov Forms Repository unless specified otherwise.

| Forms / Assurances / Certifications | Submission Requirement | Notes / Description |
|---|---|---|
| DUNS Number (Universal Identifier) and Systems for Award Management (SAM) registration. | A DUNS number is required of all applicants. To obtain a DUNS number, go to http:// fedgov.dnb. com/ webform. Active registration at the Systems Award Management (SAM) website must be maintained throughout the application and project award period. SAM registration is available at http://www.sam.gov. | A DUNS number and SAM registration are eligibility requirements for all applicants. See *Section III.3. Other* for information on obtaining a DUNS number at http:// fedgov. dnb.com / webform and registration at SAM.gov at http://www.sam.gov. |
| SF-424 - Application for Federal Assistance and SF-P/PSL - Project/Performance Site Location(s) | Submission is required for all applicants by the application due date. | Required for all applications. |
| SF-424A - Budget Information - Non-Construction Programs and SF-424B - Assurances - Non-Construction Programs | Submission is required for all applicants when applying for a non-construction project. Standard Forms must be used. Forms must be submitted by the application due date. | Required for all applications when applying for a non-construction project. By signing and submitting the SF-424B, applicants are making the appropriate certification of their compliance with all federal statutes relating to nondiscrimination. |
| Certification of Filing and Payment of Federal Taxes | Submission of a certification is required prior to award for grantees receiving more than $5,000,000 in Federal funding for the first budget year of a multi-year project; or for grantees receiving more than $5,000,000 in Federal funding for a one-year (12 months) project period; or for grantees receiving more than $5,000,000 in | Applicants are advised of the following requirement contained in Section 523 of the "Departments of Labor, Health and Human Services, and Education and Related Agencies Appropriations Act, 2008," (P.L. 110-161, Division G). This requirement remains in effect:<br><br>    Sec. 523.<br>None of the funds appropriated or otherwise made available by this Act may be used to enter |

| | | |
|---|---|---|
| | Federal funding for a multiyear project to be fully funded. | into a contract in an amount greater than $5,000,000 or to award a grant in excess of such amount unless the prospective contractor or grantee **certifies in writing to the agency awarding the contract or grant** that, to the best of its knowledge and belief, the contractor or grantee has filed all Federal tax returns required during the three years preceding the certification, has not been convicted of a criminal offense under the Internal Revenue Code of 1986, and has not, more than 90 days prior to certification, been notified of any unpaid Federal tax assessment for which the liability remains unsatisfied, unless the assessment is the subject of an installment agreement or offer in compromise that has been approved by the Internal Revenue Service and is not in default, or the assessment is the subject of a non-frivolous administrative or judicial proceeding. [Emphasis Added]<br><br>Accordingly, if applicants request more than $5 million in Federal funds for the first budget year of a multiyear project to be funded in FY 2010, or as a multiyear project to be fully funded in FY 2010, the applicant will be required to submit a certification complying with the requirements, prior to receiving an award. |
| Certification Regarding Lobbying | Submission required of all applicants with the application package.  If it is not submitted with the application package, it may also be submitted prior to the award of a grant. | Submission of this Certification is required for all applications. |
| SF-LLL - Disclosure of Lobbying Activities | If applicable, submission of this form is due at the time of application. | If any funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with this commitment providing for the United States to insure or guarantee a loan, the applicant shall complete and submit the SF-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions. |
| Maintenance of Effort (MOE) Certification | An example of a standard MOE is available at<br>https:// www.acf. hhs. gov/ grants-forms.<br>Submission required for all applicants. | Required for all applications. |
| SF-424 Key Contact Form | Submission is required for all applicants by the application due date. | Required for all applications. |

PRICE_PROD_00001720

**Non-Federal Reviewers**

Since ACF will be using non-federal reviewers in the review process, applicants have the option of omitting from the application copies (not the original) specific salary rates or amounts for individuals specified in the application budget as well as Social Security Numbers, if otherwise required for individuals. The copies may include summary salary information.If applicants are submitting their application electronically, ACF will omit the same specific salary rate information from copies made for use during the review and selection process.

**The Project Description**

**Part I: The Project Description Overview**

**Purpose**

The project description provides the majority of information by which an application is evaluated and ranked in competition with other applications for available assistance.  It should address the activity for which federal funds are being requested, and should be consistent with the goals and objectives of the program as described in *Section I. Funding Opportunity Description*.  Supporting documents should be included where they can present information clearly and succinctly.  When appropriate, applicants should cite the evaluation criteria that are relevant to specific components of their project description.
   Awarding offices use this and other information in making their funding recommendations.  It is important, therefore, that this information be included in the application in a manner that is clear and complete.

**General Expectations and Instructions**

Applicants should develop project descriptions that focus on outcomes and convey strategies for achieving intended performance. Project descriptions are evaluated on the basis of substance and measurable outcomes, not length. Extensive exhibits are not required. Cross-referencing should be used rather than repetition. Supporting information concerning activities that will not be directly funded by the grant or information that does not directly pertain to an integral part of the grant-funded activity should be placed in an appendix.

**Part II: General Instructions for Preparing a Full Project Description**

**Introduction**

Applicants must prepare the project description statement in accordance with the following instructions while being aware of the specified evaluation criteria in *Section V.1. Criteria*.  The text options give a broad overview of what the project description should include while the evaluation criteria identify the measures that will be used to evaluate applications.

**Letter of Intent**

Applicants are strongly encouraged to notify ACF of their intention to submit an application under this announcement. Please submit the letter of intent by the deadline date listed in *Section IV.3* Submission Dates and Times.

 The letter of intent should include the following information: number and title of this announcement; the name and address of the applicant organization; and/or Fiscal Agent (if known); and the name, phone number, fax number and email address of a contact person.

 Letter of intent information will be used to determine the number of expert reviewers needed to evaluate applications. **The letter of intent is optional.**  Failure to submit a letter of intent **will not** impact eligibility to submit an application and **will not** disqualify an application from competitive review.

**Table of Contents**

List the contents of the application including corresponding page numbers. The table of contents must be single spaced and will be counted against the total page limitations.

**Project Summary/Abstract**

Provide a summary of the application's project description. The summary must be clear, accurate, concise, and without reference to other parts of the application. The abstract must include a brief description of the proposed grant project including the needs to be addressed, the proposed services, and the population group(s) to be served.

 Please place the following at the top of the abstract:

- Project Title
- Applicant Name
- Address
- Contact Phone Numbers (Voice, Fax)

PRICE_PROD_00001721

- E-Mail Address
- Web Site Address, if applicable

The project abstract must be single-spaced, in Times New Roman 12-point font, and limited to one page in length. Additional pages will be removed and will not be reviewed.

**Outcomes Expected**

Identify the outcomes to be derived from the project. Outcomes should relate to the overall goals of the project as described in *Section I. Funding Opportunity Description.* If research is part of the proposed work, outcomes must include hypothesized results and implications of the proposed research.

**Approach**

Outline a plan of action that describes the scope and detail of how the proposed project will be accomplished. Applicants must account for all functions or activities identified in the application. Describe any design or technological innovations, reductions in cost or time, or extraordinary social and/or community involvement in the project. Provide a list of organizations, cooperating entities, consultants, or other key individuals that will work on the project, along with a short description of the nature of their effort or contribution.

 Cite potential obstacles and challenges to accomplishing project goals and explain strategies that will be used to address these challenges.

**Program Design and Service Provision**

- Applicants must submit a logic model for designing and managing their project.
- Applicants must describe their overall program designed and provide documentation supporting its ability to provide the required program services indicated in the *Program Services* section of *Section I.*
- Applicants' service delivery must be described in a manner that is sensitive to the culture, native language, and special needs of UAC.
- Applicant's program design must demonstrate that it is appropriate for the target population that the applicant is planning to serve.
- Applicants must demonstrate experience and proficiency in implementing a behavioral management system that utilizes a strength-based approach/model.
- Applicants must describes experience and provide documentation supporting their ability to provide appropriate case management services for UAC population, including developing and updating Individual Service Plans.
- Applicants must demonstrate an ability to comply with the pertinent laws, regulations and settlement agreements, and with ORR policies, procedures, and instructions.
- Applicants must design developmentally appropriate programs that address the specialized and individual needs of all UAC, including vulnerable and traumatized minors.
- Applicants are required to demonstrate a capacity to identify possible victims of human trafficking and other crimes.
- Applicants must demonstrate the ability to process the identification and reunification of UAC to eligible sponsors.

**Program Management**

- Applicants must provide a comprehensive overview of the applicant's organization, including qualifications, history, organizational mission and goals, and lists of all Federal, State, or local funded grants and/or contracts received.
- Applicants must describe their experience in the provision of child welfare services, child protective services, services to children with special needs and/or victims of trafficking, youth outreach, and/or other social services. Demonstration of organizational experience working directly with UAC or cross cultural/international or related services to children from various cultural backgrounds, various language capabilities, and special needs, including vulnerability to human trafficking.
- Applicants must provide documentation of clear organizational structure outlining lines of authority and supervision.
- Applicants must demonstrate staffing plans that provide a sound relationship between the proposed responsibilities of lead program staff, including Program Director, Clinician, and Lead Case Manager, and the educational and professional experience required for the position according to requirements outlined in *Section I, Program Staffing Requirements.*
- As required by State licensing, applicants must provide a detailed plan for completing background checks for applicable staff, contractors, and volunteers
- Applicants must demonstrate a comprehensive plan for coordination of activities and communication between the various program components and with other community and governmental agencies.
- Applicants must demonstrate the ability to provide a comprehensive staff training plan that meets State licensing

requirements, ORR cooperative agreement requirements and includes elements specific to working with the UAC population, prevention and intervention in child abuse and neglect, including local reporting procedures, and staff code of conduct.

- Applicants must demonstrate that case management staff is proficient in using the Internet and related computer programs (i.e., Internet Explorer).

**Administrative and Service Environment**

- Applicants must clearly states the type of facility(ies)  that is(are) being proposed and has tailored their application to address the needs of that type of facility.
- Applicants must describe the facility's accessibility to immigration court, airports, fire, police, and the local community. Applicants must provide evidence on the feasibility of administering a program in the area that is proposed.
- Applicants must clearly describe and/or provide photographs of the proposed facility (including description of sleeping arrangements, food preparation, kitchen and dining area, classrooms, office space, rest rooms, outside recreation areas, and living space).
- Applicants must demonstrate that the facility meets all relevant zoning, licensing, fire, safety, and health codes required to operate a residential based social service program. Applicants must provide detailed information regarding type of State licensure, including information on capacity, age/gender permitted, and length of stay allowable. Any and all documented State licensing allegations/concerns must be reported.
- Applicants must explain and documents facility ownership or leasing agreements.
- Applicants must describe all security measures for the facility and demonstrate they adequately meet the requirements of the program in order to minimize unauthorized absence from the facility, and to monitor those who enter and exit the facility.
- Applicants must provide documented evidence/references or letters of local community support and acceptance of the applicant's program. This could include established relationships with local emergency services (i.e., police, fire), medical and mental health agencies, religious and community organizations, and state licensing offices' recommendations for serving UAC.

**Project Timeline and Milestones**

Provide quantitative monthly or quarterly projections of the accomplishments to be achieved for each function, or activity, in such terms as the number of people to be served and the number of activities accomplished. Data may be organized and presented as project tasks and subtasks with their corresponding timelines during the project period. For example, each project task could be assigned to a row in the first column of a grid. Then, a unit of time could be assigned to each subsequent column, beginning with the first unit (i.e., week, month, quarter) of the project and ending with the last.  Shading, arrows, or other markings could be used across the applicable grid boxes or cells, representing units of time, to indicate the approximate duration and/or frequency of each task and its start and end dates within the project period.

When accomplishments cannot be quantified by activity or function, list them in chronological order to show the schedule of accomplishments and their target dates.

**Program Performance Evaluation Plan**

Applicants must describe the plan for the program performance evaluation that will contribute to continuous quality improvement. The program performance evaluation should monitor ongoing processes and the progress towards the goals and objectives of the project.  Include descriptions of the inputs (e.g., organizational profile, collaborative partners, key staff, budget, and other resources), key processes, and expected outcomes of the funded activities. The plan must be supported by a logic model and must explain how the inputs, processes and outcomes will be measured, and how the resulting information will be used to inform improvement of funded activities.

Applicants must describe the systems and processes that will support the organization's performance management requirements through effective tracking of performance outcomes, including a description of how the organization will collect and manage data (e.g. assigned skilled staff, data management software) in a way that allows for accurate and timely reporting of performance outcomes. Applicants must describe any potential obstacles for implementing the program performance evaluation and how those obstacles will be addressed.

- Applicants must demonstrate effective and resource-efficient strategies for programmatic control, predictability and accountability as evidenced by the program design.
- Applicants must demonstrate evaluation methodology based on performance. Focus will be placed on child welfare practices, particularly child safety, reunification performance and ability to ensure timely and appropriate release for those UAC with potential sponsors. Applicants should demonstrate measures that effectively track performance in this area.

PRICE_PROD_00001723

- Applicants must provide an effective plan for developing and maintaining internal structure, control, and accountability through programmatic means.
- Applicants must demonstrate ability to produce statistical reports to track demographics and performance of program.
- Applicants must demonstrate ability to maintain adequate records, including client files, medical files, financial files and personnel files.
- Applicants must provide documentation of a system that preserves the confidentiality of UAC information and protects the records from unauthorized use or disclosure. The records of UAC are the property of ORR and are required to be provided to ORR upon request.
- Applicants must demonstrate the ability to make regular reports as required by ORR that permit ORR to monitor and enforce the Flores Settlement Agreement, Federal requirements, ORR policies and procedures and other requirements and standards.
- Applicants must demonstrate the ability to implement and maintain an internal client computer database system.
- Applicants must include a plan for assessing performance with regard to the reunification and release process for UAC. Applicants must address how it will monitor the progression of individual cases and include a clear structured timeline with regard to working with each UAC on reunification and/or release.

### Geographic Location

Describe the precise location of the project and boundaries of the area to be served by the proposed project.

### Logic Model

Applicants must submit a logic model for designing and managing their project. A logic model is a tool that presents the conceptual framework for a proposed project and explains the linkages among program elements. While there are many versions of the logic model, they generally summarize the logical connections among the needs that are the focus of the project, project goals and objectives, the target population, project inputs (resources), the proposed activities/processes/outputs directed toward the target population, the expected short- and long-term outcomes the initiative is designed to achieve, and the evaluation plan for measuring the extent to which proposed processes and outcomes actually occur.

### Organizational Capacity

Provide the following information on the applicant organization and, if applicable, on any cooperating partners:

- Organizational charts;
- Resumes (no more than two single-spaced pages in length);
- Financial statements adhering to Generally Accepted Accounting Principles (GAAP), if available, submit statements for up to the two most recently completed fiscal years (this requirement does not apply to start-up organizations);
- Audit reports or statements from Certified Public Accountants/Licensed Public Accountants, if available, submit statements for up to the two most recently completed fiscal years (this requirement does not apply to start-up organizations);
- Copy or description of the applicant organization's fiscal control and accountability procedures;
- Evidence that the applicant organization, and any partnering organizations, have relevant experience and expertise with administration, development, implementation, management, and evaluation of programs similar to that offered under this announcement;
- Evidence that each participating organization, including partners and/or subcontractors, possess the organizational capability to fulfill their role(s) and function(s) effectively;
- Child care licenses and other documentation of professional accreditation;
- Information on compliance with federal/state/local government standards;

### Protection of Sensitive and/or Confidential Information

If any confidential or sensitive information will be collected during the course of the project, whether from staff (e.g., background investigations) or project participants and/or project beneficiaries, provide a description of the methods that will be used to ensure that confidential and/or sensitive information is properly handled and safeguarded. Also provide a plan for the disposition of such information at the end of the project period.

### Third-Party Agreements

Third-party agreements include Memoranda of Understanding (MOU) and Letters of Commitment. General letters of support are **not** considered to be third-party agreements. Third-party agreements must clearly describe the project activities and support to which the third party is committing. Third-party agreements must be signed by the person in the third-party organization with the authority to make such commitments on behalf of their organization.

Provide written and signed agreements between grantees and subgrantees, or subcontractors, or other cooperating entities.

These agreements must detail the scope of work to be performed, work schedules, remuneration, and other terms and conditions that structure or define the relationship.

**Letters Of Support**

Provide statements from community, public, and commercial leaders that support the project proposed for funding. All submissions must be included in the application package.

**Plan for Oversight of Federal Award Funds**

Provide a plan describing how oversight of federal funds will be ensured and how grant activities and partner(s) will adhere to applicable federal and programmatic regulations. Applicants must identify staff that will be responsible for maintaining oversight of program activities, staff, and partner(s). Applicants must describe procedures and policies used to oversee staff and/or partners/contractors.

Describe organizational records systems that relate financial data to performance data by identifying the source and application of federal funds so that they demonstrate effective control over and accountability for funds, compare outlays with budget amounts, and provide accounting records supported by source documentation.

**The Project Budget and Budget Justification**

All applicants are required to submit a project budget and budget justification with their application. The project budget is input on the Budget Information Standard Form, either SF-424A or SF-424C, according to the directions provided with the SFs. The budget justification consists of a budget narrative and a line-item budget detail that includes detailed calculations for "object class categories" identified on the Budget Information Standard Form.

Project budget calculations must include estimation methods, quantities, unit costs, and other similar quantitative detail sufficient for the calculation to be duplicated. If matching or cost sharing is a requirement, applicants must include a detailed listing of any funding sources identified in Block 18 of the SF-424 (Application for Federal Assistance). See the table in *Section IV.2. Required Forms, Assurances, and Certifications* listing the appropriate budget forms to use in this application.

***Special Note:*** *The Consolidated Appropriations Act, 2012 (Pub.L. 112-74), enacted December 23, 2011, limits the salary amount that may be awarded and charged to ACF grants and cooperative agreements. Award funds issued under this announcement may not be used to pay the salary, or any percentage of salary, to an individual at a rate in excess of Executive Level II. The Executive Level II salary of the Federal Executive Pay scale is $179,700 (http://www.opm.gov/oca/12tables/html/ex.asp). This amount reflects an individual's base salary **exclusive** of fringe benefits and any income that an individual may be permitted to earn outside of the duties to the applicant organization. This salary limitation also applies to subawards/subcontracts under a ACF grant or cooperative agreement.*

Provide a budget using the 424A and/or 424C, as applicable, for the first year of the proposed project. Provide a budget justification, which includes a budget narrative budget and a line-item detail, for the first year of the proposed project. The budget narrative should describe how the categorical costs are derived. Discuss the necessity, reasonableness, and allocation of the proposed costs.

Funding for UAC medical services is provided under a separate ORR managed care program and should not be included as a component of the applicant's budget. Applicants, however, must include the cost of coordinating medical, dental, and mental health services.

The Applicant's costs and staffing requirements for periodic escorted transportation of UAC to another ORR facility located in the U.S., as well as to and from local airports, must be reflected in the proposed budget.

Applicants must demonstrate the ability to outline a structure in defining and calculating fixed costs and child per capita costs, as explained in the *Program Requirements* section, that will allow their infrastructure to expand and contract based on the rate of UAC apprehensions. ORR will work with successful applicants in development of a final approved per capita budget for child-related costs.

Applicants budget narrative must describe the budget in detail. The reasonableness and cost-effectiveness of the proposed budget in relation to proposed program activities must be explained.

Applicants and their subcontractor(s), if applicable, must provide a description of an internal financial monitoring system that demonstrates structure and accountability as well as demonstrate effective fiscal management and accountability. A discussion of most recent audit and findings should be included.

Applicants must include all program-related costs in their budget

For profit organizations must clearly demonstrate that they are only charging the program actual cost incurred.

PRICE_PROD_00001725

**General**

Use the following guidelines for preparing the budget and budget justification. When a match or cost share is required, both federal and non-federal resources must be detailed and justified in the budget and budget narrative justification. "Federal resources" refers only to the ACF grant funds for which the applicant is applying. "Non-federal resources" are all other non-ACF federal and non-federal resources. It is suggested that budget amounts and computations be presented in a columnar format: first column, object class categories; second column, federal budget; next column(s), non-federal budget(s); and last column, total budget. The budget justification should be in a narrative form.

**Personnel**

Description: Costs of employee salaries and wages.

Justification: Identify the project director or principal investigator, if known at the time of application. For each staff person provide: the title; time commitment to the project in months; time commitment to the project as a percentage or full-time equivalent: annual salary; grant salary; wage rates; etc. Do not include the costs of consultants, personnel costs of delegate agencies, or of specific project(s) and/or businesses to be financed by the applicant. Contractors and consultants should not be placed under this category.

**Fringe Benefits**

Description: Costs of employee fringe benefits unless treated as part of an approved indirect cost rate.

Justification: Provide a breakdown of the amounts and percentages that comprise fringe benefit costs such as health insurance, Federal Insurance Contributions Act (FICA) taxes, retirement insurance, and taxes.

**Travel**

Description: Costs of out-of-state or overnight project-related travel by employees of the applicant organization. Do not include in-state travel or consultant travel.

Justification: For each trip show the total number of traveler(s); travel destination; duration of trip; per diem; mileage allowances, if privately owned vehicles will be used to travel out of town; and other transportation costs and subsistence allowances. If appropriate for this project, travel costs for key project staff to attend ACF-sponsored workshops/conferences/grantee orientations should be detailed in the budget.

**Equipment**

Description: "Equipment" means an article of nonexpendable, tangible personal property having a useful life of more than one year per unit and an acquisition cost that equals or exceeds the lesser of: (a) the capitalization level established by the organization for the financial statement purposes, or (b) $5,000. (Note: Acquisition cost means the net invoice unit price of an item of equipment, including the cost of any modifications, attachments, accessories, or auxiliary apparatus necessary to make it usable for the purpose for which it is acquired. Ancillary charges, such as taxes, duty, protective in-transit insurance, freight, and installation, shall be included in or excluded from acquisition cost in accordance with the applicant organization's regular written accounting practices.)

Justification: For each type of equipment requested applicants must provide a description of the equipment; the cost per unit; the number of units; the total cost; and a plan for use of the equipment in the project; as well as a plan for the use, and/or disposal of, the equipment after the project ends. An applicant organization that uses its own definition for equipment should provide a copy of its policy, or section of its policy, that includes the equipment definition.

**Supplies**

Description: Costs of all tangible personal property other than that included under the Equipment category. This includes office and other consumable supplies with a per-unit cost of less than $5,000.

Justification: Specify general categories of supplies and their costs. Show computations and provide other information that supports the amount requested.

**Contractual**

Description: Costs of all contracts for services and goods except for those that belong under other categories such as equipment, supplies, construction, etc. Include third-party evaluation contracts, if applicable, and contracts with secondary recipient organizations (with budget detail), including delegate agencies and specific project(s) and/or businesses to be financed by the applicant. This area is not for individual consultants.

Justification: Demonstrate that all procurement transactions will be conducted in a manner to provide, to the maximum

PRICE_PROD_00001726

extent practical, open, and free competition. Recipients and subrecipients, other than states that are required to use 45 CFR Part 92 procedures, must justify any anticipated procurement action that is expected to be awarded without competition and exceeds the simplified acquisition threshold fixed by 41 U.S.C. § 134 and currently set at $100,000. Recipients may be required to make pre-award review and procurement documents, such as requests for proposals or invitations for bids, independent cost estimates, etc., available to ACF.

