# Exhibit A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

- - - - - - - - - - - - - - -+
                              |
AMERICAN CIVIL LIBERTIES      |
UNION OF NORTHERN             |
CALIFORNIA,                   |
                              |
        Plaintiff,            | Case Number:
                              |
   vs.                        | 3:16-cv-3539-LB
                              |
ERIC G. HARGAN, Acting        |
Secretary of Health and       |
Human Services, et al,        |
                              |
        Defendants,           |
                              |
U.S. CONFERENCE OF            |
CATHOLIC BISHOPS,             |
                              |
   Defendant-Intervenor.      |
                              |
- - - - - - - - - - - - - - -+

Rule 30(b)(6) Videotaped Deposition of

The Department of Health and Human Services,

by and through its designated representative,

KATHERINE CHON

Washington, D.C.

Tuesday, December 19, 2017 - 9:24 a.m.


Reported by:

Laurie Donovan, RPR, CRR, CSR

Job no: 20318

Page 2

```
 1         Rule 30(b)(6) Videotaped Deposition of
 2        The Department of Health and Human Services,
 3         by and through its designated representative,
 4                    KATHERINE CHON
 5
 6
 7    Held at the offices of:
 8         U.S. Department of Justice
 9         20 Massachusetts Avenue, N.W.
10         Room 6139
11         Washington, D.C. 20001
12         (202)353-4556
13
14
15
16
17
18         Taken pursuant to notice, before
19    Laurie Donovan, Registered Professional
20    Reporter, Certified Realtime Reporter, and
21    Notary public in and for the District of
22    Columbia.
23
24
25
```

Page 4

```
 1    (Appearances continued)
 2    ON BEHALF OF OFFICIAL CAPACITY FEDERAL DEFENDANTS
 3    ERIC G. HARGAN AND DEPARTMENT OF HEALTH AND HUMAN
 4    SERVICES:
 5         U.S. Department of Justice
 6         20 Massachusetts Avenue, N.W.
 7         Room 6139
 8         Washington, D.C. 20001
 9         (202)353-4556
10         By:  Martin M. Tomlinson, Esq.
11            martin.m tomlinson@usdoj.gov
12            Peter J. Phipps, Esq.
13            peter.phipps@usdoj.gov
14    ALSO PRESENT:
15         Martin Sherrill, Videographer
16         Llewellyn Woolford, Esq. (HHS)
17         Caitlin Palacios, Esq. (HHS)
18         Jeffrey Hunter Moon, Esq. (USCCB)
19         Rachel Chrisinger, paralegal
20
21
22
23
24
25
```

Page 3

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF AMERICAN CIVIL LIBERTIES
 3    UNION OF NORTHERN CALIFORNIA:
 4         ACLU Foundation
 5         125 Broad Street, 18th Floor
 6         New York, New York 10004
 7         (212)519-7897
 8         By:  Brigitte Amiri, Esq.
 9            bamiri@aclu.org
10            Meagan Burrows, Esq.
11            mburrows@aclu.org
12    ON BEHALF OF THE DEFENDANT-INTERVENOR USCCB:
13         Gibson, Dunn & Crutcher, LLP
14         333 South Grand Avenue
15         Los Angeles, California 90071
16         (213)229-7000
17         By:  Daniel Nowicki, Esq.
18            dnowicki@gibsondunn.com
19            Robert Dunn, Esq. (phone)
20            rdunn@gibsondunn.com
21
22
23
24
25
```

Page 5