Note: Whenever the applicant intends to delegate part of the project to another agency, the applicant must provide a detailed budget and budget narrative for each contractor/sub-contractor, by agency title, along with the same supporting information referred to in these instructions. If the applicant plans to select the contractors/sub-contractors post-award and a detailed budget is not available at the time of application, the applicant must provide information on the nature of the work to be delegated, the estimated costs, and the process for selecting the delegate agency.

**Other**

Description: Enter the total of all other costs. Such costs, where applicable and appropriate, may include but are not limited to: consultant costs, local travel; insurance; food (when allowable); medical and dental costs (noncontractual); professional services costs (including audit charges); space and equipment rentals; printing and publication; computer use; training costs, such as tuition and stipends; staff development costs; and administrative costs.

Justification: Provide computations, a narrative description, and a justification for each cost under this category.

**Indirect Charges**

Description: Total amount of indirect costs. This category should be used only when the applicant currently has an indirect cost rate approved by the Department of Health and Human Services (HHS) or another cognizant federal agency.

Justification: An applicant that will charge indirect costs to the grant must enclose a copy of the current rate agreement. If the applicant organization is in the process of initially developing or renegotiating a rate, upon notification that an award will be made, it should immediately develop a tentative indirect cost rate proposal based on its most recently completed fiscal year, in accordance with the cognizant agency's guidelines for establishing indirect cost rates, and submit it to the cognizant agency. Applicants awaiting approval of their indirect cost proposals may also request indirect costs. When an indirect cost rate is requested, those costs included in the indirect cost pool should not be charged as direct costs to the grant. Also, if the applicant is requesting a rate that is less than what is allowed under the program, the authorized representative of the applicant organization must submit a signed acknowledgement that the applicant is accepting a lower rate than allowed.

**Program Income**

Description: The estimated amount of income, if any, expected to be generated from this project. Program income includes, but is not limited to, income from fees for services performed, the use or rental of real or personal property acquired under federally-funded projects, the sale of commodities or items fabricated under an award, license fees and royalties on patents and copyrights, and interest on loans made with award funds.

Justification: Describe the nature, source, and anticipated use of program income in the budget or refer to the pages in the application that contain this information.

**Paperwork Reduction Disclaimer**

As required by the Paperwork Reduction Act of 1995, 44 U.S.C. §§ 3501-3521, the public reporting burden for the Project Description is estimated to average 60 hours per response, including the time for reviewing instructions, gathering and maintaining the data needed, and reviewing the collection information. The Project Description information collection is approved under OMB control number 0970-0139, which expires 10/31/2015. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**Application Submission Options**

**Electronic Submission via www.Grants.gov**

- Additional guidance on the submission of electronic applications can be found at http://www.grants.gov/applicants/get_registered.jsp.
- If applicants encounter any technical difficulties in using www.Grants.gov, contact the Grants.gov Contact Center at: 1-800-518-4726, or by email at support@grants.gov, to report the problem and obtain assistance. Hours of Operation: 24 hours a day, 7 days a week. The Grants.gov Contact Center is closed on federal holidays.
- Applicants should always retain Grants.gov Contact Center service ticket number(s) as they may be needed for future reference.
- **Contact with the Grants.gov Contact Center prior to the listed application due date and time does not ensure acceptance of an application. If difficulties are encountered, the Grants Management Officer listed in *Section***

***VII. Agency Contacts*** will determine whether the submission issues are due to Grants.gov system errors or user error.

**Application Validation at www.Grants.gov**

After an application has been successfully submitted to www.Grants.gov, it still must pass a series of validation checks. After an application is submitted, Grants.gov generates a submission receipt via email and also sets the application status to "Received." This receipt verifies that the application has been successfully delivered to the Grants.gov system.

Next, Grants.gov verifies the submission is valid by ensuring it does not contain viruses, the opportunity is still open, and the applicant login and applicant DUNS number match. If the submission is valid, Grants.gov generates a submission validation receipt via email and sets the application status to "Validated."

If the application is not validated, the application status is set to "Rejected." The system sends a rejection email notification to the applicant and the applicant must re-submit the application package. See "What to Expect After Submitting" at www.Grants.gov for more information.

Each time an application is submitted, or resubmitted, via www.Grants.gov, the application will receive a new date and time stamp. Only those applications with on-time date and time stamps that result in a validated application, which are transmitted to ACF, will be acknowledged.

Applicants will be provided with an acknowledgement from Grants.gov that the submitted application package has passed, or failed, a series of checks and validations. Applications that are submitted on time that fail the validation check will not be transmitted to ACF and will not be acknowledged.

**Request an Exemption from Required Electronic Application Submission**

ACF recognizes that some applicants may have limited or no Internet access, and/or limited computer capacity, which may prohibit them from uploading large files at www.Grants.gov. To accommodate such applicants, ACF offers an exemption from required electronic submission. The exemption will allow applicants to submit hard copy, paper applications by hand-delivery, applicant courier, overnight/express mail couriers, or by other representatives of the applicant.

To receive an exemption from required electronic application submission, applicants must submit a written request to ACF that must state that the applicant qualifies for the exemption for one of the two following reasons:

- Lack of Internet access or Internet connection, or
- Limited computer capacity that prevents the uploading of large documents (files) at www.Grants.gov.

Applicants may request and receive the exemption from required electronic application submission by either:

- Submitting an email request to electronicappexemption@acf.hhs.gov, or
- Sending a written request to the Office of Grants Management Contact listed in *Section VII. Agency Contacts* in this announcement.

Requests for exemption from required electronic application submission will be acknowledged with an approval or disapproval.

Requests that do not state one of the two listed reasons will not be approved.

An exemption is applicable to all applications submitted by the applicant organization during the Federal Fiscal Year (FFY) in which it is received. Applicants need only request an exemption once in a FFY.  Applicants must request a new exemption from required electronic submission for any succeeding FFY.

***Please Note:*** electronicappexemption@acf.hhs.gov **may only be used to request an exemption from required electronic submission.** All other inquiries must be directed to the appropriate Agency Contact listed in *Section VII.* of this announcement. Queries or requests submitted to this email address for any reason other than a request for an exemption from electronic application submission will not be acknowledged or answered.

All exemption requests must include the following information:

- Funding Opportunity Announcement Title,
- Funding Opportunity Number (FON),
- The listed Catalog of Federal Domestic Assistance (CFDA) number,
- Name of Applicant Organization and DUNS Number,
- AOR name and contact information,
- Name and contact information of person to be contacted on matters involving the application (i.e., the Point of Contact), and

- The reason for which the applicant is requesting an exemption from electronic application submission. The request for exemption must state one of the following two reasons: 1) lack of Internet access or Internet connection; or 2) lack of computer capacity that prevents uploading large documents (files) to the Internet.

**Exemption requests must be** *received by* **ACF no later than two weeks before the application due date**, that is, 14 calendar days prior to the application due date listed in the *Overview* and in *Section IV.3. Submission Dates and Times*. If the fourteenth calendar day falls on a weekend or federal holiday, the due date for receipt of an exemption request will move to the next federal business day that follows the weekend or federal holiday.

Applicants may refer to *Section VIII. Other Information* for a checklist of application requirements that may be used in developing and organizing application materials. Details concerning acknowledgment of received applications are available in *Section IV.3. Submission Dates and Times* of this announcement.

**Paper Format Application Submission**

**An exemption is now required for the submission of paper applications. See the preceding section on "***Request an Exemption from Required Electronic Application Submission.***"**

Applicants with exemptions that submit their applications in paper format, by mail or delivery, must submit one original and two copies of the complete application with all attachments. The original and each of the two copies must include all required forms, certifications, assurances, and appendices, be signed by the AOR, and be unbound.  The original copy of the application must have original signature(s). See *Section IV.6.* of this announcement for address information for paper format application submissions.

Applicants may refer to *Section VIII. Other Information* for a checklist of application requirements that may be used in developing and organizing application materials.  Details concerning acknowledgment of received applications are available in *Section IV.3. Submission Dates and Times* in this announcement.

**IV.3. Submission Dates and Times**

**Due Date for Letter of Intent**
Due Date for Letter of Intent: **06/24/2013**
Due Date for Applications: **08/13/2013**

**Explanation of Due Dates**
The due date for receipt of applications is listed in the *Overview* section and in this section. See *Section III.3. Application Disqualification Factors.*

**Electronic Applications**

The deadline for submission of electronic applications via www.Grants.gov is 11:59 p.m., ET, on the due date. Electronic applications submitted at 12:00 a.m., ET, on the day after the due date will be considered late and will be disqualified from competitive review and from funding under this announcement.

Applicants are required to submit their applications electronically via www.Grants.gov unless they received an exemption through the process described in *Section IV.2. Request an Exemption from Required Electronic Application Submission.*

ACF does not accommodate transmission of applications by email or facsimile.

Instructions for electronic submission via www.Grants.gov are available at:
http://www.grants.gov/applicants/apply_for_grants.jsp.

Applications submitted to www.Grants.gov at any time during the open application period prior to the due date and time that fail the Grants.gov validation check will not be received at ACF. These applications will not be acknowledged.

**Mailed Paper Format Applications**

The deadline for mailed paper applications is 4:30 p.m., ET, on the due date. Mailed paper applications received after the due date and deadline time will be considered late and will be disqualified from competitive review and from funding under this announcement.

Paper format application submissions will be disqualified if the applicant organization has not received an exemption through the process described in *Section IV.2. Request an Exemption from Required Electronic Application Submission.*

**Hand-Delivered Paper Format Applications**

Applications that are hand-delivered by applicants, applicant couriers, by overnight/express mail couriers, or other representatives of the applicant must be received on, or before, the due date listed in the *Overview* and in this section. These

applications must be delivered between the hours of 8:00 a.m. and 4:30 p.m., ET,Monday through Friday (excluding federal holidays). Applications should be delivered to the address provided in *Section IV.6.Other Submission Requirements.*

Hand-delivered paper applications received after the due date and deadline time will be considered late and will be disqualified from competitive review and from funding under this announcement.

Hand-delivered paper format application submissions will be disqualified if the applicant organization has not received an exemption through the process described in *Section IV.2. Request an Exemption from Required Electronic Application Submission.*

**No appeals will be considered for applications classified as late under the following circumstances:**

- Applications submitted electronically via www.Grants.gov are considered late when they are dated and time-stamped after the deadline of 11:59 p.m., ET, on the due date.
- Paper format applications received by mail or hand-delivery after 4:30 p.m., ET, on the due date will be classified as late and will be disqualified.
- Paper format applications received from applicant organizations that were not approved for an exemption from required electronic application submission under the process described in *Section IV.2. Request an Exemption from Required Electronic Submission* will be disqualified.

**Extensions and/or Waiving Due Date and Receipt Time Requirements**

ACF may extend an application due date and receipt time when circumstances make it impossible for applicants to submit their applications on time. These events include natural disasters (floods, hurricanes, tornados, etc.), or when there are widespread disruptions of electrical service, or mail service, or in other rare cases. The determination to extend or waive due date and/or receipt time requirements rests with the Grants Management Officer listed as the Office of Grants Management Contact in *Section VII. Agency Contacts.*

**Acknowledgement from www.Grants.gov**

Applicants will receive an initial email upon submission of their application to www.Grants.gov. This email will provide a **Grants.gov Tracking Number**. Applicants should refer to this tracking number in all communication with Grants.gov. The email will also provide a **date and time stamp**, which serves as the official record of application's submission. Receipt of this email does not indicate that the application is accepted or that is has passed the validation check.

Applicants will be provided with an acknowledgement from www.Grants.gov that the submitted application package has passed, or failed, a series of checks and validations. Applications that are submitted on time that fail the validation check will not be transmitted to ACF and will not be acknowledged.

See "What to Expect After Submitting" at www.Grants.gov for more information.

**Acknowledgement from ACF of an electronic application's submission:**

Applicants will be sent additional email(s) from ACF acknowledging that the application has been retrieved from www.Grants.gov by ACF. Receipt of these emails is not an indication that the application is accepted for competition.

**Acknowledgement from ACF of receipt of a paper format application**

ACF will not provide acknowledgement of receipt of hard copy application packages submitted via mail or courier services.

**IV.4. Intergovernmental Review of Federal Programs**

This program is not subject to Executive Order (E.O.) 12372, "Intergovernmental Review of Federal Programs," or 45 CFR Part 100, "Intergovernmental Review of Department of Health and Human Services Programs and Activities." No action is required of applicants under this announcement with regard to E.O. 12372.

**IV.5. Funding Restrictions**

Costs of organized fund raising, including financial campaigns, endowment drives, solicitation of gifts and bequests, and similar expenses incurred solely to raise capital or obtain contributions, are considered unallowable costs under grants or cooperative agreements awarded under this funding opportunity announcement.

**Note:** Costs incurred for grant application preparation are not considered allowable costs under an award and may not be included in the project budget or budget justification.

Grant awards will not allow reimbursement of pre-award costs.

Construction is not an allowable activity or expenditure under this grant award.

PRICE_PROD_00001730

Purchase of real property is not an allowable activity or expenditure under this grant award.

### IV.6. Other Submission Requirements

Submit paper applications to one of the following addresses. See *Section IV.2. Request an Exemption from Required Electronic Application Submission.*

#### Submission By Mail

Robin Bunch
Administration for Children and Families
Office of Grants Management, 6th Floor East
Division of Discretionary Grants
370 L'Enfant Promenade, SW
6th Floor East
Washington, DC 20447

#### Hand Delivery

Robin Bunch
Office of Grants Management
Division of Discretionary Grants
Administration for Children and Families
901 D Street, SW, Aerospace Building
ACF Mailroom, 2nd Floor (near loading dock)
Washington, DC 20024

#### Electronic Submission

See *Section IV.2* for application requirements and for guidance when submitting applications electronically via
http://www.Grants.gov.
For all submissions, see *Section IV.3* for information on due dates and times.

## V. Application Review Information

### V.1. Criteria

**Please note:** Reviewers will not access, or review, any materials that are not part of the application documents. This includes information accessible on websites via hyperlinks that are referenced, or embedded, in the application. Though an application may include web links, or embedded hyperlinks, reviewers will not review this information as it is not considered to be part of the application documents. Nor will the information on websites be taken into consideration in scoring of evaluation criteria presented in this section. Reviewers will evaluate and score an application based on the documents that are presented in the application and **will not** refer to, or access, external links during the objective review.

Applications competing for financial assistance will be reviewed and evaluated using the criteria described in this section. The corresponding point values indicate the relative importance placed on each review criterion. Points will be allocated based on the extent to which the application proposal addresses each of the criteria listed. Applicants should address these criteria in their application materials, particularly in the project description and budget justification, as they are the basis upon which competing applications will be judged during the objective review. The required elements of the project description and budget justification may be found in *Section IV.2* of this announcement.

**PROGRAM DESIGN AND SERVICE PROVISION**                                   **Maximum Points: 30**

The application will be reviewed for the overall program design and ability to adequately provide the required services by evidence of the following:

- The applicant's response and accompanying documentation supporting its ability to provide the required program services indicated in the *Program Services* section of *Section I.* (0-6 points)
- Service delivery is described in a manner that is sensitive to the culture, native language, and special needs of UAC. (0-4 points)
- The extent to which the applicant's program design demonstrates that it is appropriate for the target population that the applicant is planning to serve. (0-3 points)
- The applicant demonstrates experience and proficiency in implementing a behavioral management system that utilizes a strength-based approach/model. (0-3 points)
- The applicant demonstrates an ability to comply with the pertinent laws, regulations and settlement agreements, and with ORR policies, procedures, and instructions. (0-3 points)

- The applicant describes experience and documentation supporting their ability to provide appropriate case management services for UAC population, including developing and updating Individual Service Plans. (0-4 points)
- The applicant incorporates screening for human trafficking in the program design and service provision. (0-3 points)
- The applicant demonstrates the ability to process the identification and reunification of UAC to eligible sponsors. (0-4 points)

**PROGRAM MANAGEMENT**                                                      **Maximum Points: 25**

The application will be reviewed for the capacity of the organization to adequately develop and manage a UAC program by assessing the following:

- A comprehensive overview of the applicant's organization, including qualifications, history, organizational mission and goals, and lists of all Federal, State, or local funded grants and/or contracts received. (0-4 points)
- Experience in the provision of child welfare services, child protective services, services to children with special needs and/or victims of trafficking, youth outreach, and/or other social services. Demonstration of organizational experience working directly with UAC or cross cultural/international or related services to children from various cultural backgrounds, various language capabilities, and special needs, including vulnerability to human trafficking. (0-5 points)
- A clear organizational structure outlining lines of authority and supervision. (0-4 points)
- The extent to which staffing plans demonstrate a sound relationship between the proposed responsibilities of lead program staff, including Program Director, Clinician, and Lead Case Manager, and the educational and professional experience required for the position according to requirements outlined in Section I, Program Staffing Requirements. (0-4 points)
- A comprehensive plan for coordination of activities and communication between the various program components and with other community and governmental agencies. (0-4 points)
- A comprehensive staff training plan that meets State licensing requirements, ORR cooperative agreement requirements and includes elements specific to working with the UAC population, prevention and intervention in child abuse and neglect, including local reporting procedures, and staff code of conduct. (0-3 points)
- Demonstration that case management staff is proficient in using the Internet and related computer programs (i.e., Internet Explorer). (0-1 point)

**BUDGET AND BUDGET JUSTIFICATION**                                         **Maximum Points: 15**

The application will be reviewed for fiscal accountability and reasonableness by assessing the following:

- Structure in defining and calculating fixed costs and child per capita costs that will allow the infrastructure to expand and contract based on the rate of UAC apprehensions. (0-3 points)
- The applicant's budget narrative describing the budget in detail. The reasonableness and cost-effectiveness of the proposed budget in relation to proposed program activities should be explained. (0-4 points)
- The applicant's description of an internal financial monitoring system that demonstrates structure and accountability. (0-2 points)
- The extent to which the applicant and any subcontractor(s) have demonstrated effective fiscal management and accountability. (0-2 points)
- A plan for overall fiscal and program management and accountability. A discussion of most recent audit and findings should be included. (0-2 points)
- Inclusion in the budget of all program-related costs. (0-2 points)

**PROGRAM PERFORMANCE EVALUATION PLAN**                                     **Maximum Points: 15**

The application will be reviewed for evidence of the organization's capacity to manage proper documentation and reporting with regard to the proposed program, including internal accountability and plan for monitoring of performance through evaluation and other measures. Evidence of the following should be provided:

- Effective and resource-efficient strategies for programmatic control, predictability and accountability as evidenced by the program design. (0-2 points)
- Evaluation methodology based on performance. Focus will be placed on child welfare practices, particularly child safety, reunification performance and ability to ensure timely and appropriate release for those UAC with potential sponsors. Applicants should demonstrate measures that effectively track performance in this area. (0-2 points)
- Ability to include a plan for assessing performance with regard to the reunification and release process for UAC. Ability to address how it will monitor the progression of individual cases and include a clear structured timeline with regard to working with each UAC on reunification and/or release. (0-2 points)
- An effective plan for developing and maintaining internal structure, control, and accountability through programmatic means. (0-2 points)
- Ability to produce statistical reports to track demographics and performance of program. (0-1 points)
- Ability to maintain adequate records, including client files, medical files, financial files and personnel files. (0-2 points)

- Ability to make regular reports as required by ORR that permit ORR to monitor and enforce the *Flores Settlement Agreement*, Federal requirements, ORR policies and procedures and other requirements and standards. (0-2 points)
- Ability to implement and maintain an internal client computer database system. (0-2 points)

**ADMINISTRATIVE AND SERIVCE ENVIORNMENT**                                   **Maximum Points: 15**

The application will be reviewed for information regarding the geographic location, community services, and facility design to adequately support program services by assessing the following:

- Applicant clearly states the type of facility that is being proposed and has tailored their application to address the needs of that type of facility. (0-1 point)
- Applicant describes accessibility to immigration court, airports, fire, police, and the local community. Application provides evidence on the feasibility of administering a program in the area that is proposed. (0-3 points)
- Applicant clearly describes and/or provides photographs of the proposed facility (including description of sleeping arrangements, food preparation, kitchen and dining area, classrooms, office space, rest rooms, outside recreation areas, and living space). (0-2 points)
- Applicant demonstrates that the facilty meets all relevant zoning, licensing, fire, safety, and health codes required to operate a residential based social service program. Application provides detailed information regarding type of State licensure, including information on capacity, age/gender permitted, and length of stay allowable. Any and all documented State licensing allegations/concerns must be reported. (0-3 points)
- Applicant explains and documents facility ownership or leasing agreements. (0-2 points)
- Applicant describes all security measures for the facility and demonstrates they adequately meet the requirements of the program in order to minimize unauthorized absence from the facility, and to monitor those who enter and exit the facility. (0-2 points)
- The applicant provides documented evidence/references or letters of local community support and acceptance of the applicant's program. This could include established relationships with local emergency services (i.e., police, fire), medical and mental health agencies, religious and community organizations, and state licensing offices' recommendations for serving UAC. (0-2 points)

## V.2. Review and Selection Process

No grant award will be made under this announcement on the basis of an incomplete application.  No grant award will be made to an applicant or sub-recipient that does not have a DUNS number (www.dbn.com) and an active registration at SAM (www.sam.gov). See *Section III.3. Other*.

**Initial ACF Screening**

Each application will be screened to determine whether it meets one of the following disqualification criteria as described in *Section III.3. Application Disqualification Factors*:

- Applications that are designated as late according to *Section IV.3. Submission Dates and Times*,
- Applications that are submitted in paper format without prior approval of an exemption from required electronic submission (*Section IV.2. Request an Exemption from Required Electronic Application Submission*), or
- Applications with requests that exceed the award ceiling stated in *Section II. Award Information*.

For those applications that have been disqualified under the initial ACF screening, notice will be provided by postal mail or by email. See *Section IV.3. Explanation of Due Dates* for information on Grants.gov's and ACF's acknowledgment of received applications.

**Objective Review and Results**

Applications competing for financial assistance will be reviewed and evaluated by objective review panels using the criteria described in *Section V.1. Criteria* of this announcement. Each panel is composed of experts with knowledge and experience in the area under review. Generally, review panels include three reviewers and one chairperson.

Results of the competitive objective review are taken into consideration by ACF in the selection of projects for funding; however, objective review scores and rankings are not binding. They are one element in the decision-making process.

ACF may elect not to fund applicants with management or financial problems that would indicate an inability to successfully complete the proposed project. Applications may be funded in whole or in part. Successful applicants may be funded at an amount lower than that requested.  ACF reserves the right to consider preferences to fund organizations serving emerging, unserved, or under-served populations, including those populations located in pockets of poverty. ACF will also consider the geographic distribution of federal funds in its award decisions.

ACF may refuse funding for projects with what it regards as unreasonably high start-up costs for facilities or equipment, or for projects with unreasonably high operating costs.

Please refer to *Section IV.2.* of this announcement for information on non-federal reviewers in the review process.

**Approved but Unfunded Applications**

Applications recommended for approval that were not funded under the competition because of the lack of available funds may be held over by ACF and reconsidered in a subsequent review cycle if a future competition under the program area is planned. These applications will be held over for a period of up to one year and will be re-competed for funding with all other competing applications in the next available review cycle. For those applications that have been deemed as approved but unfunded, notice will be given of such determination by postal mail.

## V.3. Anticipated Announcement and Award Dates

Announcement of awards and the disposition of applications will be provided to applicants at a later date.