```
 1              EXAMINATION INDEX
 2                                             PAGE
 3    EXAMINATION BY MS. BURROWS  . . . . . . . 10, 170
 4    EXAMINATION BY MR. TOMLINSON  . . . . . . . . 158
 5    EXAMINATION BY MR. NOWICKI  . . . . . . . 163, 179
 6
 7
 8
 9
10
11
12              E X H I B I T S
13    EXHIBIT    DESCRIPTION                    PAGE
14    Exhibit 1  Notice of Deposition . . . . . .  13
15    Exhibit 2  ACF/ORR Trafficking Victim
16               Assistance Program Funding
17               Opportunity Announcement for
18               2015 . . . . . . . . . . . .   42
19    Exhibit 3  Updated narrative and budget for
20               the USCCB Trafficking Victim
21               Assistance Program, dated
22               September 10, 2015, Bates number
23               ACR-000093 . . . . . . . . . .  48
24
25
```

Page 82

1    A   Well, the Funding Opportunity
2  Announcement references the ACF faith-based
3  policy, and within that there was -- in 2012,
4  through that policy, the Agency was making an
5  effort to -- let me see where it references --
6  making an effort to accommodate religious and
7  faith-based organizations if they were qualified
8  to provide the services under the Funding
9  Opportunity Announcement on the assumption -- in
10 accordance with the ability to meet the full FOA.
11       So it -- so it was making an effort to
12 be consistent with the ACF faith-based policy.
13    Q   We can move on.
14       So if we look at -- let's see.  If we
15 look at 979, you state, "If USCCB were awarded a
16 TVAP grant, [it] would need to identify an
17 arrangement with other TVAP grantees to refer
18 cases to subrecipients outside of their assigned
19 region, working with ACF," and we kind of already
20 touched on this a bit, but did USCCB eventually
21 identify such an arrangement?
22    A   My understanding is that at least part
23 of the arrangement would be to bring up cases in
24 the regular calls we have with all grantees if
25 those situations ever happened, and that they

Page 83

1  would let us know.
2    Q   And was there any time requirements
3  imposed on this in terms of -- let me strike that.
4  I'll rephrase it.
5       Did -- was there any time requirements
6  imposed on this notification process, for example,
7  a certain number of days or weeks between when
8  USCCB first was notified or became aware of a
9  beneficiary's request for an abortion or
10 contraception and a subgrantee's objection and
11 when it needed to notify HHS of that fact?
12    A   So the only specific time requirement
13 that we had discussed with USCCB was the referrals
14 to the initial health screenings that they had
15 committed to doing within -- I can't remember if
16 it was five or seven days of the intake date; and,
17 and then the Funding Opportunity Announcement also
18 defines -- includes some factors for the
19 alternative approach for the client to be aware of
20 these services and for the timeliness in the
21 delivery or referral of services.
22    Q   But there was nothing in place
23 specifically in terms of a timing requirement to
24 ensure that USCCB would notify HHS of any requests
25 as soon as they became aware of it?

Page 84

1    A   We had not discussed a specific time
2  frame for that.
3       MS. BURROWS:  Okay.  Thanks.
4       So I'm going mark as Exhibit 6
5  another email exchange.
6       (Exhibit 6 was marked for
7        identification.)
8  BY MS. BURROWS:
9    Q   And this kind of like spans a very long
10 period of time, so bear with me as we kind of walk
11 through it.
12       If we go to the very back, 8569, there's
13 a September 28th email from ▒▒▒▒ to you and
14 others at HHS, thanking you for your call and then
15 agreeing -- looks like they agreed to strike the
16 language you requested that they strike,
17 prohibiting subproviders from referring or
18 providing in their agreement with HHS, and then
19 include the language below about subgrantees
20 voluntarily agreeing that they share religious
21 objections in their memorandums of understanding,
22 as I believe they're called, with subrecipients,
23 correct?
24    A   Yes.
25    Q   And then if we look at 8568, we see

Page 85

1  ▒▒▒▒ has emailed you again on September 29 that
2  says, "Good morning again, Katherine.  Per our
3  phone conversation this morning, USCCB will agree
4  to remove the following sentence from
5  sub-agreement documents," and that was the same
6  sentence that they had proposed, including in the
7  email of September 28th.
8       Do you recall what was said, what you
9  said to ▒▒▒▒▒▒▒ about that proposed
10 language on the phone conversation?
11    A   On September 29?
12    Q   I believe so, yes.
13    A   The substance of it is captured in the
14 email where I gave her a call and we discussed the
15 removal of the language that's cited, and during
16 this time period, one of the reasons for the phone
17 calls in between the emails is because it was
18 toward the end of the fiscal year when we needed
19 to make the grant awards, and we weren't
20 necessarily -- we thought the phone calls would be
21 helpful in being in communications with USCCB if
22 they weren't necessarily checking their email.
23    Q   Yeah, I believe Ms. ▒▒▒▒▒ referenced
24 that in her deposition as well that, you know,
25 that there was some concern at this time about the

22 (Pages 82 to 85)

Page 98