## VI. Award Administration Information
## VI.1. Award Notices

Successful applicants will be notified through the issuance of a Notice of Award (NOA) that sets forth the amount of funds granted, the terms and conditions of the grant, the effective date of the grant, the budget period for which initial support will be given, the non-federal share to be provided (if applicable), and the total project period for which support is contemplated. The NOA will be signed by the Grants Officer and transmitted via postal mail or email. Following the finalization of funding decisions, organizations whose applications will not be funded will be notified by letter signed by the cognizant Program Office head. Any other correspondence that announces to a Principal Investigator, or a Project Director, that an application was selected is not an authorization to begin performance.

Project costs that are incurred prior to the receipt of the NoA are at the recipient's risk and may be reimbursed only to the extent that they are considered allowable as approved pre-award costs. Information on allowable pre-award costs and the time period under which they may be incurred is available in *Section IV.5. Funding Restrictions.*

## VI.2. Administrative and National Policy Requirements

Awards issued under this announcement are subject to the uniform administrative requirements and cost principles of 45 CFR Part 74 (Awards And Subawards To Institutions Of Higher Education, Hospitals, Other Nonprofit Organizations, And Commercial Organizations) or 45 CFR Part 92 (Grants And Cooperative Agreements To State, Local, And Tribal Governments). The Code of Federal Regulations (CFR) is available at http://www.gpo.gov.

An application funded with the release of federal funds through a grant award does not constitute, or imply, compliance with federal regulations. Funded organizations are responsible for ensuring that their activities comply with all applicable federal regulations.

**Prohibition Against Profit**

Grantees are subject to the limitations set forth in 45 CFR Part 74, Subpart E-Special Provisions for Awards to Commercial Organizations (45 CFR § 74.81_Prohibition against profit), which states that, "... no HHS funds may be paid as profit to any recipient even if the recipient is a commercial organization. Profit is any amount in excess of allowable direct and indirect costs."

**Equal Treatment for Faith-Based Organizations**

Grantees are also subject to the requirements of 45 CFR § 87.1(c), Equal Treatment for Faith-Based Organizations, which says, "Organizations that receive direct financial assistance from the [Health and Human Services] Department under any Department program may not engage in inherently religious activities such as worship, religious instruction, or proselytization, as part of the programs or services funded with direct financial assistance from the Department." Therefore, organizations must take steps to completely separate the presentation of any program with religious content from the presentation of the Federally funded program by time or location *in such a way that it is clear that the two programs are separate and distinct.* If separating the two programs by time but presenting them in the same location, one program must *completely* end before the other program begins.

A faith-based organization receiving HHS funds retains its independence from federal, state, and local governments, and may continue to carry out its mission, including the definition, practice, and expression of its religious beliefs. For example, a faith-based organization may use space in its facilities to provide secular programs or services funded with federal funds without removing religious art, icons, scriptures, or other religious symbols. In addition, a faith-based organization that receives federal funds retains its authority over its internal governance, and it may retain religious terms in its organization's name, select its board members on a religious basis, and include religious references in its organization's mission statements and other governing documents in accordance with all program requirements, statutes, and other applicable requirements governing the conduct of HHS-funded activities.

Regulations pertaining to the Equal Treatment for Faith-Based Organizations, which includes the prohibition against federal funding of inherently religious activities, Understanding the Regulations Related to the Faith-Based and Neighborhood Partnerships Initiative" are available at http://www.hhs.gov/ partnerships/about/r egulations/. Additional information, resources, and tools for faith-based organizations is available through The Center for Faith-based and Neighborhood Partnerships website at http://www.hhs.gov/ partnerships/index.html and at the Capacity BuildingToolkits for Faith-based and Community Organizations.

**Award Term and Condition under the Trafficking Victims Protection Act of 2000**

Awards issued under this announcement are subject to the requirements of Section 106 (g) of the Trafficking Victims Protection Act of 2000, as amended (22 U.S.C. § 7104).  For the full text of the award term, go to http://www.acf.hhs.gov /grants/ award-term- and-condition-for-trafficking- in-persons.  If you are unable to access this link, please contact the Grants Management Contact identified in *Section VII. Agency Contacts* of this announcement to obtain a copy of the term.

**Requirements for Drug-Free Workplace**

The Drug-Free Workplace Act of 1988 (41 U.S.C. §§ 8101-8106) requires that all organizations receiving grants from any federal agency agree to maintain a drug-free workplace. By signing the application, the Authorizing Official agrees that the grantee will provide a drug-free workplace and will comply with the requirement to notify ACF if an employee is convicted of violating a criminal drug statute. Failure to comply with these requirements may be cause for debarment. Government-wide requirements for Drug-Free Workplace for Financial Assistance are found in 2 CFR part 182; HHS implementing regulations are set forth in 2 CFR § 382.400. All recipients of ACF grant funds must comply with the requirements in Subpart B - Requirements for Recipients Other Than Individuals, 2 CFR § 382.225. The rule is available at Requirements for Drug-Free Workplace.

**Debarment and Suspension**

HHS regulations published in 2 CFR Part 376 implement the governmentwide debarment and suspension system guidance (2 CFR Part 180) for HHS' non-procurement programs and activities. "Non-procurement transactions" include, among other things, grants, cooperative agreements, scholarships, fellowships, and loans. ACF implements the HHS Debarment and Suspension regulations as a term and condition of award. Grantees may decide the method and frequency by which this determination is made and may check the Excluded Parties List System (EPLS) located at https://www.sam.gov/, although checking the EPLS is not required. More information is available at  https://www.acf.hhs.gov/ grants-forms.

**Pro-Children Act**

The Pro-Children Act of 2001, 20 U.S.C. §§ 7181 through 7184, imposes restrictions on smoking in facilities where federally funded children's services are provided. HHS grants are subject to these requirements only if they meet the Act's specified coverage. The Act specifies that smoking is prohibited in any indoor facility (owned, leased, or contracted for) used for the routine or regular provision of kindergarten, elementary, or secondary education or library services to children under the age of 18.  In addition, smoking is prohibited in any indoor facility or portion of a facility (owned, leased, or contracted for) used for the routine or regular provision of federally funded health care, day care, or early childhood development, including Head Start services to children under the age of 18. The statutory prohibition also applies if such facilities are constructed, operated, or maintained with federal funds.  The statute does not apply to children's services provided in private residences, facilities funded solely by Medicare or Medicaid funds, portions of facilities used for inpatient drug or alcohol treatment, or facilities where WIC coupons are redeemed.  Failure to comply with the provisions of the law may result in the imposition of a civil monetary penalty of up to $1,000 per violation and/or the imposition of an administrative compliance order on the

responsible entity.

## HHS Grants Policy Statement

The HHS Grants Policy Statement (HHS GPS) is the Department of Health and Human Services' single policy guide for discretionary grants and cooperative agreements. ACF grant awards are subject to the requirements of the HHS GPS, which covers basic grants processes, standard terms and conditions, and points of contact, as well as important agency-specific requirements. Appendices to the HHS GPS include a glossary of terms and a list of standard abbreviations for ease of reference. The general terms and conditions in the HHS GPS will apply as indicated unless there are statutory, regulatory, or award-specific requirements to the contrary that are specified in the Notice of Award (NoA). The HHS GPS is available at https://www.acf.hhs.gov/ grants/ discretionary-competitive-grants.

## Freedom of Information Act (FOIA)

Applications funded by federal grant programs are subject to disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and are frequently requested under the FOIA. In accordance with the FOIA requirement to proactively disclose frequently requested materials at 5 U.S.C. § 552(a)(2)(D), and as part of on-going efforts to promote openness in government programs, ACF will post some of the top-ranked applications funded under this FOA in its online FOIA Reading Room at http://www.acf.hhs.gov/ e-reading-room. As required under the FOIA, each of the top-ranked applications will receive appropriate redaction of specific information to protect personal privacy and competitively sensitive commercial information. Applications chosen for posting to the FOIA Reading Room will be placed on the internet website without further notice to the applicants.

## Other Administrative and National Policy Requirements

The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons. U.S. non-governmental organizations, and their sub-grantees, cannot use U.S. Government funds to lobby for, promote, or advocate the legalization or regulation of prostitution as a legitimate form of work. It is the responsibility of the primary grantee to ensure these criteria are met by its sub-grantees. Accordingly, the grant application must ensure that no monies, if awarded, will be used for these unallowable purposes.

### VI.3. Reporting

Grantees under this funding opportunity announcement will be required to submit performance progress and financial reports periodically throughout the project period. The frequency of required reporting is listed later in this section. Final reports may be submitted in hard copy to the Grants Management Office Contact listed in *Section VII. Agency Contacts* of this announcement. Instructions on submission of reports electronically will be provided with award documents.

## Performance Progress Reports (PPR)

Notice of Award documents will inform grantees of the appropriate performance progress report form or format to use. Grantees should consult their Notice of Award documents to determine the appropriate performance progress report format required under their award. Performance progress reports are due 30 days after the end of the reporting period.

Final program performance reports are due 90 days after the close of the project period. For awards that implement the use of the SF-PPR, that form may be found under "Reporting" at https://www.acf.hhs.gov/ grants-forms.

## Federal Financial Reports (FFR)

As of February 1, 2011, HHS began the transition from use of the SF-269, Financial Status Report (Short Form or Long Form) to the use of the SF-425 Federal Financial Report for expenditure reporting. SF-269s will no longer be accepted for expenditure reports due after that date. If an SF-269 is submitted, the ACF will return it and require the recipient to complete the SF-425.

The transition strategy is allowing individual HHS Operating Divisions to select--from a limited number of options--the approach that best fits their programs and business process. This transition does not affect completion or submission of the cash reporting to the HHS Division of Payment Management's Payment Management System (PMS). The primary features of this transition for recipients are that OPDIVs that previously required electronic submission of the SF-269 will receive the SF-425 expenditure reports electronically and, until further notice, OPDIVs that have been receiving expenditure reports in hard copy will continue to do so.

PRICE_PROD_00001736

All expenditure reports will be due on one of the standard due dates by which cash reporting is required to be submitted to PMS or at the end of a calendar quarter as determined by the Operating Division. As a result, a recipient that receives awards from more than one OPDIV may be subject to more than one approach, but will not be required to change its current means of submission or be subjected to more than eight standard due dates.

Beginning with budget periods which end from January 1 - March 31, 2011, and for all budget periods thereafter, all affected ACF grantees will be required to submit an SF-425 report as frequently as is required in the terms and conditions of their award using due dates for reports to PMS.

**For budget periods ending in the months of: The FFR (SF-425) is due to ACF on:**

| | |
|---|---|
| January 01 through March 31 | April 30 |
| April 01 through June 30 | July 30 |
| July 01 through September 30 | October 30 |
| October 01 through December 31 | January 30 |

Fillable versions of the SF-425 form in Adobe PDF and MS-Excel formats, along with instructions, are available at http://www.whitehouse.gov/ omb/ grants_forms, www.forms.gov, and on at https://www.acf.hhs.gov/ grants-forms. Further instructions will be provided, as necessary, with award terms and conditions that will address specific reporting periods and due dates on an award-by-award basis.

For planning purposes, ACF reporting periods for awards made under this announcement are as follows:

| | |
|---|---|
| Program Progress Reports: | Quarterly |
| Financial Reports: | Semi-Annually |

Awards issued as a result of this funding opportunity may be subject to the Transparency Act subaward and executive compensation reporting requirements of 2 CFR Part 170. See ACF's Award Term for Federal Financial Accountability and Transparency Act (FFATA) Subaward and Executive Compensation Reporting Requirement implementing this requirement and additional award applicability information at https:// www.acf.hhs.gov/ grants/ discretionary-competitive-grants.

**SF-428 Tangible Property Report and SF-429 Real Property Status Report**

As of April 1, 2012, the Administration for Children and Families has been requiring the use of the SF-428 (Tangible Personal Property Form) as well as the SF-429 (Real Property Status Report).

The **SF-428** is a standard form used by awarding agencies to collect information related to tangible personal property (equipment and supplies) when required by a federal financial assistance award. The form consists of the cover sheet, SF-428, and three attachments to be used as required: Annual Report; Final (Award Closeout) Report and a Disposition Request/Report. A Supplemental Sheet, SF-428S, may be used to provide detailed individual item information.

The **SF-429** is a standard report used by recipients of federal financial assistance to report real property status (Attachment A) or to request agency instructions on real property (Attachments B, C) that has been/will be provided as Government Furnished Property (GFP) or acquired (i.e., purchased or constructed) in whole or in part under a federal financial assistance award (i.e., grant, cooperative agreement, etc.). This includes real property that was improved using federal funds and real property that was donated to a federal project in the form of a match or cost share donation. This report is used for awards that establish a federal Interest on real property.

Beginning with budget periods ending September 30, 2012, and for all budget periods thereafter, all ACF grantees are required to submit (as applicable) an SF-428 and SF-429 report as frequently as required in the terms and conditions of their award(s).

The forms are available at http:// www.whitehouse.gov/ omb/ grants_forms.

**VII. Agency Contacts**

**Program Office Contact**

Shannon McGhee
Administration for Children and Families
Office of Refugee Resettlement
Division of Children Services
Aerospace Building-370 L'Enfant Promenade, SW
8th Floor
Washington, DC 20447
Phone: (202) 205-9513
Fax: (202) 401-1022
Email: Shannon.Mcghee@acf.hhs.gov

**Office of Grants Management Contact**

Robin Bunch
Department of Health and Human Services
Administration for Children and Families
Office of Grants Management/Division of Discretionary Grants
370 L'Enfant Promenade, SW
6th Floor East
Washington, DC 20447
Phone: (202) 401-5513
Fax: (202) 205-3449
Email: acfogme-grants@acf.hhs.gov

**Federal Relay Service:**
Hearing-impaired and speech-impaired callers may contact the Federal Relay Service for assistance at 1-800-877-8339 (**TTY** - Text Telephone or **ASCII** - American Standard Code For Information Interchange).

## VIII. Other Information

### Reference Websites

U.S. Department of Health and Human Services (HHS) on the Internet http:// www.hhs.gov/.

Administration for Children and Families (ACF) on the Internet http:// www.acf.hhs.gov/.

Administration for Children and Families - GRANTS homepage https:// www.acf.hhs.gov /grants.

Catalog of Federal Domestic Assistance (CFDA) https:// www.cfda.gov/.

Code of Federal Regulations (CFR)  http:// www.gpo.gov.

United States Code (U.S.C.)  http:// www.gpoaccess.gov /uscode/ .

All required Standard Forms (SF), assurances, and certifications are available on the ACF Grants-Forms page at https:// www.acf.hhs.gov /grants -forms.

Grants.gov Forms Repository webpage at http://www.grants.gov /agencies / aforms_repository_information .jsp.

Versions of other Standard Forms (SF) are available on the Office of Management and Budget (OMB) Grants Management Forms web site at

http:// www. whitehouse.gov /omb /grants_forms/.

For information regarding accessibility issues, visit the Grants.gov Accessibility Compliance Page at http:// www07.grants.gov /aboutgrants / accessibility_compliance.jsp.

Sign up to receive notification of ACF Funding Opportunities at www.Grants.gov

PRICE_PROD_00001738

http:// www.grants.gov / applicants /email_subscription.jsp.

**Application Checklist**

| What to Submit | Where Found | When to Submit |
|---|---|---|
| DUNS Number (Universal Identifier) and Systems for Award Management (SAM) registration. | Referenced in *Section III.3. Other* in the announcement. To obtain a DUNS number, go to http:// fedgov. dnb.com / webform. To register at SAM, go to http:// www.sam. gov. | A DUNS number and registration at SAM.gov are required for all applicants. Active registration at SAM must be maintained throughout the application and project award period. |
| SF-424 - Application for Federal Assistance and SF-P/PSL - Project/Performance Site Location(s) | Referenced in *Section IV.2.Required Forms, Assurances, and Certifications*. Found at http://www.acf.hhs.gov/ grants-forms and at the Grants.gov Forms Repository at http://www.grants.gov/ agencies/ aforms_repository_information.jsp. | Submission is due by the application due date found in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| SF-424A - Budget Information - Non-Construction Programs and SF-424B - Assurances - Non-Construction Programs | Referenced in *Section IV.2. Required Forms, Assurances, and Certifications*. Found at http://www. acf.hhs.gov /grants-forms. For electronic application submission, these forms are available on the FOA's Grants.gov "Download Opportunity Instructions and Application" page under "Download Application Package" in the section entitled, "Optional Documents." These forms are *required* for applications under this FOA: <br>• Projects that include only non-construction activities must submit the SF-424A and SF-424B, along with the SF-424 and SF-P/PSL. | Submission is due by the application due date found in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| SF-424 Key Contact Form | Referenced in *Section IV.2. Required Forms, Assurances, and Certifications*. Found at http://www.acf.hhs.gov/ grants-forms and at the Grants.gov Forms Repository at http://www. grants.gov/ agencies/ aforms_repository_information.jsp. | Submission is due by the application due date found in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| Certification Regarding Lobbying | Referenced in *Section IV.2. Required Forms, Assurances, and Certifications*. Found at http:// www.acf.hhs.gov /grants-forms. | Submission is due with the application package. If it is not submitted with the application package, it may also be submitted prior to the award of a grant. |
| | | |

| | | |
|---|---|---|
| SF-LLL - Disclosure of Lobbying Activities | "Disclosure Form to Report Lobbying" is referenced in *Section IV.2. Required Forms, Assurances, and Certifications.* Found at http://www. acf.hhs.gov /grants-forms. <br><br> If applicable, submission of this form is required if any funds have been paid, or will be paid, to any person for influencing, or attempting to influence, an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with this commitment providing for the United States to insure or guarantee a loan. | If applicable, submission of this form is applicable, it is due prior at the time of application.  It may also be submitted prior to the award of a grant. |
| Maintenance of Effort (MOE) Certification | Referenced in *Section IV.2. Forms, Assurances, and Certifications.*  An example of a standard MOE is available at https:// www.acf. hhs. gov/ grants-forms. <br> Submission is due with the application package. If it is not submitted with the application package, it may also be submitted prior to the award of a grant. | Submission is due by the application due date listed in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| Certification of Filing and Payment of Federal Taxes | Referenced in *Section IV.2. Forms, Assurances, and Certifications* of the announcement. The Certification may be found at http://www.acf.hhs.gov/grants-forms. | If applicable to the applicant, it must be submitted prior to the award of a grant. |
| The Project Description | Referenced in *Section IV.2. The Project Description.*  This is the title for the project narrative that describes the applicant's plan for the project. | Submission is due by the application due date found in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| Third-Party Agreements | Referenced in *Section IV.2. Project Description.* | If available, submission is due by the application due date found in the *Overview* and in *Section IV.3.* If not available at the time of application submission, due by the time of award. |
| Letter of Intent | Referenced in *Section IV.2. Project Description.* | Submission is due by the Letter of Intent due date found in the *Overview* and in *Section IV.3.* |
| Table of Contents | Referenced in *Section IV.2. The Project Description.* | Submission is due as part of the Project Description by the application due date found in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| Letters of Support | Referenced in *Section IV.2. The Project Description.* | Submission is due by the application due date listed in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| | | |

PRICE_PROD_00001740

| Project Summary/Abstract | Referenced in *Section IV.2. The Project Description.* The Project Summary/Abstract is limited to one single-spaced page. | Submission is due by the application due date found in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
|---|---|---|
| Logic Model | Referenced in *Section IV.2. The Project Description.* | Submission is due with the application package by the application due date found in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| The Project Budget and Budget Justification | Referenced in *Section IV.2. The Project Budget and Budget Justification* of the announcement. | Submission of the Project Budget is required on the appropriate Standard Form (424A or 424C) is due by the application due date found in the *Overview* and in *Section IV.3. Submission Dates and Times.* |
| Indirect Cost Rate Agreement (IDR) | Referenced in *Section IV.2. The Project Budget and Budget Justification.* The IDR must be submitted with the application package. | IF the IDR is available by the application due date, it must be submitted with the application package. If it is not available by the application due date listed in the *Overview* and *Section IV.3. Submission Dates and Times*, it may be submitted prior to the award of a grant. |

PRICE_PROD_00001741

# Exhibit B

Federal Defendants' Responses to Plaintiff's First
Set of Interrogatories and Accompanying Chart

CHAD A. READLER
Acting Assistant Attorney General
SHEILA M. LIEBER
Deputy Director
PETER J. PHIPPS (DC Bar 502904)
Senior Trial Counsel
ADAM GROGG
Trial Attorney
Civil Division, Federal Programs Branch
United States Department of Justice
P.O. Box 883 Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-8482
Fax: (202) 616-8470
Email: peter.phipps@usdoj.gov
*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA,<br><br>Plaintiff,<br><br>vs.<br><br>THOMAS E. PRICE, M.D., Secretary of Health and Human Services, *et al.*,<br><br>Defendants. | Civil No. 3:16-cv-3539-LB<br><br>DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO GOVERNMENT DEFENDANTS |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rules 26 and 33 of the local rules of the United States District Court for the District of California San Francisco Division, Defendants, Thomas E. Price, M.D., in his official capacity as Secretary of Health and Human Services ("HHS"), Amanda Barlow, in her official capacity as Acting Assistant Secretary of Administration for Children and Family Services ("ACF"), and E. Scott Lloyd, in his official capacity as Director of Office of Refugee Resettlement ("ORR") (hereafter, collectively "Defendants"), hereby respond to Plaintiff's First Set of Interrogatories to Government Defendants, which were served electronically on counsel for Defendants on March 16, 2017.

**OBJECTIONS AND RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1**

Describe Defendants' interpretation of the extent of their obligations, and their grantees' obligations, under *Flores v. Reno* Settlement Agreement to provide UCs with access to family planning information and services, including abortion.

      **OBJECTIONS:** Defendants object to this interrogatory because it has two discrete subparts: (a) "Defendants' interpretation of the extent of their obligations . . . under *Flores v. Reno* Settlement Agreement to provide UCs with access to family planning information and services, including abortion," and (b) "Defendants' interpretation of the extent of . . . their grantees' obligations[] under *Flores v. Reno* Settlement Agreement to provide UCs with access to family planning information and services, including abortion." This interrogatory therefore constitutes two interrogatories for purposes of the limit of 25 interrogatories. *See* Fed. R. Civ. P. 33(a)(1).

      Both subparts of this interrogatory inquire into pure questions of law, which are entirely independent of any factual allegations in this case, and as such they are objectionable in their entirety and do not require a factual response. *See Everest Nat'l Ins. Co. v. Santa Cruz Cty. Bank*, No. 15-cv-2085, 2016 WL 6311876, at \*4-5 (N.D. Cal. Oct. 28, 2016); *see also Kendrick v. Sullivan*, 125 F.R.D. 1, 3 (D.D.C. 1989).

      **RESPONSE:** Subject to and without waiving these objections, under the *Flores v. Reno* settlement agreement, except in the circumstances identified in paragraphs 12 or 21 of the agreement, Defendants are required to place UCs in HHS custody in a "licensed program," which, per paragraph 6 of the agreement, is defined as meeting the standards set forth in Exhibit 1 to the agreement. Exhibit 1, in turn, states that a licensed program shall provide or arrange for "[a]ppropriate . . . family planning" services for UC. The *Flores v. Reno* settlement agreement did not define "[a]ppropriate . . . family planning services" to include abortion. The *Flores v. Reno* settlement agreement does not discuss "family planning information." The "grantees" referenced in the interrogatory were not signatories to the *Flores v. Reno* settlement agreement.