```
 1     Program Operations Manual, USCCB notes that it is
 2     affiliated with the Catholic Church -- or the
 3     grantee, presumably USCCB, is affiliated with the
 4     Catholic Church which has moral and religious
 5     objections, and then outlines the alternative
 6     approach, using the brochure.
 7             And we see -- it looks like there's some
 8     text that has been edited there.
 9             MS. BURROWS:  And I'm also going to
10         introduce now Exhibit 9.
11             (Exhibit 9 was marked for
12                 identification.)
13             MR. TOMLINSON:  I would note for
14         the record this shows as a draft.
15             MS. BURROWS:  Yes, it is a draft.
16             MR. TOMLINSON:  Okay.
17     BY MS. BURROWS:
18        Q   This is another copy of the Program
19     Operations Manual, and if we turn to 8358 to 8359,
20     it looks like this is later in the chain in
21     February.  So the original in Exhibit 8, it
22     appears like HHS's edits were sent back to USCCB
23     on January 21, 2016, on 8159, and here USCCB is
24     sending changes back on the program manual on
25     February 17 at Exhibit 9, 8359.  ▓▓▓▓▓ responds,
```

Page 99

```
 1     asking, you know, with a few edits and questions.
 2     USCCB responds back, attaching what the edits
 3     requested, and then ▓▓▓▓▓ states on February 26,
 4     2016, "The edits look fine.  The POM is approved."
 5             So if we look at 8181 to 8182 in Exhibit
 6     8, and we also look at 8367 to 8368 in Exhibit 9,
 7     it appears that the changes that were made with
 8     the strike-through, which would be -- appears to
 9     be a strike-through and which would, on 8180, have
10     been incorporated on 8368; is that correct?
11             MR. TOMLINSON:  Object on the
12         foundation, just because it's not -- I don't
13         think it's clear which -- these are both
14         drafts, and it's not clear which one was
15         generated first or what time they were
16         generated.
17             MS. BURROWS:  Sure.
18     BY MS. BURROWS:
19        Q   My general question -- and you can, you
20     know, look at the differences between the
21     language -- is apart from the changes that we see
22     on 8181, do you know if any other changes to this
23     section were suggested by HHS prior to approval of
24     the POM?
25        A   I would not have any direct knowledge,
```

Page 100

```
 1     because I was not aware of this POM review.
 2        Q   Okay.  Did you ever see a copy of the
 3     POM?
 4        A   Yes, but not during this time period.
 5        Q   Okay.  So it would have been who -- I
 6     guess who would have been the people in charge of
 7     the HHS review of USCCB's POM?
 8        A   During this time period reflected in the
 9     emails?
10        Q   Mm-hmm.
11        A   It would have been Maggie Wynne and
12     ▓▓▓▓▓.
13        Q   Okay, and would you have reviewed the
14     POM prior to approval from HHS, or could Maggie or
15     ▓▓▓▓▓ in their capacities, have approved the
16     POM?
17             MR. TOMLINSON:  Are we still
18         talking about this same time frame?
19     BY MS. BURROWS:
20        Q   In any time frame prior to -- before,
21     before HHS as an entity had approved the POM,
22     would you have seen it and signed off on the
23     approval, or would one of your direct reports
24     below you have been able to do that?
25        A   Either I or the deputy director would
```

Page 101

```
 1     have needed to sign off on the approvals.
 2        Q   Okay, and that's you or it would have
 3     been Carolyn Hightower at the time?
 4        A   At this time we had an acting deputy
 5     director, Rochelle Rollins.
 6             I would add that under the previous ATIP
 7     structure, when ATIP was at ORR -- well, no, I
 8     wouldn't know.  Never mind.
 9        Q   And if we can turn on Exhibit 9 to 8396,
10     please.
11             Here is an Appendix 3 which looks like a
12     chart of allowable and unallowable costs, and if
13     we look to "Health/Dental/Vision Care," it lists
14     "abortion counseling/services" and "abortive
15     prescriptions" in the "unallowable" costs chart.
16             Do you know why would -- or are, I
17     guess, abortion counseling and services and
18     abortive prescriptions unallowable costs?
19             MR. TOMLINSON:  Object to the form.
20     BY MS. BURROWS:
21        Q   Under the, under the TVAP program, are
22     any TVAP funds able to be used to provide abortion
23     counseling services and abortive prescriptions?
24        A   Under the Funding Opportunity
25     Announcement, no funds could be used for abortion
```

26 (Pages 98 to 101)

Page 102