**INTERROGATORY NO. 2**

Describe Defendants' interpretation of the extent of their obligations, and their grantees' obligations, under regulations implementing the Prison Rape Elimination Act, to provide UCs with access to family planning information and services, including abortion.

**OBJECTIONS:** Defendants object to this interrogatory because it has two discrete subparts: (a) "Defendants' interpretation of the extent of their obligations . . . under regulations implementing the Prison Rape Elimination Act, to provide UCs with access to family planning information and services, including abortion," and (b) "Defendants' interpretation of the extent of . . . their grantees' obligations[] under regulations implementing the Prison Rape Elimination Act, to provide UCs with access to family planning information and services, including abortion." This interrogatory therefore constitutes two interrogatories for purposes of the limit of 25 interrogatories. *See* Fed. R. Civ. P. 33(a)(1).

Both subparts of this interrogatory inquire into pure questions of law, which are entirely independent of any factual allegations in this case, and as such they are objectionable in their entirety and do not require a factual response. *See Everest Nat'l Ins. Co.*, 2016 WL 6311876, at *4-5; *see also Kendrick*, 125 F.R.D. at 3.

**RESPONSE:** Subject to and without waiving these objections, the Prison Rape Elimination Act ("PREA") creates no obligation to provide UCs with access to family planning information and services, including abortion. The Act directed HHS to publish a final rule adopting "national standards for the detection, prevention, reduction, and punishment of rape and sexual assault in facilities that maintain custody of [UC]." 42 U.S.C. § 15607(d)(1). In addition, the Act directed HHS to give "due consideration" to national standards provided by a National Prison Rape Elimination Commission established under 42 U.S.C. § 15606(e). *Id.* § 15607(d)(4). Notably, the Act is directed at events that occur *within* a care provider, and the regulations reflect that standard. *See, e.g.*, 45 C.F.R. § 411.6 (defining sexual abuse to mean: "(1) Sexual abuse of a UC by another UC; and (2) Sexual abuse of a UC by a staff member, grantee, contractor, or volunteer"). Thus, the PREA regulations would not apply to any activities (whether or not stemming from abuse) that resulted in pregnancy but that occurred prior to HHS assuming custody of a UC. The PREA regulations do provide that when abuse of a UC while in

the custody of a care provider occurs, there must be access to "emergency medical treatment, crisis intervention services, emergency contraception, and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care, where appropriate under medical or mental health professional standards." 45 C.F.R. § 411.92(a). However, to date, no circumstance has arisen where that regulatory provision has needed to be invoked in order to provide a UC with access to emergency contraception. Similarly, the PREA regulations state that

> care provider facilities must ensure that female UC victims of sexual abuse by a male abuser while in ORR care and custody are offered pregnancy tests, as necessary. If pregnancy results from an instance of sexual abuse, care provider facility must ensure that the victim receives timely and comprehensive information about all lawful pregnancy-related medical services and timely access to all lawful pregnancy-related medical services. In order for UCs to make informed decisions regarding medical services, including, as appropriate, medical services provided under § 411.92, care provider facilities should engage the UC in discussions with family members or attorneys of record in accordance with § 411.55 to the extent practicable and follow appropriate State laws regarding the age of consent for medical procedures.

45 C.F.R. § 411.93(d). This regulatory provision also has not been invoked to date for pregnancy-related services for a UC, and the circumstances to which the provision applies— sexual abuse of a UC while in the custody of a care provider—have not occurred in such a way that the provision would be triggered. Finally, the preamble to the PREA regulations reiterates the Administration for Children and Families' faith-based policy, and states that

> ORR is mindful that some potential and existing grantees and contractors may have religious or moral objections to providing certain kinds of services, including referrals (for example, for emergency contraception). ORR is committed to providing resources and referrals for the full range of legally permissible services to UCs who need them, helping to facilitate access to these options, and doing so in a timely fashion and in a manner that respects the diverse religious and cultural backgrounds of UCs. At the same time, ORR is also committed to finding ways for organizations to partner with us, even if they object to providing specific services on religious grounds.

79 Fed. Reg. 77,768, 77,784 (Dec. 24, 2014). The remainder of this portion of the preamble explains how organizations might partner with ORR. *See id.* Grantees are not directly bound by the Prison Rape Elimination Act. Grantees do have cooperative agreements with HHS and are subject to regulations implemented to carry out PREA at 45 C.F.R. Part 411.

**INTERROGATORY NO. 3:**

Describe the criteria Defendants have used to transfer UCs between grantees when a UC requests abortion services.

**OBJECTIONS:**  Defendants object to this interrogatory as overbroad and unduly burdensome in that under the instructions, it seeks a response covering the time period from January 1, 2009, until present; Defendants' response is limited to the transfers between grantees under the UC 2015 Funding Opportunity Announcement.  Defendants also object to this interrogatory as overbroad in that it is not limited to the question of transfers due to objections by the transferring grantee; Defendants therefore limit their response to only that situation.

**RESPONSE:** Subject to and without waiving these objections, there are no published criteria governing transfer of UCs when a UC requests abortion services, but, when a UC requested abortion services, and where the religiously-affiliated grantee or subgrantee had objections to such services, the federal field specialist, in conjunction with the central office, effectuated the transfer of the UC.  The UCs were transferred to a facility that did not have an objection and that had available space.

**INTERROGATORY NO. 4**

Identify any criteria, policies, or procedures that govern placement decisions for UCs.

**OBJECTIONS:**  Defendants object to this interrogatory as overbroad and unduly burdensome in that under the instructions, it seeks a response covering the time period from January 1, 2009, until present; Defendants' response is limited to the transfers between grantees under the UC 2015 Funding Opportunity Announcement.  Defendants also object to this interrogatory as vague and ambiguous with respect to the term "placement decisions" on the grounds that the request is overly broad, overly burdensome, and vague in that Plaintiff fails to specify the type of "placement decision"; Defendants do not interpret the phrase as having meaning beyond the topics addressed in their current manuals, to which Defendants refer for their response.

**RESPONSE:**  Subject to and without waiving these objections, pursuant to Federal Rule of Civil Procedure 33(d), Defendants refer Plaintiff to the attached current manuals, section 1 of

Children Entering the United States Unaccompanied (hereafter "Policy Guide"), available on the ORR website, and section 1 of the current Operations Guide.

**INTERROGATORY NO. 5**

Identify any criteria, policies, or procedures that govern transfers of UCs between grantees.

**OBJECTIONS:** Defendants object to this interrogatory as overbroad and unduly burdensome in that under the instructions, it seeks a response covering the time period from January 1, 2009, until present; Defendants' response is limited to the transfers between grantees under the UC 2015 Funding Opportunity Announcement. Defendants also object on the grounds that the request is overly broad and vague in that it fails to specify the types of transfers or any particulars about the UC that would prompt the transfer; Defendants' response is limited to transfers based on requests for abortion.

**RESPONSE:** Subject to and without waiving these objections, pursuant to Federal Rule of Civil Procedure 33(d), Defendants refer Plaintiffs to the attached manuals, specified in the Response to Interrogatory No. 5, as well as §§ 2.3.1, 2.3.2, 2.3.3, 3.2, 3.3.1, 3.3.2, 3.3.5, 3.3.14, 3.4.7, 3.4.8, 3.6.1, 3.6.2, 3.6.3, 4.6.3, 4.9.3, 4.10.2, and 5.5.1 of the attached Policy Guide, as well as §§ 3.1.3 3.1.4, 3.2.2, 3.2.3, 3.2.4, and 3.2.5 of the attached Operations Guide.

**INTERROGATORY NO. 6**

Describe the reproductive health care needs of UCs, and identify any studies on which Defendants rely to describe those needs.

**OBJECTIONS:** Defendants object to this interrogatory because it has two discrete subparts: (a) a request to "[d]escribe the reproductive health care needs of UCs," and (b) a request to "identify any studies on which Defendants rely to describe those needs." This interrogatory therefore constitutes two interrogatories for purposes of the limit of 25 interrogatories. *See* Fed. R. Civ. P. 33(a)(1). Defendants further object to this interrogatory as vague and ambiguous with respect to the undefined term "reproductive health care needs." Defendants further object to the term "studies" as being vague and ambiguous, in that it could apply to internal agency studies, published scholarship, or private unpublished research.

1
2
3
4

**RESPONSE:**  Subject to and without waiving these objections, Defendants state that different UCs have different health care needs and that the vast majority do not make requests for abortion or contraception.  Defendants do not rely on any studies to define "reproductive health care needs."

5

**INTERROGATORY NO. 7**

6
7

State whether Defendants have allowed any grantee in the UC program to refuse to allow UC access to the HPV vaccine.

8
9
10

**OBJECTIONS:**  Defendants object on the grounds that this interrogatory is vague and ambiguous with respect to the term "grantee in the UC program"; Defendants interpret that phrase to mean a direct grantee under the UC 2015 Funding Opportunity Announcement.

11
12
13

**RESPONSE:**   Subject to and without waiving these objections, Defendants have not allowed a direct grantee under the UC 2015 Funding Opportunity Announcement to refuse to allow UCs access to the HPV vaccine.

14

**INTERROGATORY NO. 8**

15
16

Identify how much money Defendants awarded to USCCB, Youth for Tomorrow, His House, Upbring, and any Catholic Charities to care for UCs for each year starting in 2014.

17
18
19
20
21

**OBJECTIONS:**  Defendants object on the basis that the phrase "for each year starting in 2014" is vague and ambiguous as it could mean calendar year or fiscal year; Defendants interpret the phrase to mean fiscal year, and for grantees providing residential services to UC.  Based on this objection, Defendants answer beginning in fiscal year 2015 for the UC program, which began October 1, 2014.

22
23
24

**RESPONSE:**  Subject to and without waiving said objections, Defendants provide information for direct grantees under UC residential service programs, beginning in fiscal year 2015.

25
26
27
28

| Grantee | FY 2015 | FY 2016 | FY 2017 | Total |
|---|---|---|---|---|
| USCCB | 5,796,773 | 9,150,773 | 7,717,451 | 22,664,997 |
| Youth for Tomorrow | 9,204,256 | 15,420,111 | 11,428,449 | 36,052,816 |
| His House | 8,948,688 | 8,846,102 | 12,149,300 | 29,944,090 |
| Upbring[1] | 2,625,105 | 2,533,604 | | 5,158,709 |
| Lutheran Social Services of the South, Inc. | | | 19,617,084 | 19,617,084 |
| Catholic Guardian Services | 6,014,900 | 4,406,462 | 7,763,887 | 18,185,249 |
| Catholic Charities of The Archdiocese of Miami, Inc. | 4,420,203 | 6,271,302 | 5,296,886 | 15,988,391 |
| Catholic Charities Houston-Galveston | 5,897,457 | 8,080,518 | 6,704,856 | 20,682,831 |
| Total | $42,907,382 | $54,708,872 | $70,677,913 | $168,294,167 |

**INTERROGATORY NO. 9**

Identify any statistics compiled or relied upon by Defendants about UCs who were transferred because a grantee had a religious objection to their request for reproductive health care, including abortion.

   **OBJECTIONS:**  Defendants object to this interrogatory as vague and ambiguous with respect to the undefined term "reproductive health care."

   **RESPONSE:**  Subject to this objection and without waiving this objection, in response to this litigation, Defendants have compiled the attached table.

**INTERROGATORY NO. 10**

Identify any statistics compiled or relied upon by Defendants about UCs who requested, but were ultimately unable to receive, reproductive health care, including abortion.

   **OBJECTIONS:**  Defendants object to this interrogatory as vague and ambiguous with respect to the undefined term "reproductive health care."

---

[1] Upbring changed its name to Lutheran Social Services South Inc. in 2017.

1      **RESPONSE:** Subject to this objection and without waiving this objection, Defendants

2   refer to the table provided in response to Interrogatory No. 9.

3   **INTERROGATORY NO. 11**

4   Describe the reproductive health care needs of trafficking victims, and identify any studies on

5   which Defendants rely to describe those needs.

6      **OBJECTIONS:**  Defendants object to this interrogatory because it has two discrete

7   subparts: (a) a request to "[d]escribe the reproductive health care needs of human trafficking

8   victims," and (b) a request to "identify any studies on which Defendants rely to describe those

9   needs."  This interrogatory therefore constitutes two interrogatories for purposes of the limit of

10   25 interrogatories.  *See* Fed. R. Civ. P. 33(a)(1).  Defendants further object to this interrogatory

11   as vague and ambiguous with respect to the undefined term "reproductive health care needs."

12   Defendants further object to the term "studies" as being vague and ambiguous, in that it could

13   apply to internal agency studies, published scholarship, or private unpublished research.

14   Defendants also object to the term "human trafficking victims" as vague, ambiguous, and

15   potentially overbroad and unduly burdensome; Defendants construe that phrase to mean foreign

16   victims of human trafficking who could be served by HHS's Trafficking Victim Assistance

17   Program ("TVAP").

18      **RESPONSE:**  Subject to and without waiving these objections, Defendants state that

19   each foreign victim of trafficking has different health care needs.  Defendants do not rely on any

20   studies to describe "reproductive health care needs."

21   **INTERROGATORY NO. 12**

22   Identify any statistics about human trafficking victims who requested access to, but were

23   ultimately unable to receive, reproductive health care, including abortion.

24      **OBJECTIONS:**  Defendants object to this interrogatory as vague and ambiguous with

25   respect to the undefined term "reproductive health care."

26      **RESPONSE:** Subject to and without waiving these objections, Defendants are not aware

27   of any victims of trafficking under the TVAP who requested, but ultimately did not receive

28   reproductive health care, including abortion.  Defendants do not maintain statistics on this issue.

1

2   **INTERROGATORY NO. 13**

3   Describe Defendants' reason(s) for allowing USCCB to only select subgrantees/subrecipients for

4   the trafficking grant that share USCCB's religious opposition to reproductive health care and

5   marriage for same-sex couples.

6        **OBJECTIONS:**  Defendants object to this interrogatory as vague and ambiguous with

7   respect to the undefined term "reproductive health care."  Defendants object to the phrase "for

8   the trafficking grant" as vague and ambiguous; Defendants interpret that phrase to mean grants

9   provided under TVAP.  Defendants further object because the word "allowing" is misleading to

10  the extent that it implies that Defendants in practice maintain considerable involvement in each

11  selection of "subgrantees/subrecipients" for the TVAP, and to the extent it implies that USCCB's

12  application referenced same-sex marriage vis-à-vis subgrantees/subrecipients.

13       **RESPONSE:**  Subject to and without waiving these objections, in identifying grantees

14  for the 2015 TVAP Funding Opportunity Announcement, Defendants sought to provide benefits

15  and services to foreign victims of a severe form of trafficking in persons, potential victims, and

16  all other eligible individuals under the Funding Opportunity Announcement.  USCCB scored

17  highly in the grant review process, was determined to comply with the Funding Opportunity

18  Announcement, and was awarded a grant.

19  **INTERROGATORY NO. 14**

20  Identify how much money was awarded to USCCB to care for trafficking victims starting each

21  year in 2015.

22       **OBJECTIONS:**  Defendants object on the basis that this interrogatory is vague and

23  ambiguous in that it fails to identify the source of the "money that was awarded"; Defendants

24  interpret this phrase as meaning funds awarded under a grant for the TVAP.  Defendants further

25  object to the phrase "starting each year in 2015" as unintelligible, as it is not clear what it means

26  for a year to start "in 2015"; Defendants also object that the phrase "each year" is vague and

27  ambiguous as it could mean calendar year or fiscal year; Defendants interpret this interrogatory

28

as seeking an identification of funds awarded under a TVAP grant to USCCB from fiscal year 2015, which began October 1, 2014, until present.

**RESPONSE:**  Subject to and without waiving these objections, USCCB received TVAP grant awards in the amount of $2,099,855 in Fiscal Year ("FY") 2015 and $2,099,855 in FY16. The FY16 award included a $450,000 offset from FY15 and $1,649,855 from the FY16 budget.

**INTERROGATORY NO. 15**

Identify the amount of Trafficking Victims Assistance Program funds received by each participating recipient or sub-recipient in Delaware, Washington, D.C., Maryland, Pennsylvania, Virginia, West Virginia, Arkansas, Louisiana, New Mexico, Oklahoma, and Texas.

**OBJECTIONS:**  Defendants object on the grounds that the request is vague and ambiguous with respect to the phrase "participating recipient or sub-recipient"; Defendants interpret that phrase as referring to grantees and subawardees, but not foreign victims of human trafficking served by the TVAP.

**RESPONSE:**  Subject to and without waiving these objections, Defendants state in response to this interrogatory that the Office of Trafficking in Persons ("OTIP") does not collect or maintain funding information at the subawardee level, as subawardees do not receive funding directly from OTIP.  At the grantee level, OTIP provides TVAP grant award amounts for USCCB (located in Washington, D.C.) and the U.S. Committee for Refugees and Immigrants ("USCRI") (located in Virginia): the total TVAP grant award for USCCB is noted above in response to Interrogatory 14; the total FY15 grant award to USCRI was $4,399,578 and total FY16 grant award to USCRI is $3,810,000.

**INTERROGATORY NO. 16**

Describe the process by which Defendants decide how much funding to award each participant in the Trafficking Victims Assistance Program.

**OBJECTIONS:**  Defendants object on the grounds that the request is vague and ambiguous with respect to the phrase "each participant in the Trafficking Victims Assistance Program"; Defendants interpret that phrase as referring to direct grantees receiving funding under the 2015 TVAP Funding Opportunity Announcement, but not subawardees or foreign

victims of human trafficking served by the TVAP.  Defendants also object that the phrase "the process" is vague and ambiguous, and potentially unduly burdensome if it is construed to request a description of the entire grant cycle.

**RESPONSE:**  Subject to and without waiving these objections, Defendants state that in determination of funding awards to each direct grantee, they considered the grant application, including the proposed regional coverage, the number of certified victims in the State, and geographical coverage proposed and awarded.  To add an additional layer of specificity, Defendants state that projections were made for the first year of the award, and the three grantees ultimately selected were funded consistent with those projections, with the knowledge that adjustments to funding amounts could be made for subsequent years in the project period.

May 4, 2017                                    As to objections,

                                               CHAD A. READLER
                                               Acting Assistant Attorney General

                                               SHEILA M. LIEBER
                                               Deputy Director

                                               /s/ *Peter J. Phipps*
                                               PETER J. PHIPPS
                                               ADAM GROGG (N.Y. Bar)
                                               Civil Division, Federal Programs Branch
                                               United States Department of Justice

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATION OF JONATHAN WHITE**

I certify under penalty of perjury that the foregoing response to interrogatories 1-10 with respect to the UC program are true and correct to the best of my knowledge, information, belief, understanding and recollection.

Dated:  4· MAY - 2017

Jonathan White

Page **13** of **15**

**CERTIFICATION OF KATHERINE CHON**

I certify under penalty of perjury that the foregoing response to interrogatories 11-16 with respect to the TVAP program are true and correct to the best of my knowledge, information, belief, understanding and recollection.

Date: _May 4, 2017_

_[signature]_

Katherine Chon

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that I served Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories to plaintiff's counsel at bamiri@aclu.org and to counsel for USCCB at rdunn@gibsondunn.com.

May 4, 2017                                          /s/ *Peter J. Phipps*
                                                     Peter J. Phipps
                                                     Counsel for Defendants

| Program | Location | Total number of requests for abortion/contraception-related svcs FY 14-16 | Type of Service Requested | For each request, identify the type of service provided | Whether the UC was referred or transferred to another care provider to provide the service | Amount of time it took to provide the services |
|---|---|---|---|---|---|---|
| Cardinal McCloskey | Bronx, NY | 0 | N/A | N/A | N/A | N/A |
| Catholic Guardian Services | New York, NY | 0 | N/A | N/A | N/A | N/A |
| CC Boystown | Miami, FL | 1 | Abortion | Abortion | Yes | Procedure requested 9/17/14; procedure performed 10/14/14 |
| CC Houston (Autrey & Smith) | Houston, TX | 0 | N/A | N/A | N/A | N/A |
| His House | Miami, FL | 0 | N/A | N/A | N/A | N/A |
| Seton Home | San Antonio, TX | 0 | N/A | N/A | N/A | N/A |
| St. Peter & Joseph Children's Home | San Antonio, TX | 1 | IUD Removal due to pain and discomfort | IUD Removal due to pain and discomfort | No | Within 2 weeks (due to ob-gyn scheduling availability) |
| USCCB* | Nationwide | | | | | |

| Program | Location | Total number of requests for abortion/contraception-related svcs FY 14-16 | Type of Service Requested | For each request, identify the type of service provided | Whether the UC was referred or transferred to another care provider to provide the service | Amount of time it took to provide the services |
|---|---|---|---|---|---|---|
| Youth for Tomorrow | Bristow, VA | 3 | Abortion | Non-directive options counseling | 2 UCs were transferred and 1 was discharged to her sponsor, who moved forward with the UC's desire. | The UC that was discharged took three weeks to discharge to sponsor. One UC who was transferred received non-directive options counseling at 18 days LOC and transferred at 33 days LOC. The second UC was transferred at LOC 16 days. |

| Program | Location | Total number of requests for abortion/con-traception-related svcs FY 14-16 | Type of Service Requested | For each request, identify the type of service provided | Whether the UC was referred or transferred to another care provider to provide the service | Amount of time it took to provide the services |
|---|---|---|---|---|---|---|
| *USCCB Sub-grantees | | | | | | |
| Bethany Christian Services (Agape) | Grand Rapids, MI | 10 | 7 birth control requests; 2 pregnancy test requests; 1 pregnancy counseling request | All requests provided for | No | All received either same day or next day, except: 3 birth control requests (unable to determine amount of time); pregnancy counseling, which was provided after 17 days |
| Bethany Christian Services (Bellaview for Girls) | Grand Rapids, MI | 7 | Birth control | Birth control | No | All received either same day or next day, except one girl who received after 3 days. |

| Program | Location | Total number of requests for abortion/con-traception-related svcs FY 14-16 | Type of Service Requested | For each request, identify the type of service provided | Whether the UC was referred or transferred to another care provider to provide the service | Amount of time it took to provide the services |
|---|---|---|---|---|---|---|
| Bethany Christian Services (Casa del Sol for Boys) | Grand Rapids, MI | 0 | N/A | N/A | N/A | N/A |
| Catholic Charities of Fort Worth | Fort Worth, TX | 0 | N/A | N/A | N/A | N/A |
| Catholic Charities of Santa Clara County | San Jose, CA | 0 | N/A | N/A | N/A | N/A |
| Catholic Charities of the Archdiocese of Galveston - St. Jerome Emiliani Homes for Children | Houston, TX | 0 | N/A | N/A | N/A | N/A |
| Catholic Community Services Phoenix | Phoenix, AZ | 0 | N/A | N/A | N/A | N/A |
| Catholic Community Services Tacoma | Tacoma, WA | 0 | N/A | N/A | N/A | N/A |
| Catholic Family Center | Rochester, NY | 0 | N/A | N/A | N/A | N/A |

| Program | Location | Total number of requests for abortion/contraception-related svcs FY 14-16 | Type of Service Requested | For each request, identify the type of service provided | Whether the UC was referred or transferred to another care provider to provide the service | Amount of time it took to provide the services |
|---|---|---|---|---|---|---|
| Commonwealth Catholic Charities | Richmond, VA | 0 | N/A | N/A | N/A | N/A |

# Exhibit C

Deposition of Jonathan White
(Dec. 19, 2017)

                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
                         San Francisco Division

- - - - - - - - - - - - - -+
                                |
AMERICAN CIVIL LIBERTIES        |
UNION OF NORTHERN               |
CALIFORNIA,                     |
                                |
          Plaintiff,            |    Case Number:
                                |
   vs.                          |    3:16-cv-3539-LB
                                |
ERIC G. HARGAN, Acting          |
Secretary of Health and         |
Human Services, et al,          |
                                |
          Defendants,           |
                                |
U.S. CONFERENCE OF              |
CATHOLIC BISHOPS,               |
                                |
   Defendant-Intervenor.        |
                                |
- - - - - - - - - - - - - -+


        Rule 30(b)(6) Videotaped Deposition of

     The Department of Health and Human Services,

     by and through its designated representative,

                    JONATHAN WHITE

                    Washington, D.C.