```
 1   except in the cases of rape, incest, or if the
 2   mother's life is in danger.
 3       Q   So it wouldn't be accurate to say that
 4   it is not permitted or unallowable to use TVAP
 5   funds for abortions in all cases, correct?
 6       A   Say that again.
 7       Q   It, it wouldn't -- would it be accurate
 8   to say that TVAP funds are not permitted to be
 9   used for abortions in any case?
10       A   The FOA language allows for exceptions.
11       Q   And that would be exceptions in the case
12   of rape, incest, or if the woman's life is in
13   danger; is that correct?
14       A   That's correct.
15       Q   So do you know why this was included in
16   the "unallowable" costs column in the Program
17   Operations Manual?
18           MR. TOMLINSON:  Objection.  Calls
19       for speculation.
20           THE WITNESS:  No.
21   BY MS. BURROWS:
22       Q   Did anyone provide any explanation to
23   you as to why -- either your direct reports,
24   Maggie or _____ or any of your other direct
25   reports, or anyone at USCCB, provide any
```

Page 103

```
 1   explanation to you as to why this was included in
 2   the Program Operations Manual?
 3       A   I have had no conversations about this
 4   part of the Program Operations Manual.
 5       Q   Is contraception an allowable cost under
 6   the FOA and TVAP grant program?
 7       A   Yes.
 8       Q   Is that -- is contraception covered in
 9   all cases?  Would there be any exceptions to when
10   contraception wouldn't be permitted to be covered?
11       A   The FOA doesn't define that.
12       Q   So can we go back I think to tab 3 -- or
13   Exhibit 3.  Apologies.
14           We're going to go to 139 to 140, and
15   we're going to talk a bit about -- start here and
16   talk a bit about the memorandums of understanding,
17   the MOUs which, as I understand it from the
18   language of the emails, are the sub-agreements, is
19   that correct, that grantees have with, with their
20   subrecipients?
21       A   Yes.
22       Q   So this appears to be a component of the
23   USCCB's September application, which is a draft
24   Memorandum of Understanding or MOU between USCCB
25   and its subrecipient, and if we look to section
```

Page 104

```
 1   2(c) and (d) on 139, we see that it has that
 2   language that you had originally requested be
 3   removed from all program -- or requested, after
 4   having received this in September, be removed from
 5   all program documents, that the subrecipients will
 6   not provide for abortion, sterilization or
 7   artificial contraceptives, and no project funds
 8   will be used for that purpose.
 9           Apart from removing that language in the
10   subrecipient agreement, did you request any other
11   changes to any other components of the MOU?
12       A   Upon a quick scan, I don't see anything
13   else that's obvious.
14           MS. BURROWS:  So I'm now going to
15       mark as Exhibit 10 Bates range PRICE-PROD
16       8335 to 8341.
17           (Exhibit 10 was marked for
18           identification.)
19   BY MS. BURROWS:
20       Q   And this, at the beginning, appears to
21   be an email chain from late March of 2016, and the
22   email on 337, _____ requests that _____
23   _____ of USCCB send her the final program
24   documents, and later in the chain, they -- _____
25   requests a final MOU, and on March 29th, USCCB
```

Page 105

```
 1   responds saying "here you go," and if we turn to
 2   8338 to 8341, does that appear to be the final
 3   draft MOU that HHS received?
 4       A   I'm not -- I can't be sure.
 5       Q   But it does appear to have removed the
 6   language --
 7       A   Yes.
 8       Q   -- that you requested be removed?
 9           So USCCB, it seems, removed the language
10   from the MOUs with subrecipients that you
11   requested be removed, that would have prohibited
12   subrecipients from providing or referring for
13   abortion or contraception.  Was there anything in
14   place to ensure that USCCB would not request
15   verbal assurances to the same effect from
16   subgrantees, basically that necessary
17   prerequisite -- I'll stop there.
18           Was there anything -- was there any
19   mechanism in place to ensure that USCCB would not
20   request verbal assurances that subgrantees would
21   not provide or refer for abortion or
22   contraception?
23       A   No.  We had never discussed that
24   scenario with them.
25       Q   And was there anything, any mechanism in
```

Page 122