         Tuesday, December 19, 2017 - 3:14 p.m.



Reported by:

Laurie Donovan, RPR, CRR, CSR

Job no: 20318

1        Rule 30(b)(6) Videotaped Deposition of

2        The Department of Health and Human Services,

3        by and through its designated representative,

4                    JONATHAN WHITE

5

6

7     Held at the offices of:

8                U.S. Department of Justice

9                20 Massachusetts Avenue, N.W.

10               Room 6139

11               Washington, D.C. 20001

12               (202)353-4556

13

14

15

16

17

18               Taken pursuant to notice, before

19         Laurie Donovan, Registered Professional

20         Reporter, Certified Realtime Reporter, and

21         Notary public in and for the District of

22         Columbia.

23

24

25

```
1                  A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF AMERICAN CIVIL LIBERTIES

3    UNION OF NORTHERN CALIFORNIA:

4                 ACLU Foundation

5                 125 Broad Street, 18th Floor

6                 New York, New York 10004

7                 (212)519-7897

8                 By:  Brigitte Amiri, Esq.

9                      bamiri@aclu.org

10                     Meagan Burrows, Esq.

11                     mburrows@aclu.org

12   ON BEHALF OF THE DEFENDANT-INTERVENOR USCCB:

13                 Gibson, Dunn & Crutcher, LLP

14                 333 South Grand Avenue

15                 Los Angeles, California 90071

16                 (213)229-7000

17                 By:  Daniel Nowicki, Esq.

18                      dnowicki@gibsondunn.com

19                      Robert Dunn, Esq. (phone)

20                      rdunn@gibsondunn.com

21

22

23

24

25
```

Page 4

 1    (Appearances continued)

 2    ON BEHALF OF OFFICIAL CAPACITY FEDERAL DEFENDANTS

 3    ERIC G. HARGAN AND DEPARTMENT OF HEALTH AND HUMAN

 4    SERVICES:

 5              U.S. Department of Justice

 6              20 Massachusetts Avenue, N.W.

 7              Room 6139

 8              Washington, D.C. 20001

 9              (202)353-4556

10              By:  Martin M. Tomlinson, Esq.

11                   martin.m.tomlinson@usdoj.gov

12                   Peter J. Phipps, Esq.

13                   peter.phipps@usdoj.gov

14    ALSO PRESENT:

15              Martin Sherrill, Videographer

16              Llewellyn Woolford, Esq. (HHS)

17              Caitlin Palacios, Esq. (HHS)

18              Jeffrey Hunter Moon, Esq. (USCCB)

19              Rachel Chrisinger, paralegal

20

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2                THE VIDEOGRAPHER:  This is tape
 3      number 1A of the videotaped deposition of
 4      Jonathan White in the matter of ACLU of
 5      Northern California versus Burwell.  This
 6      deposition is being held at 20 Massachusetts
 7      Avenue, Northwest, Washington, D.C. on
 8      December 19, 2017, at approximately 3:14.
 9                My name is Martin Sherrill from the
10      firm of TransPerfect, and I'm the legal video
11      specialist.  The court reporter today is
12      Laurie Donovan in association with
13      TransPerfect.
14                Will counsel please introduce
15      themselves.
16                MS. AMIRI:  Brigitte Amiri for
17      plaintiff.
18                MS. BURROWS:  Meagan Burrows for
19      plaintiff.
20                MR. NOWICKI:  Daniel Nowicki for
21      defendant-intervenor USCCB.
22                MR. MOON:  Jeffrey Moon with the
23      USCCB.
24                MR. PHIPPS:  Peter Phipps for the
25      official capacity defendants.
```

1              MR. TOMLINSON:  Martin Tomlinson

2         for official capacity federal defendants.

3              MR. WOOLFORD:  Llewellen Woolford

4         for defendant US Department of Health and

5         Human Services.

6              MS. PALACIOS:  Caitlin Palacios for

7         defendant United States Department of Health

8         and Human Services.

9              MS. CHRISINGER:  Rachel Chrisinger,

10        paralegal with the Department of Justice.

11             THE VIDEOGRAPHER:  Would the court

12        reporter please swear in the witness.

13                  JONATHAN WHITE,

14        having been first duly sworn, testified

15        upon his oath as follows:

16         EXAMINATION BY COUNSEL FOR PLAINTIFF

17   BY MS. AMIRI:

18        Q    Mr. White, I'm Brigitte Amiri.  I am the

19   plaintiff's, the plaintiff's attorney, and thank

20   you so much for making the time today.

21             Have you ever been deposed before?

22        A    I have not been deposed before.

23        Q    Okay.  So I'm sure that your counsel has

24   already told you some of the ground rules, but

25   just to quickly go over them, if you need a break

1       Q    Do you recognize this document?

2       A    I do.  This is from our online policy

3   guide.

4       Q    And looking at the second bullet under

5   the sentence that starts "under the terms of the

6   Flores Settlement Agreement."

7       A    Okay.

8       Q    What is your understanding of what is

9   required under this policy?  And we'll talk about

10  Flores separately just in case there is any

11  distinction.  What is your understanding, under

12  the policy in front of you, about what is included

13  in terms of what care providers must provide in

14  terms of appropriate, routine medical and dental

15  care, family planning services, including

16  pregnancy tests and comprehensive information

17  about and access to medical reproductive health

18  services and emergency contraception?

19          That wasn't a question yet, but the

20  question is:  Does -- do you -- is it your

21  understanding that includes access to abortion?

22      A    At what point in time?

23      Q    At what point in time in pregnancy?

24      A    No, what -- at what point in time, to

25  answer that question.

Page 22

1       Q      Oh, in terms of the administration.

2    Since 2017.

3       A      So at this time?

4       Q      Yes, at this time.

5       A      At this time it is my understanding that

6    HHS does not view abortion as included in family

7    planning services.

8       Q      Okay, and does HHS at this time consider

9    abortion to be part of access to medical

10   reproductive health services?

11      A      Not at this time.

12      Q      Are you aware of a time in which HHS did

13   consider access to medical reproductive health

14   services or family planning to include abortion?

15      A      Yes.

16      Q      And when was that time?

17      A      That was the operational interpretation

18   in the last administration.

19      Q      So the actual language of the policy has

20   not changed, right?

21      A      Correct.

22      Q      It's just the interpretation of the

23   policy has changed between the last administration

24   and this administration?

25      A      The operational understanding of what

1   family planning services and medical reproductive

2   health services and emergency contraception refers

3   to has changed.

4       Q    Has there been any change in the

5   understanding of whether this includes -- this

6   definition in bullet 2 includes contraception?

7       A    Routine contraception for contraception

8   purposes has not been understood to be part of

9   family planning, as I understand it, in either of

10  those points in time.

11      Q    What is the definition of "family

12  planning services" then for -- let's start with

13  this administration.

14      A    Family planning services would include

15  prenatal care.  It would include general

16  reproductive health, such as Ob-Gyn visits or

17  urology visits.  It would include sexual health

18  education, particularly where required under the

19  state licensure laws of the state in which the

20  shelter is domiciled.

21      Q    Is contraception for contraceptive

22  purposes included in the phrase "access to medical

23  reproductive health services"?

24      A    It is my understanding it has not been.

25  Children while in our care are not permitted to

Page 24

1    engage in sexual behavior and, therefore, do not

2    routinely receive routine contraception.

3        Q    Is that true both with respect to this

4    presidential administration and the last

5    presidential administration?

6        A    That's my understanding, yes.

7        Q    With respect to "emergency

8    contraception," what does that mean?

9        A    Emergency -- at this time?

10       Q    Yes.

11       A    Emergency contraception would be a

12   requirement under the Interim Final Rule for

13   minors who were sexually assaulted while in ORR

14   care.

15       Q    So do you believe that a minor who had

16   not been sexually assaulted while at an ORR-funded

17   facility would not be permitted to have access to

18   emergency contraception?

19       A    I don't think we have a policy on that

20   at this time.

21       Q    When medical care is provided to

22   unaccompanied minors, there is a treatment

23   authorization request that is submitted; is that

24   right?

25       A    For some, for some medical interventions

Page 36

1       Q     Well, let's say five, five years.

2       A     It has happened.

3       Q     Okay.  Has it happened since

4   January 2017?

5       A     It has not happened, to my knowledge,

6   since January of 2017.

7       Q     Is it possible that it could have

8   happened without your knowledge since 2017?

9       A     It is possible but unlikely that it

10  would have happened without my knowledge since

11  January of 2017.

12      Q     Is it fair to say since March 2017,

13  let's say, you have been aware of all abortion

14  requests that have been brought to ORR's

15  attention?

16      A     Yes.  If they have been brought to ORR

17  headquarters' attention, I have been aware of them

18  all.

19      Q     It's possible that some abortion

20  requests may not have made it to ORR?  Is that

21  possible?

22      A     It is possible that some abortion

23  requests may never have been brought to ORR's

24  attention.

25      Q     Do you have a sense from speaking with

1    grantees or doing field visits whether that

2    happens in terms of a request for abortion doesn't

3    make it either because it doesn't get communicated

4    from the shelter to ORR or some other gap in

5    communication elsewhere in the chain?

6        A    I am aware of instances where minors

7    received abortion without director-level

8    authorization.

9        Q    Are you aware of the converse, where a

10   minor has wanted an abortion but has not been able

11   to obtain one because her request has not been

12   brought up the chain?

13       A    No, I'm not aware of any instances like

14   that.

15       Q    Are you aware of any instance where a

16   minor was unable to obtain an abortion because of

17   the religious affiliation of the shelter within

18   which she resided?

19       A    I am not aware of any such instance.

20       Q    So sitting here today in terms of -- oh,

21   now I forgot if I've asked this.

22            I believe you said that since March 2017

23   there has not been an instance where there has

24   been an abortion request from a religiously

25   affiliated shelter that had a religious objection

1    to providing an abortion; is that right?

2         A    That's correct.

3         Q    Okay.  So prior to March 2017, how did

4    it work when a religiously affiliated shelter had

5    an objection to providing access to abortion for a

6    minor?  If you can walk me through the steps.

7    Presumably they contacted ORR and said we have a

8    minor who is requesting an abortion, and then ORR

9    took what next steps?

10        A    So in those cases where that occurred, I

11   think it's substantially, as you see it here, that

12   the, the grantee program that would have a

13   religious or other objection to facilitating

14   termination of pregnancy would notify their

15   federal field specialist, which is the ORR

16   official regionally responsible for that program.

17   The FFS would then -- in most cases, FFSs would

18   then coordinate with the medical team with those

19   on the FFS team to transfer the minor to a program

20   that would enable her to receive the TOP.

21        Q    Do you have a sense of the average

22   length of time it took to make that transfer

23   between the religiously affiliated entity and an

24   entity that did not have an objection to providing

25   access to abortion?

1      A    I don't have any firm measures.

2  Transfer of a UAC from one shelter to another is

3  generally a one- to three-day process.

4      Q    Regardless of whether that transfer is

5  related to an abortion, just in general, I presume

6  there are transfers for other reasons?

7      A    There are numerous transfers shelter to

8  shelter, and that is, that is typical.  I'm not

9  aware of anything that would be different

10  operationally for a transfer in order to enable a

11  minor to access TOP.

12      Q    Do you have a sense of how long it takes

13  from the time ORR receives an abortion request to

14  make a decision one way or another about whether

15  to grant or deny that request?

16      A    There's not a specific time frame in my

17  experience.

18      Q    Is there -- there's not a specific time

19  frame within which the ORR director has to act on

20  a request?  Is that the -- I just wanted to

21  clarify.

22      A    That's correct.  There is not a scripted

23  time frame for the process.

24      Q    Do you have a sense just in practice how

25  long it takes between the time the director gets a

1    request and decides whether to approve the

2    abortion or not since 2017 of March -- March of

3    2017?

4         A    I would say it has varied.

5         Q    Okay.  Do you have a sense of whether

6    that variation is several days, weeks, any just

7    ballpark estimates of averages of time between a

8    request and the ORR directing -- ORR actor,

9    director acting on that request?

10        A    The, the process is typically that, upon

11   notification, there is then an instruction for

12   next steps.  Those steps are completed, and there

13   may be steps subsequent.

14        Q    What are those next steps?

15        A    It has varied.

16        Q    Since March 2017, has one of those steps

17   been a visit to a crisis pregnancy or crisis

18   resource center?

19        A    In some cases, yes.

20        Q    In some but not all?

21        A    Correct.

22        Q    The majority of cases?

23        A    I don't know that I have a count.

24   Certainly in a number of cases.

25        Q    Do you know how many abortion requests

Page 42

1       A      In some cases it has been without -- it

2    has been over the objection of the minor.

3       Q      Based on your social work background, do

4    you think it's wise to notify a parent of a

5    minor's abortion decision over her objection?

6              This is outside 30(b)(6).

7                   MR. PHIPPS:  I'll object.  Beyond

8           the scope of 30(b)(6).  Clarifying that in

9           this instance "you" means "the witness you,"

10          not you, "designee by HHS you"?

11                  MS. AMIRI:  Yes.

12                  THE WITNESS:  Could you ask the

13          question again?

14   BY MS. AMIRI:

15      Q      Sure.

16             Subject to Peter's, Mr. Phipps'

17   objections, which will stand after I finish my

18   question, but based on your social worker

19   background and, and training, do you think it's

20   wise to notify a minor's parents of her abortion

21   decision over the minor's objection?

22      A      I would not recommend such a

23   notification.

24      Q      Why is that?

25      A      Because of the potential of additional

1    harm or risk.

2         Q    Do you -- we talked a little bit about

3    whether there have been any transfers since March

4    of 2017 from a religiously affiliated grantee to a

5    secular facility since March of 2017, but my

6    question is going to be slightly different,

7    whether, since March of 2017, there have been any

8    initial placement decisions about whether a minor

9    should be placed in a particular location because

10   she's pregnant and seeking an abortion.

11        A    So I have to answer that in -- could

12   you -- so --

13        Q    Let me rephrase it, yeah, and so we'll

14   start with the time frame.

15        A    Right.

16        Q    Since March 2017 --

17        A    Right.

18        Q    -- has ORR made any placement decisions

19   about whether a minor is pregnant and seeking an

20   abortion?

21        A    We have made no placement decisions

22   based on a minor expressing an interest in

23   abortion.  We do routinely make placement

24   decisions based on knowing that a minor is

25   pregnant -- if we know that -- to a bed licensed

Page 44

1    to receive a pregnant girl.  We have made no

2    decisions, no placements differently on the basis

3    of awareness that the minor was interested in

4    terminating the pregnancy.

5         Q    Do you know whether prior to 2017 there

6    were placement decisions based on a minor's

7    request for an abortion specifically to avoid

8    putting her in a shelter where there might be a

9    religious objection to providing her access to

10   abortion?

11        A    I'm not aware of any such placement

12   decisions.

13        Q    Do you know how many current ORR

14   grantees have religious objections to providing

15   access to abortion or contraception?

16        A    I think the ones of which I'm aware,

17   they sort of have a documented objection, I

18   believe is the, the USCCB network.

19        Q    Any others that you're aware of?

20        A    There may be, there may be others.

21   That's the one of which I'm aware from my, my

22   reading of the, of the documents.

23        Q    Have you personally been involved in

24   negotiating the terms of a cooperative agreement

25   with religiously affiliated entities that have a

1    religious objection to providing abortion or

2    contraception?

3         A    I have not.

4         Q    Do you have knowledge of the process by

5    which such cooperative agreements were negotiated

6    by your colleagues at ORR?

7         A    I don't believe that cooperative

8    agreements are negotiated in that way with

9    individual providers.  I think there's a standard

10   cooperative agreement produced for a period of

11   time.

12        Q    So you're not aware, for example, of a

13   situation where a religiously affiliated grantee

14   had asked to remove certain terms from the

15   cooperative agreement related to access to

16   abortion or contraception?

17        A    I am aware that, that grantees may have

18   sought a reasonable accommodation to the terms of

19   the cooperative agreement.  That's not a

20   negotiation of the cooperative agreement.

21        Q    Okay, but is it your understanding that

22   the actual language in the cooperative agreement

23   may have changed based on a religious objection to

24   providing access to abortion or contraception?

25                    MR. PHIPPS:  Just I'll impose --

1    access to abortion or contraception?

2         A    No.  There's been no new decision or

3    policy formulation that's been shared with me.

4              MS. AMIRI:  Okay.  I don't have

5         anything further at this time.  I would like

6         to say, before I forget, though, that we have

7         an agreement to keep this deposition open in

8         case we need to come back and have a quick

9         conversation after we get additional

10        documents that the government is to produce

11        by the close of discovery this week.

12             MR. PHIPPS:  Oh, and just to

13        clarify --

14             MS. AMIRI:  Yes.

15             MR. PHIPPS:  -- we're going to

16        produce documents through the close of

17        discovery --

18             MS. AMIRI:  Correct.

19             MR. PHIPPS:  -- but I don't think

20        we're going to produce them this week.

21             MS. AMIRI:  By close?  By the end

22        of --

23             MR. PHIPPS:  Yeah, it will be

24        through that date, but --

25             MS. AMIRI:  Fair enough.  Okay.

1          We'll talk about it.

2                   EXAMINATION BY COUNSEL FOR

3               OFFICIAL CAPACITY DEFENDANTS

4     BY MR. PHIPPS:

5          Q    Good afternoon, Mr. White.  My name is

6     Peter Phipps.  I'm an attorney at the Department

7     of Justice, and I represent the defendants in

8     their official capacity in this case.  I have a

9     few follow-up questions for you about your

10    testimony today.

11         A    Yes, sir.

12         Q    First, are you aware of any instance in

13    which any grantee shelter has made a final

14    decision that an unaccompanied alien child in its

15    custody may not receive contraception?

16         A    No.

17         Q    Are you aware of any instance in which

18    any grantee shelter has made the final decision

19    that an unaccompanied alien child in its custody

20    may not receive access to an abortion?

21         A    No.

22         Q    As deputy director of ORR, are you aware

23    of any preferential treatment that HHS or ORR has

24    given to any faith-based grantee or faith-based

25    applicant for the care and custody of

Page 98

1     unaccompanied alien children?

2         A    No.

3               MR. PHIPPS:  Thank you.  That's all

4         I have.

5         EXAMINATION BY COUNSEL FOR DEFENDANT USCCB

6     BY MR. NOWICKI:

7         Q    Good afternoon.  I'm Dan Nowicki for

8     USCCB.  I just have maybe just one quick follow-up

9     question.

10              So you were asked a question about Seton

11    Home and their affiliation with certain grantee

12    networks, and I believe you may have already

13    clarified this, but do you know which grantee

14    network Seton Home is part of?

15        A    I don't.  I would need to check.

16              MR. NOWICKI:  I have no further

17        questions.

18                  THE WITNESS:  Right.

19                  THE VIDEOGRAPHER:  Going off the

20        record at 5:53.

21                  THE REPORTER:  And do you still

22        want a rough draft?

23                  MS. AMIRI:  Sure.

24                  MR. PHIPPS:  We get a transcript.

25                  MR. NOWICKI:  I get a transcript.

Page 100

1

2

3

4

5

6             ACKNOWLEDGEMENT OF WITNESS

7                  I, Jonathan White, do hereby

8         acknowledge that I have read and examined the

9         foregoing testimony, and the same is a true,

10        correct and complete transcription of the

11        testimony given by me, and any corrections

12        appear on the attached Errata sheet signed by

13        me.

14

15

16        _____   _____

17        (DATE)                 (SIGNATURE)

18

19

20

21

22

23

24

25

Page 102

CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

            I, Laurie Donovan, Registered
      Professional Reporter, Certified Realtime
      Reporter, the officer before whom the
      foregoing deposition was taken, do hereby
      certify that the foregoing transcript is a
      true and correct record of the testimony
      given; that said testimony was taken by me
      stenographically and thereafter reduced to
      typewriting under my supervision; and that I
      am neither counsel for, related to, nor
      employed by any of the parties to this case
      and have no interest, financial or otherwise,
      in its outcome.

            IN WITNESS WHEREOF, I have hereunto
      set my hand and affixed my notarial seal this
      2nd day of January, 2018.

      My commission expires:  March 14th, 2021


      _____

      LAURIE DONOVAN
      NOTARY PUBLIC IN AND FOR
      THE DISTRICT OF COLUMBIA

# Exhibit D

Deposition of Katherine Chon
(Dec. 19, 2017)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

```
- - - - - - - - - - - - - -+
                           |
AMERICAN CIVIL LIBERTIES   |
UNION OF NORTHERN          |
CALIFORNIA,                |
                           |
        Plaintiff,         |   Case Number:
                           |
   vs.                     |   3:16-cv-3539-LB
                           |
ERIC G. HARGAN, Acting     |
Secretary of Health and    |
Human Services, et al,     |
                           |
        Defendants,        |
                           |
U.S. CONFERENCE OF         |
CATHOLIC BISHOPS,          |
                           |
   Defendant-Intervenor.   |
                           |
- - - - - - - - - - - - - -+
```

Rule 30(b)(6) Videotaped Deposition of

The Department of Health and Human Services,

by and through its designated representative,

KATHERINE CHON

Washington, D.C.

Tuesday, December 19, 2017 - 9:24 a.m.

Reported by:

Laurie Donovan, RPR, CRR, CSR

Job no: 20318

1          Rule 30(b)(6) Videotaped Deposition of

2        The Department of Health and Human Services,

3        by and through its designated representative,

4                    KATHERINE CHON

5

6

7     Held at the offices of:

8                    U.S. Department of Justice

9                    20 Massachusetts Avenue, N.W.

10                   Room 6139

11                   Washington, D.C. 20001

12                   (202)353-4556

13

14

15

16

17

18                    Taken pursuant to notice, before

19        Laurie Donovan, Registered Professional

20        Reporter, Certified Realtime Reporter, and

21        Notary public in and for the District of

22        Columbia.

23

24

25

```
 1                 A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF AMERICAN CIVIL LIBERTIES

 3   UNION OF NORTHERN CALIFORNIA:

 4              ACLU Foundation

 5              125 Broad Street, 18th Floor

 6              New York, New York 10004

 7              (212)519-7897

 8              By:  Brigitte Amiri, Esq.

 9                   bamiri@aclu.org

10                   Meagan Burrows, Esq.

11                   mburrows@aclu.org

12   ON BEHALF OF THE DEFENDANT-INTERVENOR USCCB:

13              Gibson, Dunn & Crutcher, LLP

14              333 South Grand Avenue

15              Los Angeles, California 90071

16              (213)229-7000

17              By:  Daniel Nowicki, Esq.

18                   dnowicki@gibsondunn.com

19                   Robert Dunn, Esq. (phone)

20                   rdunn@gibsondunn.com

21

22

23

24

25
```

Page 4

1    (Appearances continued)

2   ON BEHALF OF OFFICIAL CAPACITY FEDERAL DEFENDANTS

3   ERIC G. HARGAN AND DEPARTMENT OF HEALTH AND HUMAN

4   SERVICES:

5            U.S. Department of Justice

6            20 Massachusetts Avenue, N.W.

7            Room 6139

8            Washington, D.C. 20001

9            (202)353-4556

10           By:  Martin M. Tomlinson, Esq.

11               martin.m.tomlinson@usdoj.gov

12               Peter J. Phipps, Esq.

13               peter.phipps@usdoj.gov

14   ALSO PRESENT:

15           Martin Sherrill, Videographer

16           Llewellyn Woolford, Esq. (HHS)

17           Caitlin Palacios, Esq. (HHS)

18           Jeffrey Hunter Moon, Esq. (USCCB)

19           Rachel Chrisinger, paralegal

20

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2                THE VIDEOGRAPHER:  This is tape
 3       number 1 of the videotaped deposition of
 4       Katherine Chon in the matter of ACLU of
 5       Northern California versus Burwell [sic].
 6       This deposition is being held at 20
 7       Massachusetts Avenue, Northwest, Washington,
 8       D.C., on December 19, 2017, at approximately
 9       9:24.
10                My name is Martin Sherrill from
11       TransPerfect, and I'm the legal video
12       specialist.  The court reporter today is
13       Laurie Donovan in association with
14       TransPerfect.
15                Would counsel please introduce
16       themselves.
17                MS. BURROWS:  Meagan Burrows for
18       the plaintiff.
19                MS. AMIRI:  Brigitte Amiri for the
20       plaintiff.
21                MR. NOWICKI:  Daniel Nowicki for
22       defendant-intervenor USCCB.
23                MR. MOON:  Jeffrey Moon with the
24       defendant-intervenor.
25                MR. TOMLINSON:  Martin Tomlinson
```

1          for the official capacity federal defendants.