```
 1   information, one packet per grantee with -- there
 2   were physical copies of program materials, and if
 3   in the application -- if the application or the
 4   narrative noted what the alternative approach was,
 5   a copy of that from the narrative.
 6       Q   Did anything prompt your sending of this
 7   email?
 8       A   December 2016.  I can't, I can't
 9   remember if there was any particular prompt.  It
10   was an effort for being responsible for the
11   implementation of the grant.
12       Q   Sure.  Did you have any concerns around
13   this time in 2016, in December of 2016, about
14   grantees' adherence to the FOA conditions?
15       A   Not any particular concerns.  Just
16   wanting to make sure that, as the grantees were
17   executing their first quarter of programming, that
18   we checked in with them.
19       Q   Sure, and these physical copies, these
20   documents that you received, what did they contain
21   more specifically, if you could expand on that a
22   bit?
23       A   I can't recall the details.  I just have
24   a visual image of three piles of documents that I
25   reviewed at one point.
```

Page 123

```
 1       Q   Was it -- try this more broadly.  Was it
 2   like specific reports from the grantees or the
 3   subgrantees about, you know, how many
 4   beneficiaries they had been serviced, what kind of
 5   services were provided, how much funds had been
 6   expended?  Was it that detailed?
 7       A   No.  At this time it was just the
 8   program materials, so copies of draft agreements
 9   with subrecipients, program materials, brochures,
10   or those types of materials per grantee, because
11   the grantees would not have reported -- they
12   report on a quarterly basis.
13       Q   Okay.
14       A   So their first report wouldn't have been
15   until January 2017.
16       Q   Okay, with the more detailed data as to
17   actually how they were implementing the grant
18   program?
19       A   Yes.
20       Q   Okay, and we kind of touched on this
21   already, but if you'll forgive me, I have a few
22   more questions on it.
23           Do you -- does HHS monitor grantees'
24   subgrantee selection process?
25       A   No.
```

Page 124

```
 1       Q   Do you know -- is HHS aware of the
 2   process by which grantees select their
 3   subgrantees?
 4       A   We are aware of what the agreements say,
 5   and we are aware of who the subrecipients are,
 6   because when we're regularly hosting calls with
 7   all three grantees, there are periodic check-ins
 8   to ensure that grantees are not -- there's no
 9   duplication of subrecipients among the grantee
10   network.
11       Q   Does HHS have any criteria at all for
12   the selection of subgrantees?
13       A   No, we do not.
14       Q   And does -- do grantees -- you say on
15   the calls -- strike that.  You say on the calls
16   that you become aware of who the grantees are,
17   correct?
18       A   Yes, calls and sometimes email
19   communications.
20       Q   Do the grantees provide lists to HHS of
21   the identities of the subgrantees as well?
22       A   Yes.
23       Q   Does HHS have the power to reject a
24   grantee's subgrantee?
25       A   No.  We have not had that situation.
```

Page 125