2                    MR. PHIPPS:  Peter Phipps for the

3          official capacity federal defendants.

4                    MR. WOOLFORD:  Llewellyn Woolford

5          for defendant US Department of Health and

6          Human Services.

7                    MS. PALACIOS:  Caitlin Palacios for

8          the defendant US Department of Health and

9          Human Services.

10                    MS. CHRISINGER:  Rachel Chrisinger,

11          paralegal with the Department of Justice.

12                    THE VIDEOGRAPHER:  Would the court

13          reporter please swear in the witness.

14                        KATHERINE CHON,

15          having been first duly sworn, testified

16          upon her oath as follows:

17            EXAMINATION BY COUNSEL FOR PLAINTIFF

18      BY MS. BURROWS:

19          Q    Okay.  My name is Meagan Burrows, and

20      I'm one of the attorneys representing the

21      plaintiff ACLU of Northern California in this

22      case.  I'm just going to go over a few preliminary

23      deposition tips and tricks and points before we

24      get into the substance.

25                    Okay?

1    an ATIP, but it merged into OTIP when OTIP was

2    founded.

3              So how does OTIP relate to ORR in terms

4    of administrating the grants that ORR provides to

5    grantees to provide care for unaccompanied

6    immigrant minors?

7        A    So we are not responsible for any of the

8    grants that ORR awards for the care of

9    unaccompanied minors.  We work with the

10   unaccompanied minor program within the scope of

11   our responsibilities to review requests for

12   assistance for certain foreign victims of

13   trafficking.

14             So when it comes to foreign minor

15   victims of trafficking who may have or who have

16   experienced human trafficking, ORR staff or ORR

17   grantees may refer those cases to us through a

18   formal request for assistance process, and then we

19   review those cases and determine whether a minor

20   may have or has experienced human trafficking, and

21   if they have, then we issue either an interim

22   assistance letter, an eligibility letter so that

23   they could be eligible for benefits and services

24   to the same extent as refugees.

25        Q    So now I'd like to talk a little bit

1    about OTIP's role in awarding and administering

2    grants through the Trafficking Victims Assistance

3    Program.  We'll start at a very macro level, and

4    then we can kind of narrow it.

5            So my first question is:  What is the

6    Trafficking Victim Assistance Program?

7        A    In its current form?

8        Q    In its current form, yes.

9        A    So the Trafficking Victim Assistance

10   Program is a grant program with the purpose of

11   providing comprehensive victim services for

12   foreign victims of trafficking who have received

13   certification or are in positions of seeking

14   certification from HHS.

15           And these are time-limited funds, and

16   depending on the grantee, each grantee structures

17   in different ways, but a victim of trafficking

18   would receive case management support in addition

19   to funding to meet direct service needs, including

20   basic needs.  And the grant is providing

21   assistance to victims of trafficking and certain

22   eligible family members.

23       Q    And so OTIP would award the grant to

24   applicant organizations to apply seeking the

25   grant, and then do they administer the grant

1    through subgrantees?

2                    MR. TOMLINSON:  Object to the form.

3    BY MS. BURROWS:

4        Q    I can rephrase.

5             Does OTIP award a grant to a grant

6    applicant who administers the grant through

7    subgrantees?

8        A    In the current grant that's in

9    implementation, OTIP has awarded grants to

10   grants -- or to organization where each of those

11   three grantees have their own structure of how

12   they deliver services, but those structures in

13   each of those grantees includes a network of

14   service providers.

15       Q    And you said "in its current form."

16   How, if at all, was it different in 2015?

17       A    In 2015 meaning the, prior to -- so the

18   previous grant award?

19       Q    Yes.  Well, in your answer you

20   indicated -- and this could just be me picking up

21   on certain language where there is nothing there,

22   but that the current TVAP program may have been

23   different from prior iterations of the program.

24   So if you could tell me a little bit more about

25   how, if at all, the current program right now is

1  FOA requirements also include not verbally

2  restricting subgrantees from providing or

3  referring for abortion, sterilization or

4  artificial contraceptives?

5      A   Well, per the FOA requirements as it's

6  stated there, "a grantee may not take any steps to

7  discourage program participants," so whether

8  that's in writing or verbal, that would be

9  considered -- that would be a step.

10     Q   Okay, and we'll get more -- we'll get to

11 that a little bit later in terms of the Memorandum

12 of Understanding between USCCB and its

13 subrecipients.

14         If we turn to 528 now, actually, to 529,

15 there's an email to you and Maggie Wynne from

16 Kristyn Peck of USCCB, and she's thanking you "for

17 your time this afternoon," and the email is sent

18 at 5:42 p.m.

19         Did you have a meeting with USCCB on

20 September 10, 2015?

21     A   On September 10?

22     Q   Oh, sorry.  September 18, 2015.

23     A   Well, in reading the email, it seems

24 that there was some type of meeting or call.  I

25 can't know for sure.  There was a mix, mixture of

1    email and phone conversations during this time

2    period, mostly over email, but there were at least

3    a couple of phone conversations.

4         Q    Do you recall the substance of any of

5    those phone conversations?

6         A    It would have, it would have been all

7    related to what was captured in the email.

8         Q    So everything that is -- everything that

9    would have been discussed on the phone is also

10   reflected in email?

11        A    Substantively, yes.

12        Q    So if we look at USCCB's response to

13   your question that we just discussed of whether

14   they would be able to meet the FOA requirement,

15   and that is on page 529, they say, "As indicated

16   in our proposal in the first paragraph of page 13,

17   each of USCCB's subcontractors are affiliates of

18   either Catholic agencies or Bethany Christian

19   Services," and later on, down below, they say,

20   "Catholic agencies and Bethany Christian Services

21   have a religious objection to providing abortion,

22   sterilization, and artificial contraceptives.

23   Thus, USCCB will be able to comply" . . .

24             When you read this response, did you

25   have any concerns about the fact that all of

1    USCCB's -- according to USCCB's own statement, all

2    of its subgrantees would have religious objections

3    to providing those services?

4         A    Well, in terms of the Funding

5    Opportunity Announcement, the FOA left it to each

6    grantee to determine their subrecipient network.

7    As the government agency implementing the FOA, we

8    can't direct grantees which subrecipients they

9    should or should not enroll.

10             However, there are other conditions of

11   the FOA that if -- so in USCCB's narrative, they

12   did explain that they have these current

13   relationships with these network of service

14   providers, but through the course of the grant

15   program, that they would identify additional

16   organizations to potentially enroll in their

17   network, and, and so it was -- so while we can't

18   be directive of who a grantee chooses to --

19   chooses as its subrecipients, there are conditions

20   in the FOA that would prohibit any practices --

21   let me see.

22             There is some language in here that may

23   be helpful if we specifically reference.

24        Q    I think there's language from the FOA on

25   533 at the top.  That's with the alternative

1    approach.  It might not be in here.  It may be

2    back in the FOA.  We can also find it on a break

3    as well.

4         A    Mm-hmm.  There is -- so there's language

5    in the Funding Opportunity Announcement that

6    attempts to balance out a grantee's self-direction

7    on who the subrecipients would be, but also

8    prohibiting certain practices that would not meet

9    the full conditions of the FOA.

10        Q    And you said that in terms of the

11   discussion with USCCB about its grant, that they

12   indicated that throughout, you know, the course of

13   administering the grant, they would enroll other

14   grantees, subgrantees, possibly, right?  Apart

15   from the ones with religious objections that they

16   identified here, correct?

17        A    Well, I would want to refer to what was

18   actually in their program narrative.  From my

19   recollection, I think it was just simply that they

20   would identify other organizations and didn't

21   necessarily specify one way or another in terms of

22   whether the organizations would share their

23   religious objections.

24        Q    Okay.

25             So in this chain, USCCB also explains

1     that under the alternative approach -- and we

2     discussed this already a little bit.  It intended

3     to advise subrecipients to direct beneficiaries to

4     their medical providers in the event they are

5     seeking services to which USCCB and its subgrantee

6     had a moral objection, and that they would provide

7     referrals or direct beneficiaries to public

8     health, public community health providers that

9     were part of the public health system, and would

10    not screen out any of the providers based on the

11    range of services they provided.

12            And you, I believe, asked a question --

13    let me just find it -- I believe it is on 530 --

14    about USCCB's identification of these public

15    health providers and screening out.

16            What prompted that question?

17    A    In our review prior to making an award,

18    we wanted to check that USCCB was able to fully

19    comply with the conditions of the FOA in regard to

20    their alternative approach, and so this was just a

21    subset of questions to ensure that victims had

22    access to information about the full range of

23    services available to them; and, and because

24    USCCB's alternative approach included connecting

25    their clients to health and medical service

1  subrecipients, why -- strike that.  Let me back up

2  a bit.

3          Were there any other -- apart from --

4  who received 2015 grant funds, TVAP grand funds?

5  Who were the grant recipients apart from USCCB?

6      A    So there were two other grantees.  One

7  was Tapestry, and the other was USCRI.

8      Q    Do you recall if, apart from Tapestry

9  and USCCB and USCRI, any other organizations

10  applied for TVAP grant funds that year?

11     A    Yes, there were other organizations.

12     Q    So when considering all of the

13  applicants for TVAP grant funds, knowing that at

14  least one of the applicants, USCCB, believed

15  that -- had religious objections to the provision

16  of abortion and contraceptive care that extended,

17  as they said, to the point of service provision,

18  and that they strongly desired to include language

19  in their agreements with subrecipients,

20  prohibiting them from referring or providing for

21  abortion and contraception, why was USCCB selected

22  from among the many organizations that applied for

23  grant funds?

24     A    SO I think it would be helpful to

25  understand how the grant review process happens --

1      Q     Sure.

2      A     -- in part, to answer your question.

3            So as the Funding Opportunity
4    Announcement outlines, there was an initial
5    screening process related to various
6    disqualification factors that was kind of
7    universal for any applicant, but then also
8    specific for the TVAP grant program, and then
9    after that initial screening or in that initial
10   screening, some applications were disqualified,
11   because they didn't -- because it triggered some
12   other disqualification factors that the FOA
13   outlined.

14           And then the second stage of review was
15   for the remaining applicants or applications went
16   to an independent review panel of grant reviewers,
17   and that independent review panel provided notes
18   and a scoring, a rank scoring of each of the
19   applications.

20           And then after that, there was a final
21   round of review where then I reviewed the rank
22   scorings, as well as reviewed the applications to
23   identify whether they could be in compliance with
24   the Funding Opportunity Announcement, and then a
25   final decision was made after those three steps.

1      Q     Would it have been simpler to award

2    grant funds to a grantee that did not have

3    religious objections to abortion and contraception

4    for administration of the grant program?

5                    MR. TOMLINSON:  Objection.  Vague.

6    BY MS. BURROWS:

7      Q     In terms of administering the program,

8    monitoring, and ensuring compliance, and

9    transferring beneficiaries from subgrantee to

10   subgrantee in the event that subgrantee had a

11   religious objection?

12                   MR. TOMLINSON:  We would object.

13        Calls for speculation.

14                   THE WITNESS:  Is there another --

15        I'm just trying to understand what you're

16        asking, trying to ask.

17   BY MS. BURROWS:

18     Q     Sure.  I guess I can say the award to

19   USCCB carried with it certain additional

20   requirements in terms of monitoring and in terms

21   of implementation and implementing the transfer

22   system proposed that compared to what would have

23   been required if USCCB did not have religious

24   objections to the provision of abortion and

25   contraception; is that right?

1    gets kind of the aggregate report of the

2    subrecipients' individual monitoring reports,

3    right?

4        A    Yes.

5        Q    Does HHS ever receive all of the

6    subrecipient monitoring reports?

7        A    No.

8        Q    So it's only the information that the

9    grantee provides to HHS in its monitoring report

10   that it has received from its subrecipients

11   through their monitoring reports?

12       A    That's correct.

13       Q    Okay, and so do you recall at any time,

14   apart from the time around here, receiving

15   information from USCCB, pursuant to its monitoring

16   report obligations, about whether clients were

17   being referred to healthcare providers?

18       A    So each grantee files quarterly program

19   and financial reports, and I don't review those

20   reports, so I'm not sure.

21       Q    Okay.  Do you recall any cases during

22   the implementation of the 2015 grant where a

23   trafficking survivor requested access to abortion

24   or contraception, and a subgrantee refused to

25   provide on religious grounds?

Page 133

1        A     No, I'm not aware.

2        Q     Who at HHS would be aware, if anyone, of

3   that?

4        A     Our -- the program, the project officer,

5   so Sherri Harris would be aware, and whoever

6   Sherri may have told.  I mean those are situations

7   where she would bring it to my attention or to the

8   deputy director's attention.

9        Q     But you don't recall that ever

10  occurring?

11       A     Where there was a request that was

12  denied or a request --

13       Q     I guess I'll do both, but first, do you

14  recall HHS having to -- do you recall a request

15  being made for abortion or access to contraception

16  and a subrecipient or a subgrantee or the grantee

17  themselves requesting transfer of the beneficiary

18  because they had a religious objection to that

19  service?

20       A     No.

21       Q     Do you recall an instance where a

22  beneficiary requested access to abortion or

23  contraception, and the subrecipient -- and there

24  were issues accessing abortion or contraception

25  because of a subrecipient's objections to

Page 134

1    providing those services?

2              MR. TOMLINSON:  Object to the form.

3    BY MS. BURROWS:

4         Q    I can reask it, yeah.

5              Do you recall a circumstance in which a

6    beneficiary requested access to abortion and

7    contraception and had issues accessing abortion or

8    contraception because of a subgrantee's objection

9    to providing those services?

10        A    No.

11             MS. BURROWS:  So I'm going to mark

12        this as Exhibit 18.

13             (Exhibit 18 was marked for

14             identification.)

15   BY MS. BURROWS:

16        Q    This is Bates PRICE-PROD 9071 to 9083.

17   Looks like USCCB's continuation proposal for TVAP

18   for budget period September 30, 2016 to

19   September 29, 2017.

20             Have you seen this document before?

21        A    Yes.  It's just not clear whether this

22   is their initial submission for their continuation

23   year or their subsequent submission.

24             MS. BURROWS:  Okay, great.

25             I'm going to also mark this as

1      Exhibit 19.

2                  (Exhibit 19 was marked for

3                  identification.)

4  BY MS. BURROWS:

5      Q    This is PRICE-PROD 7964 to 66, which is

6  an email exchange between you, Carolyn Hightower

7  and Sherri Harris, and also including -- no, just

8  you three -- discussing the Year 2 application,

9  and it looks like on Bates, of that exhibit,

10  7964 -- or 7965 -- sorry -- to 7966, there is a

11  chart where Sherri compares the amended and

12  approved Year 1 application to USCCB's submitted

13  Year 2 application -- as I think you indicated,

14  there were revisions -- and then the amended Year

15  2 application.

16            And if we look at 7965, it shows that in

17  the Submitted Year 2 application, USCCB --

18                  THE REPORTER:  Can you slow down a

19      little?

20  BY MS. BURROWS:

21      Q    Yes.  In the Submitted Year 2

22  application, USCCB states that it "carries out its

23  TVAP program through agreements with primarily

24  Catholic social service agencies around the

25  country," and it looks like in the amended

1          A     Okay.

2          Q     And if I use the term "grantee," that

3     means a grantee who's receiving one of those

4     grants?

5          A     That's fine.

6          Q     I will also use the term "TVAP" instead

7     of the Trafficking Victim Assistance Program.   Is

8     that okay?

9          A     That's fine.

10         Q     Okay.

11               Was any TVAP grant awarded to any

12    religiously affiliated grantee for the purpose of

13    promoting religion?

14         A     No.

15         Q     Was any TVAP grant awarded to any

16    religiously affiliated grantee for the purpose of

17    promoting any specific religion or religious

18    belief?

19         A     No.

20         Q     Are you aware of any grantee using TVAP

21    grant funds for religious proselytization?

22         A     Not that I'm aware of.

23         Q     Are you aware of any grantee using TVAP

24    grant funds for religious instruction?

25         A     Not that I'm aware of.

1      Q    Are you aware of any grantee using TVAP

2    grant funds for the purpose -- oh, excuse me.

3    Scratch that.

4           Are you aware of any grantee using TVAP

5    grant funds for the purchase of religious items?

6      A    Not that I'm aware of.

7      Q    Are you aware of any grantee using TVAP

8    grant funds for the purpose of purchasing or

9    distributing religious literature?

10     A    Not that I'm aware of.

11     Q    Now, you talked about the funding

12   limitation on using grant funds for abortions.  Do

13   you remember that?

14     A    Yes.

15     Q    Does that funding limitation apply

16   equally to religiously affiliated and

17   nonreligiously affiliated grantees?

18     A    Yes.

19     Q    The trafficking victims who receive care

20   under this program, they are not in federal

21   custody; is that correct?

22     A    They -- I can't know for every single

23   victim, but generally they are not in federal

24   custody.

25     Q    And that generally means that wherever

1  they live, they're free to come and go as they

2  please, correct?

3       A    It's a voluntary program.

4       Q    So can any, can any grantee prevent a

5  trafficking victim from independently seeking

6  contraception?

7       A    No.

8       Q    Can any grantee prevent a trafficking

9  victim from independently seeking access to an

10 abortion?

11      A    No.

12      Q    I believe you testified previously that

13 any instance of a religiously affiliated grantee

14 refusing to provide services to a trafficking

15 victim would be elevated to your office at OTIP;

16 is that correct?

17      A    That's the current arrangement we have

18 with our grantees, that they would let us know.

19      Q    Okay.  Are you aware of any trafficking

20 victim being provided care by a TVAP grantee who

21 sought contraception but was unable to obtain it

22 due to the religious beliefs of the grantee?

23      A    Not to my knowledge.

24      Q    Are you aware of any trafficking victim

25 being provided care by a TVAP grantee who sought

1    an abortion but was unable to obtain it due to the

2    religious beliefs of the grantee?

3         A    Not to my knowledge.

4         Q    And you testified previously that it

5    might be possible that there may be a state that

6    only had USCCB subgrantees.

7              Do you remember that?

8         A    Yes.

9         Q    Now, if that were the case, and the

10   victim was requesting services that was not

11   provided by USCCB, what would you do?

12        A    We would work within our grantee network

13   and find referrals for other organizations that

14   could enroll within the network.

15             MR. TOMLINSON:  That's all the

16        questions I have, and I think counsel for

17        USCCB may have a few questions.

18             EXAMINATION BY COUNSEL FOR USCCB

19   BY MR. NOWICKI:

20        Q    I'm Daniel Nowicki, and I'm counsel for

21   USCCB in this matter.  I'm going to use the same

22   terminology and abbreviations that Marty used if

23   that's okay?

24        A    That's, that's fine.

25        Q    So I think when we were talking about

1    some conversations you had with USCCB

2    representatives in September 2015, we were

3    discussing how you were ensuring that USCCB would

4    comply with the FOA; is that correct?

5         A    That's correct.

6         Q    And I think in Exhibit 4 there was some

7    discussion, and as part of this discussion you had

8    had some points that you brought up regarding how

9    you thought USCCB would need to change their

10   proposal in order to comply with FOA; is that

11   fair?

12             I'm looking at the USCCB Bates stamp 539

13   and 540 at the end of Exhibit 4.  Looks like an

14   email from Bridget passing on your questions.

15        A    Yes.  Those are questions we ask to

16   assess whether USCCB would be in compliance with

17   the FOA.

18        Q    So you wanted to ensure that USCCB would

19   ensure that traffic victims understand the full

20   range of services available so them, including

21   reproductive health services?

22        A    Yes.  That is one part of the

23   alternative approach.

24        Q    And you wanted to ensure that they would

25   make sure that victims requesting any of the

1    access those services, and absent that assistance,

2    they may not be able to access those services?

3                    MR. TOMLINSON:  Object to the form.

4                    THE WITNESS:  Some victims.

5    BY MS. BURROWS:

6        Q    Thank you, and without waiving

7    deliberative privilege, can you tell me -- can you

8    talk as much as you can about what policy changes

9    are being considered to the faith-based policy

10   that you, that you just referenced is currently

11   under review?

12                   MR. TOMLINSON:  Yeah, I know you

13           acknowledged it, but I am going to instruct

14           the witness not to answer anything

15           deliberative process.

16                   My understanding -- and she can

17           correct me if I'm wrong, because I may be

18           wrong, but the grantees have been informed

19           that it's under review but not given any

20           further information, and I think any further

21           information about specific policies that are

22           under review or any -- any more information

23           than that I think would go to deliberative

24           process.

25                   THE WITNESS:  I'm not aware of the

1          deliberations regarding that review.

2     BY MS. BURROWS:

3          Q     Okay.  Do you know whether Tapestry has

4     a religious subgrantee with an objection to

5     contraception or abortion?

6          A     I am not aware of what all the

7     subrecipient religious affiliations may be, but I

8     am aware that both Tapestry and USCRI have

9     subrecipients who have religious affiliations.

10               MS. BURROWS:  I think that's all I

11          have.

12               MR. NOWICKI:  I have like two more

13          questions.

14               MR. TOMLINSON:  I mean it's fine

15          with me.

16     FURTHER EXAMINATION BY COUNSEL FOR USCCB

17     BY MR. NOWICKI:

18          Q     This is Dan Nowicki for USCCB again.

19               Just with regard to the Cooperative

20     Agreement change that you mentioned, my

21     understanding is that that included a line in the

22     Cooperative Agreement saying that TVAP funds

23     cannot be used for abortion; is that correct?  Is

24     that part of the change?

25          A     I would need to look at -- I can't

Page 180

1    remember if -- so that was a change in the, our

2    domestic victims of human trafficking cooperative

3    agreement, but for TVAP specifically, I can't

4    remember if it was in an email or if it was in the

5    actual updated Cooperative Agreement.