```
 1       Q   Let's say that situation arose, and HHS
 2   discovered that a subgrantee was not complying
 3   with the FOA.  Would HHS have the power to require
 4   the grantee to sever ties or cease their contract
 5   with the subgrantee?
 6           MR. TOMLINSON:  Objection. Calls
 7       for speculation.
 8           THE WITNESS:  Sorry.  What was the
 9       question?
10   BY MS. BURROWS:
11       Q   If a situation arose -- if it came to
12   HHS's attention that a subgrantee was not in
13   compliance with the FOA or with any other terms or
14   conditions associated with the implementation of
15   the TVAP grant, would HHS have the power to
16   require their grantee, their direct grantee, to
17   cease working with that subgrantee?
18           MR. TOMLINSON:  Same objection.
19           THE WITNESS:  So our responsibility
20       for grant monitoring is for the grantees, to
21       ensure that they are in compliance with the
22       FOA.
23   BY MS. BURROWS:
24       Q   So that does not include any monitoring
25   of the subgrantees?
```

Page 126

1  A   The primary grantees are responsible to
2  monitor the, their respective subrecipients.
3  Q   So just to confirm, HHS has no direct
4  oversight over the subgrantees and what they're
5  doing?
6  A   That's correct.
7  Q   Do you know if any secular entities have
8  applied to be a USCCB subgrantee within the
9  implementation period for the 2015 grant?
10 A   I'm not aware of any formal
11 applications.
12 Q   Would you -- is there a mechanism by
13 which HHS would be aware or would become aware of
14 those applications?
15 A   If the grantee told us.  Often we'll
16 have conversations with grantees on which
17 organizations they've conducted outreach to and
18 then which organizations have then signed
19 subrecipient agreements with.
20 Q   But that would be only if the grantee
21 contacted you and provided that information; is
22 that correct?
23 A   If the grantee or another organization
24 contacted us, and so it's possible that another
25 organization may reach out to us directly.

Page 127

1  Q   So it's possible that you wouldn't know
2  if a secular organization had requested to become
3  a subgrantee and grantee had denied that request?
4  A   We would only know if either the grantee
5  told us or if that organization told us.
6  Q   So it's possible that you wouldn't know?
7  A   That is possible.
8  Q   Does HHS review the sub -- well, I'll
9  start with:  Does HHS receive the subcontracts,
10 once signed?
11 A   We do not -- the grantees maintain the
12 signed subrecipient agreements.
13 Q   Okay.  So HHS doesn't receive them at
14 any point?
15 A   No.
16 Q   And HHS, if they don't receive them, I
17 presume would not have reviewed the subcontracts
18 either?
19 A   Well, we, per the Cooperative Agreement,
20 we review the templates for the subrecipient
21 agreements, whether it's in the form of an MOU or
22 however the grantee names the document, but we
23 don't maintain the files of all the signed, all
24 the signed sub-agreements.
25 Q   So HHS wouldn't know exactly what is in

Page 128

1  the final contracts that USCCB signs with each
2  subgrantee; is that correct?
3  A   Well, we're assuming that the template
4  that we reviewed and approved would be the ones
5  that would be signed.
6       MS. BURROWS:  Okay.  I'm going to
7  mark this as Exhibit 17.
8       (Exhibit 17 was marked for
9       identification.)
10 BY MS. BURROWS:
11 Q   So this is, it says "TVAP monitoring,"
12 PRICE-PROD 10184.  It looks like it lists the
13 three grant recipients -- USCCB, USCRI and
14 Tapestry -- their program, respective program
15 documents, and then has some notes on monitoring.
16      This -- under USCCB it notes that "OTIP
17 requested USCCB to provide documentation in their
18 subrecipient monitoring report, verifying [that]
19 all clients were referred to a health provider."
20      So I have a few questions about this in
21 particular, but I guess, first, could you describe
22 to me what is included in the subrecipient
23 monitoring report that you referenced in response
24 to my prior question?
25 A   Can you restate that?  Which, which

Page 129

1  prior question was that?
2  Q   Sure.
3       I think before you said that you
4  wouldn't have received a formal monitoring report
5  yet, because it wasn't yet January, and those
6  reports were due at the end of the first quarter,
7  and here in this document it references a
8  subrecipient monitoring report.
9       Is that the same report that you were
10 referencing was due to be submitted in January?
11 A   I, I think so, but as part of -- there
12 are a number of documents that the grantees need
13 to provide.
14 Q   And could you describe to me what those
15 documents are?
16 A   Financial reports, program narratives, a
17 description of major accomplishments or
18 challenges/barriers to grant implementation; if
19 relevant, updates to -- updates on training events
20 or technical assistance provided; and then
21 quantitative data, number of individuals assisted
22 and the types of services that individuals
23 received in aggregate.
24 Q   And the types of services received,
25 would that include services related to abortion

Page 174

```
 1   BY MS. BURROWS:
 2       Q   And what, what do you believe her
 3   motivations may have been?
 4           MR. TOMLINSON:  Objection.
 5       Speculative.
 6           THE WITNESS:  I can't know for sure
 7       what her motivations may have been.
 8   BY MS. BURROWS:
 9       Q   Do you believe that she was at all
10   motivated by her personal religious beliefs?
11           MR. TOMLINSON:  Objection.  Calls
12       for speculation.
13           THE WITNESS:  I don't know.
14   BY MS. BURROWS:
15       Q   Do you have any reason to believe that
16   Maggie Wynne has given USCCB any preferential
17   treatment since you've been working with her?
18       A   How would you define "preferential
19   treatment"?
20       Q   Giving preference to USCCB in terms of
21   grant awards or TVAP grant requirements over other
22   prospective grantees or grantees.
23       A   In terms of differences in application
24   of language, for example, the TVAP Cooperative
25   Agreement, when it was updated, it was initially
```

Page 175