6         Q    But either in the email or in the

7    Cooperative Agreement, that specific language was

8    referenced or described as now being part of the

9    Cooperative Agreement?

10        A    Yes.  It references the HHS grants

11   policy statement from 2007.

12        Q    And like you said, the changes were made

13   to Tapestry and USCRI but not to USCCB's

14   Cooperative Agreement; is that correct?

15        A    That's correct.

16        Q    So USCRI and Tapestry now have a

17   statement that TVAP funds cannot be used for

18   abortions, and USCCB does not?

19        A    Specific to the Cooperative Agreement,

20   yes, that would be the case, but if that was

21   language that was additionally communicated in a

22   call with the grantees or email with the grantees,

23   it would apply to all -- I mean it does apply to

24   all.

25             MR. NOWICKI:  That's all I have.

1              THE VIDEOGRAPHER:  Going off the

2     record at 3:05.

3                  (Signature having not been waived,

4                  the Rule 30b6 video deposition of

5                  Department of Health and Human

6                  Services, by and through its

7                  designated representative,

8                  KATHERINE CHON, was concluded

9                  at 3:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6          ACKNOWLEDGEMENT OF WITNESS

7              I, Katherine Chon, do hereby

8      acknowledge that I have read and examined the

9      foregoing testimony, and the same is a true,

10     correct and complete transcription of the

11     testimony given by me, and any corrections

12     appear on the attached Errata sheet signed by

13     me.

14

15

16     _____    _____

17     (DATE)                   (SIGNATURE)

18

19

20

21

22

23

24

25

Page 184

1

2

3

4

5

6     CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

7              I, Laurie Donovan, Registered
          Professional Reporter, Certified Realtime
8         Reporter, the officer before whom the
          foregoing deposition was taken, do hereby
9         certify that the foregoing transcript is a
          true and correct record of the testimony
10        given; that said testimony was taken by me
          stenographically and thereafter reduced to
11        typewriting under my supervision; and that I
          am neither counsel for, related to, nor
12        employed by any of the parties to this case
          and have no interest, financial or otherwise,
13        in its outcome.

14              IN WITNESS WHEREOF, I have hereunto
          set my hand and affixed my notarial seal this
15        29th day of December, 2017.

16        My commission expires:  March 14th, 2021

17

18

19     _____

20     LAURIE DONOVAN
       NOTARY PUBLIC IN AND FOR
21     THE DISTRICT OF COLUMBIA

22

23

24

25

# Exhibit E

Deposition of Hilary L. Chester
(Nov. 16, 2017)

```
              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
                   SAN FRANCISCO DIVISION

- - - - - - - - - - - - - -+
                           |
AMERICAN CIVIL LIBERTIES   |
UNION OF NORTHERN          |
CALIFORNIA,                |
                           |
          Plaintiff,       |
                           |
     vs.                   |
                           |  Case Number:
THOMAS E. PRICE, Secretary |
of Health and Human        |  3:16-cv-3539-LB
Services, et al,           |
                           |
          Defendants.      |
                           |
U.S. CONFERENCE OF         |
CATHOLIC BISHOPS,          |
                           |
    Defendant-Intervenor.  |
- - - - - - - - - - - - - -+
```

               Rule 30(b)(6) Deposition of the

           U.S. Conference of Catholic Bishops

       by and through its designated representative,

                    HILARY L. CHESTER

                     Washington, D.C.

          Thursday, November 16, 2017 - 10:00 a.m.

Reported by:

Laurie Donovan, RPR, CRR, CSR

Job no: 20143

```
 1           Rule 30(b)(6) Deposition of the

 2           U.S. Conference of Catholic Bishops

 3     by and through its designated representative,

 4              HILARY L. CHESTER

 5

 6   Held at the offices of:

 7              Gibson Dunn & Crutcher

 8              1050 Connecticut Avenue, N.W.

 9              Washington, D.C. 20036

10              (202)955-8500

11

12

13

14

15

16

17

18              Taken pursuant to notice, before

19      Laurie Donovan, Registered Professional

20      Reporter, Certified Realtime Reporter, and

21      Notary public in and for the District of

22      Columbia.

23

24

25
```

1        A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3            American Civil Liberties Union

4            125 Broad Street, 18th Floor

5            New York, New York 10041

6            (212)519-7897

7            By:  Brigitte Amiri, Esq.

8                 bamiri@aclu.org

9

10   ON BEHALF OF THE FEDERAL DEFENDANTS:

11           U.S. Department of Justice

12           Civil Division

13           20 Massachusetts Avenue, N.W.

14           Room 6139

15           Washington, D.C. 20001

16           (202)353-4556

17           By:  Martin M. Tomlinson, Esq.

18                martin.m.tomlinson@usdoj.gov

19

20

21

22

23

24

25

```
 1   (Appearances continued)

 2  ON BEHALF OF DEFENDANT-INTERVENOR:

 3          Gibson Dunn & Crutcher

 4          1881 Page Mill Road

 5          Palo Alto, California 94304

 6          (650)849-5384

 7          By:  Robert E. Dunn, Esq.

 8               rdunn@gibsondunn.com

 9  ALSO PRESENT:

10          Jeffrey Moon, USCCB

11          Meagan Burrows, ACLU

12          Llewellyn Woolford, Jr., HHS

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S
 2                  HILARY L. CHESTER,
 3        having been first duly sworn, testified
 4        upon her oath as follows:
 5          EXAMINATION BY COUNSEL FOR PLAINTIFF
 6   BY MS. AMIRI:
 7        Q    Could you please state your name for the
 8   record?
 9        A    Hilary Chester.
10        Q    My name is Brigitte Amiri.  I'm one of
11   the attorneys representing the plaintiff in this
12   case.  Thank you so much for making the time to be
13   here today.
14             I just wanted to start by marking as
15   Exhibit 1.
16                  (Exhibit 1 was marked for
17                   identification.)
18   BY MS. AMIRI:
19        Q    I'm going to hand you what I've just
20   marked as Exhibit 1.  I'm sorry.  I have copies of
21   everything else, but this is just the deposition
22   notice, and I just wanted you to take a look at it
23   and turn to the next page, which delineates the
24   topics that we had requested USCCB to appear today
25   to discuss, and I just wanted to clarify what
```

1    own look at those documents?

2         A    They were selected by counsel.

3         Q    Can you talk a little bit about your

4    role at USCCB, your job title, your position, your

5    responsibilities?

6         A    Sure.  I'm the associate director for

7    anti-trafficking programs, and so I oversee,

8    manage and administer all of our programs related

9    to anti-trafficking.

10        Q    And how long have you been at USCCB?

11        A    A total of nine years.

12        Q    During that time have you always been

13   involved in the trafficking program, or have you

14   moved to different areas of the organization?

15        A    I had one prior position before moving

16   to the trafficking program.

17        Q    And what was that position?

18        A    I was the assistant director for family

19   reunification services and Children's Services.

20        Q    And was that related to unaccompanied

21   immigrant minor reunification?

22        A    Yes.

23        Q    About what time period did you hold that

24   position?

25        A    2008 to 2010.

1      Q    Could you start by giving a scope of the

2   current trafficking program that USCCB has a

3   contract with the federal government to

4   administer, generally the geographic scope, the

5   number of subgrantees.  We can talk a little bit

6   more, but just to kind of paint the picture a

7   little bit about the program, because I think that

8   that overview might be a little helpful as we go

9   into some of the deeper questions.

10     A    Is this just limited to the HHS

11   trafficking program?

12     Q    Yes.

13     A    It's a national program with three

14   different national grantees.  We are one of those

15   grantees.  We are the primary grantee for HHS

16   Regions 3 and 6, but we have some providers in

17   other states as well.  Similarly, the other

18   grantees also have subproviders in our regions.

19          We propose and hope to serve about 200

20   individuals each fiscal year.  We provide basic

21   case management services through subgrantees that

22   are operating at the local level and have the

23   direct contact.

24     Q    And I should have stated this at the

25   beginning.

1           If at any time you need a break, just
2    let me know, and I'll ask that you finish the
3    question that's posed before we take a break.
4           If you don't understand a question I've
5    asked, feel free to ask me to clarify it, tell me
6    you don't understand it.
7           If your attorney objects, unless he
8    instructs you not to answer it, feel free to
9    answer the question.
10          I'm sorry I forgot to go over that in
11   the beginning.
12          So in terms of the geographic scope, I
13   think you said it's regions 3 and 6; is that
14   right?
15   A    Yes.
16   Q    What states does that comprise?
17   A    New Mexico, Oklahoma, Texas, and then
18   West Virginia, Virginia, Pennsylvania, Maryland,
19   Delaware, I believe.
20   Q    And does that mean that USCCB, in their
21   contract with HHS, only provides services in those
22   states?
23   A    No.
24   Q    What other states do they provide
25   services in?

1    the time that the award is made -- and a victim

2    isn't necessarily identified, are you having

3    conversations with entities that were your

4    subrecipients in the prior trafficking program or

5    other entities that you have had conversations

6    with about wanting to participate as subrecipients

7    in the 2015 program?

8            I'm just trying to figure out kind of

9    how you figured out who to be talking to for the

10   subrecipient's MOUs.

11       A    Sure.

12           We have been promoting, and prior to

13   being awarded, we reached out to some of our

14   refugee resettlement providers, some of our

15   Children's Services providers, and then once we

16   were awarded, we went back out to that same -- at

17   least those two networks, seeing if any of those

18   agencies wanted to come on board with this program

19   as well as the other ones they were already

20   implementing for us.

21       Q    And during that selection process and

22   throughout the subgranting process, was USCCB only

23   talking to and selecting subrecipients that shared

24   USCCB's religious opposition to abortion and

25   contraception?

1       A    We were working through our existing

2   partners, and so we were working with

3   organizations that we already have ongoing

4   relationships with, implementing other programs.

5       Q    In the context of the application

6   process, though, I believe at one point there is

7   mention of "our subrecipients will share our same

8   position on abortion and contraception, so

9   therefore we won't be imposing any belief system

10  on our subrecipients," so I believe that's in the

11  email exchange from September.

12           Do you recall that?

13      A    Yes.   That's correct.

14      Q    So in the execution of this grant, was

15  USCCB following that essentially?

16      A    Yes.

17      Q    Okay, and did the federal government

18  know that USCCB was executing the contract in a

19  way by selecting subrecipients that shared the

20  same Catholic social teachings?

21      A    I wouldn't say that they all share the

22  same Catholic social teachings, because they are

23  not all Catholic providers.

24           The government was aware that we were

25  working with our existing providers that we

1   already had ongoing working relationships with,

2   because we are not vetting new unknown providers,

3   we're working with our known networks and networks

4   that are already in alignment and in agreement

5   with working with us in these implementing

6   programs with clients on the ground.

7         So I think it's fair to say that they

8   understood that we were using our existing

9   networks, which are quite extensive.

10   Q   And when you're talking about existing

11   networks, I'm assuming, though, that you're not

12   referring to the 2006 trafficking program where

13   USCCB was the sole grantee and there was a network

14   of entities that were quite diverse in terms of

15   their religious affiliation and beliefs about

16   contraception and abortion.

17         That's not the network you're talking

18   about?

19   A   Correct.

20   Q   So when you're talking about "existing

21   network," what are we looking to in terms of

22   existing network?

23   A   So we have multiple refugee resettlement

24   programs, and that's one network.  We have

25   children services programs that implement foster

1   care, that implement family reunification or

2   post-release services.  So those are two

3   additional networks that we are working with.

4        Q    At any time during the post-award phase

5   until present, has there ever been an entity that

6   has approached USCCB and asked to be a

7   subrecipient that has not shared the USCCB's

8   position on abortion or contraception?

9        A    We have had organizations that have

10  asked to be one of our subrecipients.  In some

11  cases they were already subrecipients with one of

12  the other national grantees, and so we advised

13  that they stay with that grantee, because we don't

14  have to be exclusive regionally; and then in

15  another one instance that I can think of, we

16  referred them to USCRI, which is one of the other

17  national grantees, because they were a secular

18  organization.

19       Q    Do you know if there are differences in

20  the programs between USCCB and Tapestry and USCRI

21  in terms of, for example, the amount of

22  reimbursement for a survivor?

23       A    We do have different reimbursement rates

24  across the three grantees, yes.

25       Q    Do you know what the varying levels are?

1    with us, and I know the director of the program.

2    We're professional colleagues and maybe friends,

3    and so I think that was part of the interest, but

4    I wouldn't call it double-dipping, though.

5        Q    So for some trafficking survivors, they

6    would come to USCCB; for others, they might go to

7    USCRI?

8        A    That was what they pictured.  It's not

9    possible.

10       Q    Okay, and I believe you mentioned before

11   there's no geographic limitation on services, so

12   even though you, USCCB, have regions 3 and 6,

13   there isn't any sort of limitation on USCCB to

14   only serve trafficking survivors in those

15   geographic regions; is that fair?

16       A    That's right, yes.

17       Q    And is there any sort of restriction on

18   having only subgrantees in those particular

19   regions?

20       A    No.

21       Q    So you, USCCB, can have subgrantees

22   across the country?

23       A    Yes.

24       Q    Do you, in fact, have subgrantees across

25   the country?

1       A    We do.  I believe we are present in --

2  and I don't know the exact number, but 18 to 20

3  different states, I believe.

4       Q    Do you know whether USCCB had a

5  conversation with HHS about the secular

6  organization that approached USCCB to be a

7  subrecipient or the other organizations that

8  wanted to work with both USCCB and USCRI?

9       A    I didn't have a conversation with anyone

10  at HHS about that.

11       Q    Do you know whether anyone at USCCB did?

12       A    No.

13       Q    Do you remember the names of both of the

14  organizations?

15       A    I remember the one that is the current

16  subrecipient of USCRI.

17       Q    And what is that organization?

18       A    It's YMCA International in Houston.

19       Q    And you don't remember the secular

20  organization that approached USCCB and asked to

21  work with USCCB?

22       A    I believe it was Boat People SOS, but

23  I'm not 100 percent sure.

24                 MS. AMIRI:  We're going to move to

25       Exhibit 12.

1                    (Exhibit 12 was marked for

2                    identification.)

3   BY MS. AMIRI:

4        Q    Again, this might be a draft.  We got

5   multiple versions of this.  Take a look and see if

6   that reflects the MOU that you sent to

7   subrecipients.

8                    (Witness peruses document.)

9                    THE WITNESS:  Okay.

10  BY MS. AMIRI:

11       Q    Is what's been marked as Exhibit 12 the

12  Memorandum of Understanding between USCCB and

13  subrecipients?  I know it's not a completed

14  version, but is that the version that gets

15  completed and sent to subrecipients?

16       A    This is the version I believe that we

17  submitted as an attachment to our proposal in

18  response to the funding opportunity announcement.

19       Q    Was this the version that was approved

20  by HHS?

21       A    It was the version that we were

22  negotiating over.

23       Q    So were there conversations between

24  USCCB and HHS about the language in the MOU?

25       A    Yes.

1    initial screenings and more comprehensive health,

2    and so it's a little bit more preventive in scope

3    than taking clients that don't have access to

4    that, just for serving whatever medical needs they

5    may have.

6              Some clients, depending on the state

7    again, are eligible for health insurance through

8    the Affordable Care Act or Medicaid, and so then

9    in those cases, the case manager would attempt to

10   also enroll them in those programs.

11        Q    Do you know approximately how many

12   trafficking survivors that USCCB, through its

13   subrecipients, serve are precertified versus

14   certified?

15        A    I believe we have about a 60/40 mix.

16   I'm not 100 percent sure, but 60 percent are

17   precertified, about 40 percent are certified.

18        Q    Do you know how many survivors were

19   served in the first fiscal year of the program by

20   USCCB?

21        A    I believe we served about 100, 105.

22        Q    When does the fiscal year end; do you

23   know?

24        A    The federal fiscal year generally ends

25   September 29th or 30th.

1      Q     So USCCB has started its -- you're now

2      in the beginning of your third year of the

3      program, if I'm doing the math right.

4      A     So we are in the third year of the

5      financial fiscal year of the project.  We had to

6      start the project, the third project year back on

7      June 1 as a result of some funding and enrollment

8      issues that all three of the grantees were having,

9      so we prematurely ended the project year and

10     started a new one.

11     Q     How long is the program supposed to go

12     in terms of the funding will continue for how

13     long?

14     A     36 months.

15     Q     36 months total?  Okay.  So we talked

16     about in the first fiscal year serving about 100

17     trafficking survivors.  Do you know how many

18     trafficking survivors were served in the second

19     fiscal year?

20     A     So that one I want to say -- I don't

21     know these numbers perfectly -- we were much

22     closer to almost our 200 target, but again we

23     ended it in June, so we ended early.

24     Q     So going back to kind of the real-life

25     experience of a trafficking survivor who comes to

1    a subrecipient who is in need of medical care, and

2    let's say in the context of an abortion.  A

3    trafficking survivor says to one of your

4    subrecipients, I am pregnant and I would like to

5    have an abortion.

6              What is your understanding of -- or what

7    does USCCB tell its subrecipient it should do in

8    that context in response?

9         A    That they need to refer and redirect

10   that client to the medical provider that they have

11   already connected the client with, or if this is

12   like during the very first meeting, it's probably

13   unlikely for them to disclose something so

14   personal, but they will be connecting the clients

15   to a medical provider, and they would redirect and

16   instruct the client that something medical needs

17   to be discussed with a medical provider,

18   maintaining that kind of confidentiality.

19        Q    Do you know if that's the same response

20   if, for example, the woman says I'm pregnant and I

21   would like to carry my pregnancy to term, and I

22   need to know what to do in terms of proper

23   prenatal care?

24        A    Yes.  Again, it would be referred to a

25   medical provider to then make those kind of

1    specialist referrals, presumably.

2         Q    Does the subrecipient provide

3    transportation for the trafficking survivor to the

4    doctor's appointment in general for medical care?

5         A    In some cases, not in all cases.   The

6    program is, is more intense in that there is more

7    direct contact with the clients that are in the

8    more high-level category, but many of the clients

9    are already independent and relatively mobile on

10   their own, independently navigating, so it really

11   varies client to client.

12        Q    And in terms of payment for the medical

13   procedure, you talked about the various potential

14   pots of money or insurance or free clinics.   For

15   something like contraception, which would be

16   covered in the Medicaid program, for example, but

17   perhaps not something that can be reimbursed by

18   the subrecipient, per the program operations

19   manual -- well, first let me ask that question.

20             Can subrecipients use money that it

21   receives from USCCB to pay for contraception for

22   trafficking survivors?

23        A    Technically they would be following

24   their own internal agency's policies about whether

25   or not they make those kinds of direct referrals

1   where they are interjecting themselves that

2   directly, if that makes sense.

3        Q    I think my question is more about

4   payments.  Maybe we can turn to page 50 of the

5   program operations manual, which is Bates 301, and

6   this is a chart of allowable and unallowable

7   costs, and on the "Unallowable" column for the

8   "Health Care" row, it says "abortion

9   counseling/services" and "abortive prescriptions"

10  are unallowable.  I didn't know if that would

11  include contraception.

12       A    All forms of contraception?

13       Q    Yes.  Let's say -- well, if it matters,

14  I mean we can kind of go through each one, but if

15  a trafficking survivor says that she was on birth

16  control and wanted to continue to be on birth

17  control and needed money from the subrecipient to

18  pay for that, would that be an unallowable cost in

19  this chart?

20       A    Not in this chart, no.  In practice, the

21  clients in some cases are reimbursed, for example.

22  In most cases, what the clients will do is receive

23  some kind of an invoice or a bill from a medical

24  provider, and that is turned over to the agency

25  which makes the payment.

1            And so in our experience, the level of

2    detail is not that refined, and so if a client

3    goes and gets glasses at WalMart, in some cases

4    they pay for that with a WalMart gift cart.  In

5    other cases, they may receive a bill, and that's

6    just turned over, and then the payment is made

7    directly to the medical provider.

8            And so the clients are not fronting

9    money themselves up front.  We're not handing

10   money to them unless it's something like a WalMart

11   Vision Center where they can be given a gift card,

12   but if the client is charged for medical service,

13   then they are given that bill, the bill is turned

14   in to the agency, who in turn makes the payment.

15   Q    Do you -- meaning USCCB -- have

16   communications on a regular basis with your

17   subrecipients about what types of requests are

18   made from the trafficking survivor to the

19   subrecipient about abortion and contraception?

20   A    We actually haven't had questions about

21   those procedures specifically from the

22   subproviders referencing any specific clients.

23   Q    So there hasn't been a subrecipient who

24   has come to USCCB and said I'm not sure if I can

25   pay for this pack of birth control pills or this

1    Depo-Provera shot, you know, is that something

2    that's allowable under the costs?  Have you even

3    had those types of conversations?

4          A    We have not.

5          Q    Okay.  Do you know what the experience

6    is on the ground for a trafficking survivor who

7    then is referred to her initial healthcare

8    provider but then might need specialized care?

9    For example, in the abortion context, do you know

10   whether the healthcare provider that she has seen

11   then has referred to an abortion clinic, for

12   example?

13         A    I don't know about that.

14         Q    So there's no report back from the

15   subrecipient about the types of referrals that are

16   made by the medical facility that has done the

17   initial screening or seen the woman?

18         A    That's correct, and in practice I

19   wouldn't imagine that a medical provider would be

20   reporting back somehow to our case managers about

21   referrals that they're making for treatment

22   either.

23         Q    Has there been any discussion from

24   subrecipients to USCCB about transportation to an

25   abortion clinic or Planned Parenthood and

1   questions about whether that transportation could

2   be paid for?

3          A     We've never had that come up, no.

4          Q     Is it USCCB's position that it would

5   prohibit its subrecipients for paying for

6   transportation to an abortion clinic for the

7   purposes of an abortion?

8          A     We provide things like bus passes to

9   clients.  Clients are given some spending money

10  specifically for things like transportation, and

11  how they spend that would be their decision, and

12  so would we explicitly pay?  I don't know that we

13  would know that.

14         Q     But that hasn't come up in terms of a

15  conversation between a subrecipient and USCCB?

16         A     No.

17         Q     Do you know if USCCB has had any

18  conversations with HHS, post-award, about abortion

19  or contraception?

20         A     We had to explain the alternative

21  approach to the new incoming staff who were new to

22  the OTIP office.  There's a new deputy director,

23  and we have a new project officer, and so there

24  were new staff that were not around when we were

25  having the initial negotiations during the

1    their feedback, and then, when they approved the

2    version, we began implementing it in our TVAP

3    program for our clients.

4        Q    So did you send the draft that's been

5    marked as Exhibit 16 to HHS for its feedback?

6        A    Yes.

7        Q    And what did HHS say in response after

8    they received the draft?

9        A    The only issue that we, that we were all

10   unsure about was who would need to be notified if

11   the individual client were to request a change in

12   provider, because there seemed to be -- it seemed

13   to be implied that in addition to just the local

14   people making a referral to another program, that

15   there needed to be a notification that this was

16   happening.

17          So it wasn't clear whether I should be

18   the person as the main point of contact or if it

19   should be HHS, and we just went back and forth

20   with them, and ultimately I believe it's us that

21   are the person notified -- the entity notified.

22   That was the only question.

23       Q    So at some point then, the final version

24   is Exhibit 17; is that fair?

25       A    Yes.

1     Q    And how did USCCB then operationalize

2  this?  Did you send the final version to your

3  subrecipients and ask them to present it to the

4  individuals that they serve?