```
 1   updated for all three grantees, and USCCB had
 2   requested retaining their language, and they were
 3   able to do so, so it wasn't uniformly -- so the
 4   grantees have different cooperative agreements,
 5   but that's -- I can't answer what the motivations
 6   may have been to allow for that.
 7       Q   Did the other grantees request
 8   adjustments to the language in their agreements?
 9       A   I am not sure about that.
10       Q   And do you have reason to believe that
11   anyone else in HHS has given preferential
12   treatment to USCCB since you've been working
13   there?
14       A   Can you define "preferential treatment"
15   again?
16       Q   Sure.
17           Let's say giving preference to USCCB in
18   terms of decisions to award grants or the
19   implementation of grants over other prospective
20   grantees or current grantees.
21       A   I can't be sure.
22       Q   Do you have any reason to believe that
23   Steven Wagner has given preferential treatment to
24   USCCB because of his religious beliefs?
25           MR. TOMLINSON:  Objection.  Calls
```

Page 176

```
 1       for speculation.
 2           THE WITNESS:  I don't know what his
 3       motivations would have been.
 4   BY MS. BURROWS:
 5       Q   Do you have any reason to believe that
 6   he gave USCCB special treatment in any way?
 7           MR. TOMLINSON:  Same objection.
 8           THE WITNESS:  I mean just in terms
 9       of the Cooperative Agreement, he was part of
10       that decision to allow a difference in
11       language.
12   BY MS. BURROWS:
13       Q   Do you know what that difference in
14   language is?
15       A   That's what we had discussed earlier, a
16   reference to the alternative approach and ACF's
17   faith-based language.
18       Q   Is it the case that trafficking
19   survivors may face obstacles in obtaining care in
20   the, you know, general public due to, for example,
21   language barriers or knowing where resources are
22   located, if they are required to do that on their
23   own?
24       A   Those are commonly known barriers to
25   accessing services.
```

Page 177

```
 1       Q   So is it the case that oftentimes
 2   trafficking victims depend upon or require the
 3   assistance of subgrantees who administer the TVAP
 4   program and other supports in their community in
 5   order to access resources such as medical care or
 6   educational resources or employment resources?
 7       A   So not all trafficking victims access
 8   case management services.  Some do, and of those
 9   who do, some are grantees of ours and some are
10   not.
11       Q   Do those individuals, though, generally,
12   you know, just in terms of trafficking survivors
13   in general and, you know, what they've been
14   through and the countries that they've come from,
15   is it the case that they often depend upon or rely
16   on assistance from within the confines of -- you
17   know, speaking of the TVAP program in
18   particular -- of subgrantees to help facilitate or
19   direct them to services within their communities
20   that they might need?
21       A   The case managers of subrecipients or
22   grantees provide guidance and support to navigate
23   services.
24       Q   And is it true that trafficking victims
25   sometimes depend on that or need it in order to
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 178

```
 1    access those services, and absent that assistance,
 2    they may not be able to access those services?
 3            MR. TOMLINSON:  Object to the form.
 4            THE WITNESS:  Some victims.
 5    BY MS. BURROWS:
 6       Q   Thank you, and without waiving
 7    deliberative privilege, can you tell me -- can you
 8    talk as much as you can about what policy changes
 9    are being considered to the faith-based policy
10    that you, that you just referenced is currently
11    under review?
12            MR. TOMLINSON:  Yeah, I know you
13       acknowledged it, but I am going to instruct
14       the witness not to answer anything
15       deliberative process.
16            My understanding -- and she can
17       correct me if I'm wrong, because I may be
18       wrong, but the grantees have been informed
19       that it's under review but not given any
20       further information, and I think any further
21       information about specific policies that are
22       under review or any -- any more information
23       than that I think would go to deliberative
24       process.
25            THE WITNESS:  I'm not aware of the
```