5     A    So we sent it out to all the

6  subproviders and asked them to not only use it

7  going forward with new clients that were enrolled

8  in the program but to also meet and provide this

9  to all the existing open cases and have them sign

10  it as well.

11     Q    And in the life of this award for the

12  Trafficking Victims Assistance Program, the TVAP,

13  have you received any written notices back by a

14  beneficiary that has requested a referral?

15     A    No, we haven't.

16     Q    If you did, what would that mean in

17  practice?  If someone did send this to you, and

18  she was a trafficking survivor, what would happen

19  in terms of her care?

20     A    We would reach out to one of the other

21  national grantees to see if they had a provider in

22  the area who would be able to transfer -- we could

23  transfer the case to, or if they would be able to

24  then provide another provider, if they could bring

25  on board another provider in the area to provide

1    those services.

2             I know that we have, in practice,

3    several of our subproviders as well as the other

4    grantees' subproviders have done remote case

5    management.  So it is also possible that a

6    provider not in the direct local proximity would

7    be able to also serve that individual, and so if

8    one of the other two grantees had a provider

9    within a reasonable distance, then they would be

10   able to take the case and provide services going

11   forward.

12       Q    Do you have a sense of how often it is

13   that there is, there are multiple providers

14   working with different grantees in a particular

15   region?  So for example, in a particular state, is

16   it that there are multiple providers providing

17   services to trafficking survivors, some of which

18   get their reimbursement from USCCB, others from

19   Tapestry or USCRI?

20       A    So that's certainly the case in Atlanta,

21   it's the case in Houston, it's the case in Los

22   Angeles, it's the case in the sort of wider New

23   York City area.  It happens in larger suburban

24   metropolitan areas where there are both a lot of

25   different organizations that are capable of

1  providing these kinds of services and relatively

2  high numbers of survivors that need the services.

3      Q    Do you know in what areas there is only

4  a provider that is associated with USCCB?

5      A    I couldn't answer that very accurately

6  without looking at our map, at the other two

7  grantees' maps, to be honest.

8      Q    But do you think it's accurate to say

9  that there are some locations where USCCB is the

10  only -- where a USCCB subrecipient is the only

11  provider of services for trafficking survivors?

12      A    Yes.

13              MS. AMIRI:  So we're going to mark

14      as Exhibit 18 a memorandum.

15              (Exhibit 18 was marked for

16              identification.)

17  BY MS. AMIRI:

18      Q    I decided not to ask you any questions

19  about Exhibit 18.  I'll strike that and say we

20  marked as Exhibit 18 a document which -- I'm not

21  exactly sure who generated it, but I'll show it to

22  you, and I think it's largely about the Safe

23  Passages program, but there is a mention of

24  trafficking in it on Bates 2310, so I just wanted

25  to ask you questions about the trafficking

1        A    Yes.

2        Q    Were there conversations with HHS about

3   USCCB's position about assisting same-sex couples

4   who sought T visas?

5        A    I don't recall having like telephone

6   conversations about that.  Any communication would

7   have been through email.

8        Q    Do you know what the final resolution

9   was?  Did HHS say that USCCB and its subrecipients

10  did not have to provide assistance to same-sex

11  couples who are seeking T visas?

12       A    My understanding, based on our written

13  text in the proposal and in our guidance to

14  subrecipients, is that the assistance isn't --

15  it's not that we would not serve individuals who

16  are seeking a T visa and are in a same-sex

17  marriage; it's that we would not assist them in

18  applying specifically for that T visa.  I think

19  that's two different -- it's two things.  There's

20  a distinction.

21       Q    Was this a conversation that you had

22  making that distinction with HHS?  Did you have a

23  conversation with HHS about this?

24       A    I think we made the distinction clear

25  that we would certainly assist individuals if they

1   were in a same-sex marriage and were pursuing a

2   T visa.  What we would not do is assist literally

3   with the application of the T visa in order to

4   then have the derivative status for that spouse.

5        Q    And did HHS at any time, verbally or in

6   writing, say that it would be acceptable for USCCB

7   and its subrecipients to refrain from assisting

8   the same-sex partner with the application for the

9   T visa?

10       A    I don't recall that they wrote back or

11  communicated anything that that was acceptable;

12  rather, that they did approve the language that we

13  provided in the footnotes in our documents.

14       Q    Before, when we were talking about the

15  secular organization, Boat People SOS, that had

16  asked to be a subrecipient of USCCB, and USCCB

17  referred them to USCRI, and you may have said

18  this -- and forgive me if you did, but the reason

19  why USCCB referred them to USCRI rather than

20  taking them on as a subrecipient, was it because

21  Boat People SOS did not share USCCB's religious

22  beliefs with respect to abortion and

23  contraception?

24       A    I think it's a bigger decision, a bigger

25  program design that we were following in this 2015

1    forward version of the Trafficking Victim

2    Assistance Program.  We have a very small national

3    staff, with a much smaller range of activities

4    that we are doing at the national office versus

5    under the contract.

6            Under the contract, as the sole provider

7    for the whole country, we had to be able to be

8    responsive across the country, and that required

9    quite a bit of staffing to proactively and

10   reactively find new providers.

11           We were working with organizations that

12   we had no prior knowledge of that were just Google

13   searching, and that required a level of vetting, a

14   level of financial vetting, a level of their

15   capacity.

16           Under this current program, we have a

17   much smaller staff.  It's a much smaller budget,

18   and in order to pass through the maximum funds to

19   the subproviders and for clients, we have really

20   reduced what we do at the national office.

21           And so part of the decision is very

22   practical, which is that we only want to work with

23   organizations that we've already done all of that

24   vetting and done all of that assessment of their

25   capacity and their ability to provide quality

1    services for this specific population.

2           And then also there is a comfort level,

3    and there is an assurance that by selecting people

4    that are already in agreements with us for other

5    programs, that they will be operating our program

6    in a way that we are comfortable with.

7       Q   When you say "that we are comfortable

8    with," do you specifically mean with respect to

9    the religious beliefs as they pertain to abortion

10   and contraception?

11      A   As one area, certainly.

12      Q   And with Boat People SOS, USCCB did have

13   them as a subcontractor in the 2006 contract,

14   correct?

15      A   Yes.

16      Q   So USCCB in that circumstance did

17   already do the vetting with Boat People SOS and

18   were familiar with their services?

19      A   I would say relatively.  I think it's,

20   it is relevant, it is significant that that was --

21   that contract ended in 2010, which is five to six

22   years ago, and I think that that makes a

23   difference and that we would still want to vet an

24   organization that we weren't currently working

25   with if they were five, six years beyond when we

1    had a working relationship with them.

2        Q    So with some of the subrecipients that

3    USCCB is currently working with now, were some of

4    them new to USCCB's network, and you had to do

5    that vetting process with them?

6        A    We have some sub-offices of existing

7    partners, and so in some cases a sub-office of an

8    existing Catholic Charities or Bethany Christian

9    Services or some organization is coming on board

10   that perhaps hadn't done the resettlement for

11   Children's Services, but there's an existing

12   relationship with that parent agency that we do

13   have agreements with.

14              MS. AMIRI:  I think I'm almost

15        done, if we can take two minutes.

16              (Whereupon, a short recess was

17              taken.)

18              MS. AMIRI:  I don't have anything

19        further.

20    EXAMINATION BY COUNSEL FOR DEPARTMENT OF JUSTICE

21   BY MR. TOMLINSON:

22        Q    Dr. Chester, my name is Martin

23   Tomlinson.  I work for the Department of Justice.

24   I'm representing the government in this matter.  I

25   just have a few questions for you.

1          Please let me know if you don't
2   understand anything and need me to reword
3   something or ask something again.
4          I want to ask you just a few questions
5   about the 2015 TVAP grant that was awarded to
6   USCCB from HHS.  Is it okay if I just call it "the
7   grant" for the purposes of our questions?  Will
8   you know what I'm talking about, or would you
9   prefer me to use some other terminology?
10      A    No, that's fine.
11      Q    Okay.
12           Does USCCB use any funds from the grant
13   to promote Catholicism?
14      A    No.
15      Q    Does USCCB use any funds from the grant
16   for proselytization?
17      A    No.
18      Q    Does USCCB use any funds from the grant
19   for religious education purposes?
20      A    It is possible for a case manager,
21   during the time that they are spending with the
22   client, which would be presumably covered by the
23   funds for the administrative reimbursement, to
24   make referrals to a client's preferred religious
25   organization or faith community for something like

```
 1
 2
 3
 4
 5
 6                ACKNOWLEDGEMENT OF WITNESS
 7                   I, Hilary L. Chester, do hereby
 8         acknowledge that I have read and examined the
 9         foregoing testimony, and the same is a true,
10         correct and complete transcription of the
11         testimony given by me, and any corrections
12         appear on the attached Errata sheet signed by
13         me.
14
15
16     _____        _____
17     (DATE)                  (SIGNATURE)
18
19
20
21
22
23
24
25
```

1

2

3

4

5     CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

6              I, Laurie Donovan, Registered
       Professional Reporter, Certified Realtime
7      Reporter, the officer before whom the
       foregoing deposition was taken, do hereby
8      certify that the foregoing transcript is a
       true and correct record of the testimony
9      given; that said testimony was taken by me
       stenographically and thereafter reduced to
10     typewriting under my supervision; and that I
       am neither counsel for, related to, nor
11     employed by any of the parties to this case
       and have no interest, financial or otherwise,
12     in its outcome.

13              IN WITNESS WHEREOF, I have hereunto
       set my hand and affixed my notarial seal this
14     27th day of November, 2017.

15     My commission expires:  March 14th, 2021

16

17

18     _____

19     LAURIE DONOVAN
       NOTARY PUBLIC IN AND FOR
20     THE DISTRICT OF COLUMBIA

21

22

23

24

25

# Exhibit F

Deposition of Scott Lloyd
(Dec. 18, 2017)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

- - - - - - - - - - - - - -+
                           |
AMERICAN CIVIL LIBERTIES   |
UNION OF NORTHERN          |
CALIFORNIA,                |
                           |
        Plaintiff,         |   Case Number:
                           |
  vs.                      |   3:16-cv-3539-LB
                           |
ERIC G. HARGAN, Acting     |
Secretary of Health and    |
Human Services, et al,     |
                           |
        Defendants,        |
                           |
U.S. CONFERENCE OF         |
CATHOLIC BISHOPS,          |
                           |
   Defendant-Intervenor.   |
                           |
- - - - - - - - - - - - - -+


Videotaped Deposition of Scott Lloyd, Esq.

Washington, D.C.

Monday, December 18, 2017 – 12:10 p.m.




Reported by:

Laurie Donovan, RPR, CRR, CSR

Job no: 20317

1                   Videotaped Deposition of

2                      SCOTT LLOYD, ESQ.

3

4    Held at the offices of:

5               U.S. Department of Justice

6               20 Massachusetts Avenue, N.W.

7               Room 6139

8               Washington, D.C. 20001

9               (202)353-4556

10

11

12

13

14

15

16

17                   Taken pursuant to notice, before

18        Laurie Donovan, Registered Professional

19        Reporter, Certified Realtime Reporter, and

20        Notary public in and for the District of

21        Columbia.

22

23

24

25

```
 1                A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF AMERICAN CIVIL LIBERTIES
 3   UNION OF NORTHERN CALIFORNIA:
 4            ACLU Foundation
 5            125 Broad Street
 6            New York, New York 10004
 7            (212)519-7897
 8            By:  Brigitte Amiri, Esq.
 9                 bamiri@aclu.org
10                 Meagan Burrows, Esq.
11                 mburrows@aclu.org
12   ON BEHALF OF THE DEFENDANT-INTERVENOR USCCB:
13            Gibson, Dunn & Crutcher, LLP
14            333 South Grand Avenue
15            Los Angeles, California 90071
16            (213)229-7000
17            By:  Daniel Nowicki, Esq.
18                 dnowicki@gibsondunn.com
19                 Robert Dunn, Esq. (phone)
20                 rdunn@gibsondunn.com
21
22
23
24
25
```

1   (Appearances continued)

2   ON BEHALF OF OFFICIAL CAPACITY FEDERAL DEFENDANTS

3   ERIC G. HARGAN AND DEPARTMENT OF HEALTH AND HUMAN

4   SERVICES:

5           U.S. Department of Justice

6           20 Massachusetts Avenue, N.W.

7           Room 6139

8           Washington, D.C. 20001

9           (202)353-4556

10          By:  Martin M. Tomlinson, Esq.

11               martin.m.tomlinson@usdoj.gov

12               Peter J. Phipps, Esq.

13               peter.phipps@usdoj.gov

14   ALSO PRESENT:

15          Martin Sherrill, Videographer

16          Llewellyn Woolford, Esq. (HHS)

17          Caitlin Palacios, Esq. (HHS)

18          Jeffrey Hunter Moon, Esq. (USCCB)

19          Rachel Chrisinger, paralegal

20

21

22

23

24

25

```
1                P R O C E E D I N G S
2                THE VIDEOGRAPHER:  This is tape
3        number 1 of the video deposition of Scott
4        Lloyd in the matter of ACLU of Northern
5        California versus Burwell.  This deposition
6        is being held at 20 Massachusetts Avenue,
7        Northwest, Washington, D.C., at approximately
8        12:10 on December 18, 2017.
9                My name is Martin Sherrill from the
10       firm of TransPerfect Video, and I'm the video
11       legal specialist.  The court reporter today
12       is Laurie Donovan in association with
13       TransPerfect Video.
14                Would counsel please introduce
15       themselves.
16                MS. AMIRI:  Brigitte Amiri for the
17       plaintiff.
18                MS. BURROWS:  Meagan Burrows for
19       the plaintiff.
20                MR. NOWICKI:  Daniel Nowicki for
21       the defendant-intervenor USCCB.
22                MR. MOON:  Jeffrey Moon for
23       defendant-intervenor.
24                MR. PHIPPS:  Peter Phipps for the
25       official capacity federal defendants.
```

1          MR. TOMLINSON:  Martin Tomlinson

2      for the official capacity federal defendants.

3          MR. WOOLFORD:  Llewellyn Woolford

4      for the defendant U.S. Department of Health

5      and Human Services.

6          MS. PALACIOS:  Caitlin Palacios for

7      defendant U.S. Department of Health and Human

8      Services.

9          MS. CHRISINGER:  Rachel Chrisinger

10      with the official capacity federal

11      defendants.

12          THE VIDEOGRAPHER:  Will the court

13      reporter please swear in the witness.

14          SCOTT LLOYD, ESQUIRE,

15      having been first duly sworn, testified

16      upon his oath as follows:

17      EXAMINATION BY COUNSEL FOR PLAINTIFF

18  BY MS. AMIRI:

19      Q   Good afternoon, Mr. Lloyd.  Thank you

20  for taking the time to be here today.

21          Other than speaking with your attorneys,

22  what did you do to prepare for today's deposition?

23      A   Just thought about the subject matter.

24      Q   Did you review any documents that were

25  not provided to you by counsel?

1       Q    Yes.

2       A    It's similar, similar language to what

3   you find in the Preamble to PREA --

4       Q    Okay.

5       A    -- regarding religious accommodations.

6       Q    Okay.

7            Have you personally been involved in

8   placement decisions related to a minor who is

9   seeking an abortion and a placement decision that

10  was affected by whether a grantee had a religious

11  objection to abortion or contraception?

12      A    No.

13      Q    Have you been involved in any individual

14  minor's circumstances where she has requested an

15  abortion and needed to be transferred because the

16  grantee where she was residing had a religious

17  objection to providing access to abortion?

18      A    I'm sorry.  Could you -- I missed the

19  first part.

20      Q    Yes.

21           Have you personally been involved in the

22  decision to transfer a minor out of a religiously

23  affiliated shelter that has a religious objection

24  to abortion to another facility because she

25  requested an abortion?

1       A     No.

2       Q     Do you know whether, since your time at

3    ORR, that has happened, that a minor has requested

4    an abortion at a religiously affiliated shelter

5    and has been transferred to a shelter that doesn't

6    have a religious objection to abortion?

7       A     I don't recall.

8       Q     Can you walk me through how it works

9    when a minor requests an abortion at ORR.

10      A     All of our UACs receive routine medical

11   services and also regular clinical intervention

12   counseling services, both on an individual and

13   group basis, and there's just counseling or

14   clinical services available generally.

15            And so at some point it's raised to

16   either -- oftentimes a UAC will find out she's

17   pregnant during a, during the initial medical exam

18   or will have known and will disclose it at some

19   point during the initial process.  Usually it

20   happens by one of those two means, by

21   self-disclosure or discovering it during the

22   initial medical exam.

23      Q     And let's say then the minor requests an

24   abortion to her doctor or the grantee.  Then what

25   happens?

1        A     Then, then it would be essentially

2   through the medical staff -- I was about to say

3   staff.  Through the grantee medical staff, it

4   would go to ORR medical staff, sometimes perhaps

5   through federal field staff who aren't necessarily

6   medical personnel, and then would go through our

7   medical department, DHUC, Division of Health for

8   Unaccompanied Children.  Sometimes directly to me,

9   with Jonathan White copied, or sometimes through

10  Jonathan White to me.

11       Q     And when you talk about how this comes

12  through, is it through a Significant Incident

13  Report or some other mechanism?

14       A     It's, it's, it's more through -- a

15  Significant Incident Report may trigger it, or it

16  could be a less formal means of communication.  It

17  usually wouldn't come to me in the form of a

18  Significant Incident Report.  It would be more of

19  an email, usually, either from Michael Bartholomew

20  or Jonathan White.

21       Q     And when you get the request for an

22  abortion, what is your role at that point?

23       A     To, to gather information.

24       Q     And how do you do that?

25       A     I read the record that's provided, and

1   if there's anything that needs to be further

2   developed, I'll, I'll request that information.

3        Q    What would be an example of something

4   that needs to be further developed?

5        A    Oh, you know, sometimes the, the nature

6   of the relationship that gave rise to pregnancy,

7   prospects for sponsorship, any medical conditions,

8   how far along she is in the pregnancy.  It could

9   be, could be any of those factors.

10       Q    Why does the manner in which she became

11  pregnant affect your analysis?

12       A    It's just the number of -- it's one

13  among the many potentially relevant facts.

14  It's -- we, we are seeking to understand the

15  totality of the circumstances, and so I guess it

16  goes to the totality of the circumstances,

17  understanding that.

18       Q    To, to what end?  To make the final

19  determination of whether to approve the abortion?

20       A    Yeah, I mean that would be -- it would

21  be a piece of information we would need to know to

22  make that determination.

23       Q    Is there a difference in your mind of

24  whether a minor is pregnant as a result of rape or

25  if she's not in terms of whether she may be

1    granted the permission to have the abortion?

2         A     There, there is a difference.

3         Q     And why is that?

4         A     It's just from the 2008 policy, it

5    treats the two differently.

6         Q     Does it treat the two differently with

7    respect to the substantive decision about whether

8    she can have the abortion or with respect to

9    funding?

10        A     Well, does the 2008 policy?

11        Q     Yes.

12        A     My understanding is that it's related to

13   the funding.

14        Q     So if there's a decision about funding

15   with respect to the nature of the pregnancy, does

16   the nature of the pregnancy matter to you in terms

17   of your decision about whether to permit the

18   abortion or not?

19        A     Yeah.  All circumstances, the nature of

20   the pregnancy among them, matter.

21        Q     You also mentioned how far along she is.

22   Why does that matter in terms of your decision to

23   permit the abortion or not?

24        A     It's just some information that you

25   expect to be part of a like well-developed medical

1  record, and its absence would be puzzling.  I

2  don't know that we really had to chase that

3  information down, but it's -- it's possible that

4  we may have, but in any case just to understand

5  the totality of the circumstances.

6       Q    Why is the sponsor relevant in your

7  determination -- or the possibility of a sponsor

8  relevant in your determination about a minor's

9  request for abortion?

10      A    This is a person who is going to inherit

11  that, you know, care for that individual, and we

12  need to have some rudimentary understanding of --

13  not just rudimentary -- actually a detailed

14  understanding of what that individual is prepared

15  to take on, and also, also factors related to

16  whether the UAC is related to the sponsor or how

17  far along the sponsorship process is could affect

18  a determination about a pregnancy termination.

19      Q    Have you ever approved an abortion

20  request in your time as ORR director?

21      A    No.

22      Q    Are there any circumstances under which

23  you would approve an abortion request?

24           MR. PHIPPS:  Objection.  Calls for

25      speculation.

1              THE WITNESS:  Well, I was going to

2       not answer that.

3  BY MS. AMIRI:

4       Q    Well, you can still answer it.

5       A    I don't, I don't know.

6       Q    Are there any -- let me back up.

7            You have denied abortion requests,

8  correct?

9       A    Yes.

10      Q    You have denied abortion requests even

11  in the context where the pregnancy is as a result

12  of rape, right?

13      A    Yes.

14      Q    So it sounds like if the young woman has

15  been raped, that is not a determining factor about

16  whether you would allow the abortion, right?

17      A    It could be.

18      Q    But it hasn't yet?

19      A    No.

20      Q    You're personally opposed to abortion,

21  correct?

22      A    Yes.

23      Q    You've written on the subject?

24      A    Yes.

25      Q    You're personally opposed to

1   contraception, correct?

2        A    Depends.

3        Q    You wrote an article that said in order

4   to be pro-life, you need to be anti-contraception?

5        A    That was the title of the article,

6   something along those lines.

7        Q    Right.  So you have, have written on the

8   subject?

9        A    I have written on subjects related to

10  those things, yes.

11       Q    And you believe that unaccompanied

12  minors have no constitutional right to abortion?

13       A    That's legal speculation.

14            MR. PHIPPS:  Objection.

15            THE WITNESS:  I mean --

16  BY MS. AMIRI:

17       Q    You're an attorney.  I'm not asking you

18  for your, your legal understanding in like the

19  context of the defense of this proceeding.  I'm

20  asking you in terms of what you as the ORR

21  director believe.

22       A    Okay.  Then please restate the question.

23       Q    Do you believe that unaccompanied

24  immigrant minors maintain a constitutional right

25  to access abortion?

```
 1

 2

 3

 4

 5              ACKNOWLEDGEMENT OF WITNESS

 6                   I, Scott Lloyd, Esquire, do hereby

 7         acknowledge that I have read and examined the

 8         foregoing testimony, and the same is a true,

 9         correct and complete transcription of the

10         testimony given by me, and any corrections

11         appear on the attached Errata sheet signed by

12         me.

13

14

15    _____   _____

16    (DATE)                  (SIGNATURE)

17

18

19

20

21

22

23

24

25
```

Page 183

1

2

3

4

5

6    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

7                 I, Laurie Donovan, Registered
          Professional Reporter, Certified Realtime
8         Reporter, the officer before whom the
          foregoing deposition was taken, do hereby
9         certify that the foregoing transcript is a
          true and correct record of the testimony
10        given; that said testimony was taken by me
          stenographically and thereafter reduced to
11        typewriting under my supervision; and that I
          am neither counsel for, related to, nor
12        employed by any of the parties to this case
          and have no interest, financial or otherwise,
13        in its outcome.

14                 IN WITNESS WHEREOF, I have hereunto
          set my hand and affixed my notarial seal this
15        2yth day of December, 2017.

16        My commission expires:  March 14th, 2021

17

18

19    _____

20    LAURIE DONOVAN
      NOTARY PUBLIC IN AND FOR
21    THE DISTRICT OF COLUMBIA

22

23

24

25