Page 179

```
 1       deliberations regarding that review.
 2    BY MS. BURROWS:
 3       Q   Okay.  Do you know whether Tapestry has
 4    a religious subgrantee with an objection to
 5    contraception or abortion?
 6       A   I am not aware of what all the
 7    subrecipient religious affiliations may be, but I
 8    am aware that both Tapestry and USCRI have
 9    subrecipients who have religious affiliations.
10            MS. BURROWS:  I think that's all I
11       have.
12            MR. NOWICKI:  I have like two more
13       questions.
14            MR. TOMLINSON:  I mean it's fine
15       with me.
16       FURTHER EXAMINATION BY COUNSEL FOR USCCB
17    BY MR. NOWICKI:
18       Q   This is Dan Nowicki for USCCB again.
19            Just with regard to the Cooperative
20    Agreement change that you mentioned, my
21    understanding is that that included a line in the
22    Cooperative Agreement saying that TVAP funds
23    cannot be used for abortion; is that correct?  Is
24    that part of the change?
25       A   I would need to look at -- I can't
```

Page 180

```
 1    remember if -- so that was a change in the, our
 2    domestic victims of human trafficking cooperative
 3    agreement, but for TVAP specifically, I can't
 4    remember if it was in an email or if it was in the
 5    actual updated Cooperative Agreement.
 6       Q   But either in the email or in the
 7    Cooperative Agreement, that specific language was
 8    referenced or described as now being part of the
 9    Cooperative Agreement?
10       A   Yes.  It references the HHS grants
11    policy statement from 2007.
12       Q   And like you said, the changes were made
13    to Tapestry and USCRI but not to USCCB's
14    Cooperative Agreement; is that correct?
15       A   That's correct.
16       Q   So USCRI and Tapestry now have a
17    statement that TVAP funds cannot be used for
18    abortions, and USCCB does not?
19       A   Specific to the Cooperative Agreement,
20    yes, that would be the case, but if that was
21    language that was additionally communicated in a
22    call with the grantees or email with the grantees,
23    it would apply to all -- I mean it does apply to
24    all.
25            MR. NOWICKI:  That's all I have.
```

Page 181

```
 1            THE VIDEOGRAPHER:  Going off the
 2    record at 3:05.
 3            (Signature having not been waived,
 4            the Rule 30b6 video deposition of
 5            Department of Health and Human
 6            Services, by and through its
 7            designated representative,
 8            KATHERINE CHON, was concluded
 9            at 3:05 p.m.)
```

Page 182

```
 1
 2
 3
 4
 5
 6           ACKNOWLEDGEMENT OF WITNESS
 7           I, Katherine Chon, do hereby
 8    acknowledge that I have read and examined the
 9    foregoing testimony, and the same is a true,
10    correct and complete transcription of the
11    testimony given by me, and any corrections
12    appear on the attached Errata sheet signed by
13    me.
14
15
16    _____  _____
17    (DATE)           (SIGNATURE)
18
19
20
21
22
23
24
25
```

Page 184

```
 1
 2
 3
 4
 5
 6    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 7           I, Laurie Donovan, Registered
      Professional Reporter, Certified Realtime
 8    Reporter, the officer before whom the
      foregoing deposition was taken, do hereby
 9    certify that the foregoing transcript is a
      true and correct record of the testimony
10    given; that said testimony was taken by me
      stenographically and thereafter reduced to
11    typewriting under my supervision; and that I
      am neither counsel for, related to, nor
12    employed by any of the parties to this case
      and have no interest, financial or otherwise,
13    in its outcome.
14           IN WITNESS WHEREOF, I have hereunto
      set my hand and affixed my notarial seal this
15    29th day of December, 2017.
16    My commission expires:  March 14th, 2021
17
18
19    _____
20    LAURIE DONOVAN
      NOTARY PUBLIC IN AND FOR
21    THE DISTRICT OF COLUMBIA
22
23
24
25
```

Page 183

```
 1           E R R A T A  S H E E T
 2    IN RE:  ACLU vs. HARGAN & USCCB
 3    RETURN BY:
 4    PAGE   LINE        CORRECTION AND REASON
 5    ____  _____  _____
 6    ____  _____  _____
 7    ____  _____  _____
 8    ____  _____  _____
 9    ____  _____  _____
10    ____  _____  _____
11    ____  _____  _____
12    ____  _____  _____
13    ____  _____  _____
14    ____  _____  _____
15    ____  _____  _____
16    ____  _____  _____
17    ____  _____  _____
18    ____  _____  _____
19    ____  _____  _____
20    ____  _____  _____
21    ____  _____  _____
22    ____  _____  _____
23    ____  _____  _____
24    _____  _____
25    (DATE)         (SIGNATURE)
```