# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

AMERICAN CIVIL LIBERTIES UNION
OF NORTHERN CALIFORNIA,

        Plaintiff,

    v.

ALEX M. AZAR, II, Secretary of Health and
Human Services, et al.,

        Defendants,

    v.

U.S. CONFERENCE OF CATHOLIC
BISHOPS,

        Defendant-Intervenor.

Case No. 16-cv-03539-LB

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
AND GRANTING DEFENDANTS'
CROSS-MOTIONS FOR SUMMARY
JUDGMENT**

Re: ECF No. 116, 120, 121

## INTRODUCTION

The American Civil Liberties Union of Northern California brings this Establishment Clause action in connection with two government programs, one that provides services to undocumented minors who arrive in the United States without being accompanied by a parent or guardian (the Unaccompanied Alien Children Program, or "UACP") and one that provides services to victims of human trafficking (the Trafficking Victim Assistance Program, or "TVAP"). The ACLU claims that the government's UACP and TVAP grant funding of, and interactions with, religious organizations such as the U.S. Conference of Catholic Bishops (the "Bishops Conference" or

"USCCB") — in the face of such organizations' religious objection to providing access to abortion or contraception — violates the Establishment Clause.

Discovery has clarified that this case is not about the government or any religious organization denying access to abortion or contraception. There is no evidence in the record that any unaccompanied minor or trafficking victim who wanted an abortion or contraception during the time period relevant to this case was unable to obtain them.[1] While the ACLU claims that the government has provided millions of dollars in grant funding to the Bishops Conference while allowing the Conference to impose its religious beliefs and restrict access to abortion and contraception services to the unaccompanied minors and trafficking victims in its care, the record in this case does not bear this out. There is no evidence that any grant funding was used for any religious purpose or that any unaccompanied minor or trafficking victim who wanted an abortion or contraception was unable to obtain them.

The fact that certain government grantees like the Bishops Conference have religious objections to abortion has, in three or four instances, led to unaccompanied minors being transferred from one shelter to another. When an unaccompanied minor who is housed at a shelter operated by an organization with such an objection asks for an abortion, the government facilitates a transfer to another shelter that does not have objections to abortion so that the minor can obtain an abortion. The ACLU argues that this transfer process harms the minor because (1) the transfer delays her obtaining an abortion and (2) the transfer forces her to leave the support structure at her original shelter. No unaccompanied minor is a party to this case, and the ACLU — which brings

---

[1] In March 2017, the government allegedly promulgated new policies that prevent all shelters for unaccompanied minors (religious and secular) from taking any actions facilitating access to abortions (including transportation to medical appointments) without signed approval from defendant Scott Lloyd, Director of the Office of Refugee Resettlement. Those policies are not at issue in this case. *See ACLU of N. Cal. v. Burwell*, No. 16-cv-03539-LB, 2017 WL 4551492, at *1, *4–6 (N.D. Cal. Oct. 11, 2017) (Order – ECF No. 102) (denying motion to amend complaint to include claims that the government itself blocking abortion access, as not closely related to the originally-pleaded Establishment Clause claim). The government's alleged blocking of abortion access is the subject of a separate case pending in the District of Columbia, where the district court issued an order enjoining the government from enforcing its new policies (a decision that is now on appeal). *Garza v. Azar*, 304 F. Supp. 3d 145 (D.D.C. 2018), *appeal docketed sub nom.*, *In re Azar*, No. 18-8003 (D.C. Cir. Apr. 12, 2018).

its claim solely in its capacity as a taxpayer — cannot base its claim on putative harms that it did not bear itself. The ACLU also argues that the government is endorsing the Conference's religious views by participating in this process. A reasonable person would not view the government, which facilitated access to abortion by transferring unaccompanied minors who want abortions to shelters where they can obtain them, to be endorsing the Conference's anti-abortion views.

The record in this case shows that the government's UACP and TVAP grant relationships and interactions with religious organizations like the Bishops Conference (1) had a secular purpose, (2) did not have a principal or primary effect of advancing religion, and (3) did not foster an excessive entanglement with religion. *Cf. Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971) (setting out three-part Establishment Clause test). The court therefore denies the ACLU's motion for summary judgment and grants the defendants' cross-motions for summary judgment.

## STATEMENT

### 1. The Unaccompanied Alien Children Program

#### 1.1 Overview

Each year, tens of thousands of undocumented minors[2] who are unaccompanied by their parents or any legal guardian are taken into federal custody after crossing the border into the United States.[3] Pursuant to statute, the U.S. Department of Health and Human Services ("HHS")

---

[2] The government uses the terms "children" and "minors" interchangeably in the context of the UACP. *See, e.g.*, Office of Refugee Resettlement, Funding Opportunity Announcement: Residential Services for Unaccompanied Alien Children HHS-2014-ACF-ORR-ZU-0608 ("2013 UACP FOA") – ECF No. 120-1 at 4 (PRICE_PROD_00001704). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[3] Permanent Subcomm. on Investigations, S. Comm. of Homeland Sec. & Governmental Affairs, *Protecting Unaccompanied Alien Children from Trafficking and Other Abuses: The Role of the Office of Refugee Resettlement*, at 1, 5 (2016), *available at* https://www.hsgac.senate.gov/imo/media/doc/Majority%20&%20Minority%20Staff%20Report%20-%20Protecting%20Unaccompanied%20Alien%20Children%20from%20Trafficking%20and%20Other%20Abuses%202016-01-282.pdf (last visited Oct. 11, 2018) (cited by First Amend. Compl. ("FAC") – ECF No. 57 at 20 (¶ 71 & n.6)) ("PSI Report"); *accord* ACLU Mot. – ECF No. 116 at 8; Gov't Cross-Mot. – ECF No. 120 at 7. The court may take judicial notice of information on government websites that is not reasonably subject to dispute, as a matter of public record. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

and its component agency the Office of Refugee Resettlement ("ORR") are tasked with providing care and custody to those unaccompanied minors. 8 U.S.C. § 1232(b)(1) ("Consistent with section 279 of Title 6, and except as otherwise provided under subsection (a), the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services."); 6 U.S.C. § 279(b)(1) (assigning responsibilities to ORR). Subject to considerations of "danger to self, danger to the community, and risk of flight," ORR is responsible for promptly placing unaccompanied minors in "the least restrictive setting that is in the best interests of the child." 8 U.S.C. § 1232(c)(2)(A).

Most unaccompanied minors who are referred to ORR are eventually released from government custody to parents or sponsors who live in the United States.[4] These unaccompanied minors often are held in short-term facilities or shelters while they await release to their parents and sponsors.[5] For some unaccompanied minors, ORR cannot identify an individual who can serve as a viable sponsor.[6] Unaccompanied minors who are expected to be in the government's custody for an extended period or those who have special needs are sometimes transferred to a group home or a foster family.[7] For others, ORR may determine that the unaccompanied minor must be placed in a more restrictive custodian setting.[8]

ORR is subject to the terms of the class-action settlement in *Flores v. Reno*, No. CV 85-4544-RJK (Px) (C.D. Cal.), that the government signed in 1997 ("*Flores* Agreement").[9] The *Flores* Agreement sets minimum standards for "licensed programs" — "program[s], agenc[ies] or organization[s] that [are] licensed by an appropriate State agency to provide residential, group, or

---

[4] FAC – ECF No. 57 at 8 (¶ 25); Gov't Answer – ECF No. 60 at 4 (¶ 25).

[5] FAC – ECF No. 57 at 8 (¶ 25); Gov't Answer – ECF No. 60 at 4 (¶ 25).

[6] FAC – ECF No. 57 at 8 (¶ 25); Gov't Answer – ECF No. 60 at 4 (¶ 25).

[7] FAC – ECF No. 57 at 8 (¶ 25); Gov't Answer – ECF No. 60 at 4 (¶ 25).

[8] FAC – ECF No. 57 at 8 (¶ 25); Gov't Answer – ECF No. 60 at 4 (¶ 25).

[9] Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK (Px) (C.D. Cal. Jan. 17, 1997, as amended Dec. 7, 2001), *available at* https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf (last visited Oct. 11, 2018). The government filed the *Flores* Agreement on the docket at ECF No. 92-3 and also cites to the version of the *Flores* Agreement on the ACLU's website as authoritative. Gov't Cross-Mot. – ECF No. 120 at 8.

foster care services for dependent children" — where ORR can place unaccompanied minors.[10] Among other things, licensed programs must provide unaccompanied minors with living accommodations, food, clothing, personal grooming items, medical care, an individualized needs assessment, educational services, a recreation and leisure-time plan including daily outdoor activity, individual and group counseling sessions, access to religious services of the minor's choice whenever possible, visitation and contact with family members (regardless of their immigration status), a reasonable right to privacy, family reunification services, and legal-services information.[11] Specifically with respect to medical care, the *Flores* Agreement states that licensed programs must provide "[a]ppropriate routine medical and dental care, family planning services, and emergency health care services[.]"[12]

### 1.2   Grants

#### 1.2.1   Funding opportunity announcement

In 2013, ORR issued a "funding opportunity announcement" ("FOA") to invite licensed non-governmental organizations to apply for government grant funding to provide residential custody-and-care services to unaccompanied minors.[13] The FOA provided that services must include "a complete medical examination . . .; family planning services[;] other appropriate and routine medical and dental care; emergency health care services; administration of prescribed medication and special diets; and appropriate mental health interventions when necessary."[14]

Both faith-based and secular organizations were eligible to apply to participate as grantees.[15] Grantees are subject to federal regulations that provide that they may not engage in inherently religious activities, such as worship, religious instruction, or proselytization, as part of the

---

[10] *Flores* Agreement – ECF No. 92-3 at 4–5 (pp. 4–5); *Flores* Agreement Ex. 1 – ECF No. 92-3 at 23–26 (pp. 1–4).

[11] *Flores* Agreement Ex. 1 – ECF No. 92-3 at 23–26 (pp. 1–4).

[12] *Id.* at 23 (p. 1).

[13] 2013 UACP FOA – ECF No. 120-1.

[14] *Id.* at 8 (PRICE_PROD_00001708).

[15] *See id.* at 13 (PRICE_PROD_00001713).

programs or services funded with direct governmental financial assistance. 45 C.F.R. §§ 87.1(c),

87.2(c) (2004) (amended Jan. 20, 2016); 45 C.F.R. §§ 87.1(c), 87.2(c) (Jan. 20, 2016) (amended

May 4, 2016); 45 C.F.R. § 87.3(b) (May 4, 2016). Grantees remain independent from the

government and may continue to express their religious beliefs, provided they do not use direct

financial assistance from the government to support any inherently religious activities. 45 C.F.R.

§§ 87.1(d), 87.2(d) (2004) (amended Jan. 20, 2016); 45 C.F.R. §§ 87.1 (d), 87.2(d) (Jan. 20, 2016)

(amended May 4, 2016); 45 C.F.R. § 87.3(c) (May 4, 2016).

The FOA provided that ORR would use objective review panels comprised of experts with

knowledge and experience in the area to review and evaluate grant applications.[16]

### 1.2.2 Grant awards

ORR selected and entered into grant agreements with numerous grantees.[17] One of these

grantees was the Bishops Conference.[18] The Bishops Conference in turn entered into subgrant

agreements with various organizations (including Catholic Charities, His House, and Youth for

Tomorrow) that operate facilities and shelters that provide services to unaccompanied minors.[19]

The Bishops Conference, Catholic Charities, His House, and Youth for Tomorrow received UACP

grants of approximately $42.9 million in fiscal year 2015, $54.7 million in fiscal year 2016, and

$72.7 million in fiscal year 2017.[20]

There is no evidence in the record that ORR or any government actor selected the Bishops

Conference as a grantee to promote Catholicism, Catholic religious views, or Catholic social

---

[16] *Id.* at 33 (PRICE_PROD_00001733).

[17] According to a U.S. Senate subcommittee report, HHS awarded 56 grants to over 30 care providers in fiscal year 2016. PSI Report at 11. Currently, ORR has agreements with just over 100 shelters in 17 states. Office of Refugee Resettlement, Fact Sheet: Unaccompanied Alien Children Program (June 15, 2018), *available at* https://www.hhs.gov/sites/default/files/Unaccompanied-Alien-Children-Program-Fact-Sheet.pdf (last visited Oct. 11, 2018). As a matter of public record, the court may take judicial notice of information on government websites that is not reasonably subject to dispute. *Daniels-Hall*, 629 F.3d at 998–99.

[18] *See* Gov't Suppl. Interrog. Resps. – ECF No. 116-1 at 11.

[19] FAC – ECF No. 57 at 8–9 (¶¶ 26–27); Gov't Answer – ECF No. 60 at 5 (¶¶ 26–27); Bishops Conf. Answer – ECF No. 59 at 9 (¶ 26).

[20] Gov't Suppl. Interrog. Resps. – ECF No. 116-1 at 11.

teaching.[21] There is no evidence in the record that the Bishops Conference or any of its

subgrantees used any government-grant money to promote Catholicism or for religious education

or proselytization, to maintain or improve churches or religious facilities, to purchase religious

items, or to distribute religious literature.[22] There is no evidence in the record that the Bishops

Conference required any subgrantee to adopt its religious views in order to receive a subgrant.[23]

### 1.3 Access to Abortion

#### 1.3.1 Generally

The Catholic Church and the Bishops Conference have moral and religious objections to

abortion and contraception.[24] Consequently, the Conference will not provide access to abortion or

contraception services or refer individuals to such services.[25]

---

[21] *Cf.* HHS Rule 30(b)(6) Dep. (White) – ECF No. 120-1 at 84–85 (pp. 97–98) ("Q. As deputy direct[o]r of ORR, are you aware of any preferential treatment that HHS or ORR has given to any faith-based grantee or faith-based applicant for the care and custody of unaccompanied alien children? A. No."); Bishops Conf. Bishops Conf. Rule 30(b)(6) Dep. (Kuennen) – ECF No. 121-1 at 45 (p. 69) ("Q. Was the primary effect of the grant, as administered by USCCB, to provide funding for the Catholic Church? A. No. Q. Was the primary effect of the grant, as administered by USCCB, to promote Catholic religious views? A. No. Q. Was the primary effect of the grant, as administered by USCCB, to promote Catholic social teaching? A. No.").

[22] *Cf.* Bishops Conf. Bishops Conf. Rule 30(b)(6) Dep. (Kuennen) – ECF No. 121-1 at 45 (p. 68) ("Q. Okay. Does USCCB use any funds from the grant to promote Catholicism? A. No. Q. Does USCCB use any funds from the grant for proselytization? A. No. Q. Does USCCB use any funds from the grants for religious education purposes? A. No. Q. Does USCCB use any funds from the grant to maintain or improve churches or other religious facilities? A. No. Q. Does USCCB use any funds from the grant to purchase religious items? A. No. Q. Does USCCB use any funds from the grant to purchase or distribute religious literature? A. No.").

[23] *Cf.* ACLU Interrog. Resps. – ECF No. 116-1 at 60–61 ("Plaintiff states that Plaintiff's First Amended Complaint does not make such an allegation [that the Bishops Conference's subgrantees were compelled to adopt religious objections to abortion and/or contraception]. Plaintiff does not allege that USCCB's subgrantees were compelled to adopt religious objections but rather that they are prohibited through funding agreements and [memorandums of understanding] from providing abortion or contraception care or referrals.").

[24] *See, e.g.*, Bishops Conf., Proposal for Trafficking Victim Assistance Program – ECF No. 116-1 at 182 (ACF_000105) ("This grantee is affiliated with a program of the Catholic Church, which has moral and religious objections to direct sterilization, contraception, and abortion."); HHS Rule 30(b)(6) Dep. (White) – ECF No. 120-1 at 81 (p. 44).

[25] *See, e.g.*, Bishops Conf., Proposal for Trafficking Victim Assistance Program – ECF No. 116-1 at 182 (ACF_000105).

If an unaccompanied minor in the custody of a Bishops Conference subgrantee asks for an abortion, the subgrantee notifies ORR and the Conference.[26] ORR then arranges to transfer the unaccompanied minor to another provider that does not have an objection to providing abortion access.[27]

The government has stated in sworn interrogatory responses that in the three-year period between fiscal year 2014 and fiscal year 2016, four unaccompanied minors that had been placed in the care of faith-based grantees asked for an abortion.[28] Of the four, three were transferred to other care providers to provide them with access to abortion services, and one was discharged to her sponsor, who moved forward with her request for an abortion.[29] There is no evidence in the record that any unaccompanied minor who asked for an abortion was unable to obtain one because of the religious objections of the Conference or any subgrantee.[30]

---

[26] HHS Rule 30(b)(6) Dep. (White) – ECF No. 120-1 at 76 (p. 38); Bishops Conf. Rule 30(b)(6) Dep. (Kuennen) – ECF No. 121-1 at 41 (pp. 28–29); Lloyd Dep. – ECF No. 116-1 at 45 (pp. 60–61).

[27] Gov't Suppl. Interrog. Resps. – ECF No. 116-1 at 9 ("[T]here are no published criteria governing transfer of UCs when a UC requests abortion services, but, when a UC requested abortion services, and where the religiously-affiliated grantee or subgrantee had objections to such services, the federal field specialist, in conjunction with the central office, effectuated the transfer of the UC. The UCs were transferred to a facility that did not have an objection and that had available space."); HHS Rule 30(b)(6) Dep. (White) – ECF No. 120-1 at 76 (p. 38); Lloyd Dep. – ECF No. 116-1 at 46 (pp. 75–76).

[28] Gov't Interrog. Resps. – ECF No. 120-1 at 58–59.

[29] *Id.*

[30] *Cf.* HHS Rule 30(b)(6) Dep. (White) – ECF No. 120-1 at 75, 84 (pp. 37, 97) ("Q. Are you aware of any instance where a minor was unable to obtain an abortion because of the religious affiliation of the shelter within which she resided? A. I am not aware of any such instance. . . . Q. Are you aware of any instance in which any grantee shelter has made the final decision that an unaccompanied alien child in its custody may not receive access to an abortion? A. No."); Lloyd Dep. – ECF No. 116-1 at 46 (pp. 76–77) ("Q. . . . Do you know whether any minor has been unable to receive abortion or contraception because of the religious entity's objection to providing that service? A. No. Q. No, you don't know, or no, that hasn't happened? A. I don't recall that happening. . . . Q. So during that period of time that you've been at ORR, are you aware of whether any minor has been unable to receive abortion or contraception because of the religious objection of the shelter within which she resides? A. I, I am aware. I have a pretty firm recollection. Q. You are aware that that has happened? A. No, that that has not happened. Q. Okay. So just to clarify, you — it is your recollection that no minor has been unable to receive abortion or contraception because of the religious objection of a grantee? A. Yes, in my recollection."); Gov't Suppl. Interrog. Resps. – ECF No. 116-1 at 9 ("[W]hen a UC requested abortion services, and where the religiously-affiliated grantee or subgrantee had objections to such services, the federal field specialist, in conjunction with the central office, effectuated the transfer of the UC. The UCs were transferred to a facility that did not have an objection and that had available space."); *accord* ACLU 2d Amend. Interrog. Resps. – ECF No. 116-1 at 59 ("At this time, Plaintiff has not identified particular UCs who have been prevented from obtaining an abortion because of USCCB's policies.").

### 1.3.2 Specific examples

The ACLU cites four specific examples of unaccompanied minors who asked for abortion services.

The first, "Rosa,"[31] was apparently raped on her journey to the United States and became pregnant.[32] While residing at a shelter in Miami run by a Bishops Conference subgrantee, Catholic Charities Boystown, Rosa requested an abortion.[33] Catholic Charities notified ORR of Rosa's request on September 24, 2014, and asked that Rosa be transferred to another facility.[34] Rosa was hospitalized, and following her treatment, was not placed back at her original shelter at Catholic Charities because of her request for an abortion.[35] ORR reached out on September 26 to another provider, the Children's Home Society of Florida, which accepted Rosa on September 29.[36] Rosa appears to have obtained an abortion on October 14, 2014.[37]

The second, "Maria," was a victim of rape who became pregnant.[38] ORR was holding Maria at a temporary shelter (possibly in Texas).[39] Maria's sponsors (her parents) were in Florida.[40] At

---

[31] Rosa's real name, and the real names of the other three unaccompanied minors whose examples the ACLU cites, were redacted in the documents submitted to the court and therefore are not part of the record.

[32] *See* E-mail from Catholic Charities to HHS (Sept. 24, 2014 1:39 PM) – ECF No. 116-1 at 87 (ORRFOIA2015_000016).

[33] *Id.*

[34] *Id.*; Email from HHS to HHS (Sept. 24, 2014 9:50 PM) – ECF No. 116-1 at 86 (ORRFOIA2015_000015).

[35] Email from HHS to Children's Home Soc'y of Fla. (Sept. 29, 2014 8:35 AM) – ECF No. 116-1 at 85 (ORRFOIA2015_000014). The ACLU states that the reason for Rosa's hospitalization was because she had become suicidal at the prospect of not being able to obtain an abortion, ACLU Reply – ECF No. 124 at 9, but the email chain it cites does not contain any discussion that supports this characterization, *see* Email Chain – ECF No. 116-1 at 85–87 (ORRFOIA2015_000014–16).

[36] Email from Children's Home Soc'y of Fla. to HHS (Sept. 29, 2014 8:36 AM) – ECF No. 116-1 at 85 (ORRFOIA2015_000014).

[37] *See* Gov't Interrog. Resps. – ECF No. 120-1 at 58.

[38] Email from HHS to HHS (Apr. 17, 2014 7:57 PM) – ECF No. 116-1 at 78 (ORRFOIA2015_000007).

[39] *See* ACLU Reply – ECF No. 124 at 9.

[40] Email from HHS to HHS (Apr. 18, 2014 10:27 AM) - ECF No. 116-1 at 78 (ORRFOIA2015_000007).

some point on or before April 17, 2014, Maria said that she wanted an abortion.[41] Maria did not

want her parents to know that she was pregnant.[42] Two ORR field specialists looked into the

abortion laws in both Texas and Florida and reported that the general rule in both states was that

minors could not have abortions without parental consent (absent exceptions, such as obtaining a

waiver from a judge).[43] The Texas field specialist emailed other ORR staff members to say, "This

is why termination of pregnancies are done in New Mexico due to the fact that currently (by law)

there is no parental consent requirement."[44] The Florida field specialist emailed to say, "both of

the shelters in Florida are faith-based and will not take the child to have this procedure."[45] It

appears that as of April 28, 2014, Maria had not received an abortion.[46] There is nothing in the

record that indicates that Maria was ever placed with a Bishops Conference subgrantee or that the

Conference was involved in this discussion. The record does not clearly indicate what ultimately

happened to Maria, but there is no evidence in the record that she was ultimately denied access to

abortion services.[47]

    The third, "Michelle," arrived at a short-term shelter referred to as "IES Shelter" and found out

there that she was pregnant.[48] On June 2, 2014, Michelle told her clinician that she wanted to

---

[41] *Id.*

[42] *Id.*

[43] Email from HHS to HHS (Apr. 17, 2014 7:57 PM) – ECF No. 116-1 at 78 (ORRFOIA2015_ 000007); Email from HHS to HHS (Apr. 21, 2014 9:07 PM) - ECF No. 116-1 at 77 (ORRFOIA2015_ 000006).

[44] Email from HHS to HHS (Apr. 17, 2014 7:57 PM) – ECF No. 116-1 at 78 (ORRFOIA2015_ 000007) (spacing corrected).

[45] Email from HHS to HHS (Apr. 21, 2014 9:07 PM) - ECF No. 116-1 at 77 (ORRFOIA2015_ 000006).

[46] *See* Email (unknown date, sender, and recipient – header not included) – ECF No.116-1 at 76 (ORRFOIA2015_000005).

[47] *Cf.* Gov't Interrog. Resps. – ECF No. 120-1 at 58–59.

[48] Email from HHS to HHS (June 12, 2014 7:56 PM) – ECF No. 116-1 at 83–84 (ORRFOIA2015_ 000012–13). It is not clear from the email chain what the "IES Shelter" is, but it may refer to a shelter run by International Educational Services. The parties do not point to any evidence in the record suggesting that the "IES Shelter" was run by a Bishops Conference subgrantee. *Cf.* ACLU Reply – ECF No. 124 at 10 (describing the IES Shelter as a "short-term shelter").

explore terminating her pregnancy.[49] Michelle expressed that she did not want to be transferred to a new shelter where she would have to "re-tell" her story to another clinician, case manager, and attorney.[50] An ORR field specialist sent an email recommending that Michelle be transferred to San Antonio so that she could explore the option of terminating her pregnancy.[51] Once the procedure was completed, the field specialist wrote, Michelle could be transferred back to IES.[52] Various HHS staff members discussed transferring Michelle to "Seton Home" (but rejected the idea because Seton Home was a shelter for pregnant women who want to keep their babies and was full) or transferring her to "SW Key Casa Blanca" or "BCFS San Antonio Campus" (but rejected the latter proposal because it also was full).[53] It appears that as of June 25, 2014, Michelle had not received an abortion.[54] There is nothing in the record that indicates that Michelle was ever placed with a Bishops Conference subgrantee or that the Conference was involved in this discussion. The record does not clearly indicate what ultimately happened to Michelle, but there is no evidence in the record that she was ultimately denied access to abortion services.[55]

The fourth, "Zoe," was placed at a shelter run by Youth for Tomorrow, a faith-based Bishops Conference subgrantee.[56] On January 28, 2015, Zoe told her doctor that she did not want to have the baby because the father was her cousin.[57] Zoe said on multiple occasions that she wanted to terminate the pregnancy and did not want to disclose the pregnancy or the decision to terminate

---

[49] *Id.* at 84 (ORRFOIA2015_000013).

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Email Chain – ECF No. 116-1 at 79–82 (ORRFOIA2015_000008–11).

[54] *See* Email from HHS to HHS (June 25, 2015 11:28 AM) – ECF No. 116-1 at 79 (ORRFOIA2015_00000008).

[55] *Cf.* Gov't Interrog. Resps. – ECF No. 120-1 at 58–59.

[56] Email from HHS to HHS (Feb. 17, 2015 3:54 PM) – ECF No. 116-1 at 88 (ORRFOIA_000017); *see* FAC – ECF No. 57 at 8–9 (¶ 26) (alleging that Youth for Tomorrow is a Bishops Conference subgrantee); Gov't Answer – ECF No. 60 at 5 (¶ 26) (admitting); Bishops Conf. Answer – ECF No. 59 at 9 (¶ 26) (admitting).

[57] Email from HHS to HHS (Feb. 17, 2015 3:54 PM) – ECF No. 116-1 at 88 (ORRFOIA_000017).

the pregnancy to her parents.[58] It appears that as of February 17, 2015, Zoe had not received an abortion.[59] The record does not clearly indicate what ultimately happened to Zoe, but there is no evidence in the record that she was ultimately denied access to abortion services.[60]

### 1.4    Access to Contraception

If an unaccompanied minor in the custody of a Bishops Conference subgrantee asks for contraception, the subgrantee is referred to a medical provider who is independent of the subgrantee.[61] The medical provider then addresses the unaccompanied minor's request independent of the Bishops Conference or its subgrantee.[62]

The government has stated in sworn interrogatory responses that in the three-year period between 2014 and 2016, seventeen unaccompanied minors in the care of faith-based grantees asked for birth-control medication.[63] All seventeen received that medication — most the same day or the next day after they made their requests.[64] There is no evidence in the record that any unaccompanied minor who asked for contraception was unable to obtain it because of the religious objections of the Conference or any subgrantee.[65]

---

[58] *Id.*

[59] *Id.*

[60] *Cf.* Gov't Interrog. Resps. – ECF No. 120-1 at 58–59.

[61] Bishops Conf. Rule 30(b)(6) Dep. (Kuennen) – ECF No. 121-1 at 42 (pp. 30–31).

[62] *Id.*

[63] Gov't Interrog. Resps. – ECF No. 120-1 at 60.

[64] *Id.*

[65] *Cf.* HHS Rule 30(b)(6) Dep. (White) – ECF No. 120-1 at 84 (p. 97) ("Q. First, are you aware of any instance in which any grantee shelter has made a final decision that an unaccompanied alien child in its custody may not receive contraception? A. No."); *accord* ACLU 2d Amend. Interrog. Resps. – ECF No. 116-1 at 59 ("As of now, Plaintiff has not identified particular UCs who have been prevented from obtaining contraceptives because of USCCB's policies."); *see also* Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 120-1 at 140–41 (pp. 69–70) (Bishops Conference reimburses for contraception in some cases); Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 116-1 at 249 (pp. 88–89) (Bishops Conference does not prohibit subgrantees from using TVAP funds to pay for contraception, although individual subgrantees can make a request to opt out of paying for contraception).

## 2. The Trafficking Victim Assistance Program

### 2.1 Overview

In 2000, Congress passed the Trafficking Victims Protection Act ("TVPA"). Pub. L. No. 106-386, div. A, 114 Stat. 1464, 1466–91 (2000). Congress found that "[t]rafficking in persons is a modern form of slavery, and it is the largest manifestation of slavery today. At least 700,000 persons annually, primarily women and children, are trafficked within or across international borders. Approximately 50,000 women and children are trafficked into the United States each year." 22 U.S.C. § 7101(b)(1). Congress enacted the TVPA "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 22 U.S.C. § 7101(a). Among other things, the TVPA tasked HHS with expanding benefits and services to trafficking victims. 22 U.S.C. § 7105(b)(1)(B)(i).

To that end, HHS and its component agency the Office of Trafficking in Persons ("OTIP") oversee the Trafficking Victim Assistance Program, a grant program that funds time-limited comprehensive victim services to foreign trafficking victims who have received or are seeking HHS certification, and certain family members.[66] (OTIP was established in June 2015.[67] Before OTIP was established, ORR handled certain aspects of the TVAP, including issuing a Funding Opportunity Announcement in early 2015.[68])

### 2.2 Grants

#### 2.2.1 2006–2011

In 2005, HHS decided to select a general contractor to administer TVAP funds. *ACLU of Mass. v. Sebelius*, 821 F. Supp. 2d 474, 476 (D. Mass. 2012) ("*ACLU of Mass. I*"), *vacated as moot sub nom. ACLU of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44 (1st Cir. 2013)

---

[66] HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 116-1 at 153 (p. 33); *see also* Office of Refugee Resettlement, Funding Opportunity Announcement: Trafficking Victim Assistance Program HHS-2015-ACF-ORR-ZV-0976 ("2015 TVAP FOA") – ECF No. 116-1 at 97–147.

[67] HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 116-1 at 154 (p. 37).

[68] *Id.*

("*ACLU of Mass. II*"). HHS entered into a master contract with the Bishops Conference in 2006. *Id.* at 477. The Conference was the only TVAP grantee selected. *See id.*

The Conference, in turn, entered into subcontracts with over 100 service providers. *Id.* The Conference's subcontracts included a restriction that "funds shall not be used to provide referral for abortion services or contraceptive materials, pursuant to this contract." *Id.*

The ACLU sued, alleging that the government was violating the Establishment Clause by allowing a religiously based restriction on the use of taxpayer funds. *Id.* at 478. On cross-motions for summary judgment, the District Court for the District of Massachusetts held that the government's arrangement with the Bishops Conference violated the Establishment Clause by effectively endorsing the Conference's religious views in allowing the Conference to place a religiously motivated restriction on TVAP funding that subcontracting organizations could not opt out of and in delegating to the Conference the authority to decide which services the TVAP would fund and which services (e.g., abortion) it would not. *Id.* at 486–88.

HHS's master contract with the Bishops Conference expired in 2011. *ACLU of Mass. II*, 705 F.3d at 48. After the expiration of its contract with the Conference, HHS awarded grants to three separate organizations. *Id.* at 50–51. The Conference applied for a grant, but its proposal was not selected. *Id.* at 51. Because the Conference's grant agreement had ended, the First Circuit on appeal vacated the *ACLU of Massachusetts I* decision as moot. *Id.* at 52–54.

The government's 2006–2011 arrangement with the Conference is not at issue in this action.

### 2.2.2    2015 funding opportunity announcement

In 2015, the ORR issued a new Funding Opportunity Announcement to invite organizations to apply to enter into TVAP grant agreements.[69] The FOA provided that grantees must provide services that included "direct services and/or community referrals for housing, mental health screening and therapy, employability services, legal services, counselling, health screening and medical care, including treatment for sexually transmitted infections, family planning services and

---

[69] 2015 TVAP FOA – ECF No. 116-1 at 99.

United States District Court
Northern District of California

the full range of legally permissible gynecological and obstetric care, including but not limited to exams, tests, pre-natal services and non-directive health-related counselling."[70] The FOA further provided that "[n]o HHS funds may be expended for an abortion, except in cases where pregnancy is a result of rape or incest or where the woman suffers from a physical condition that would place her life in danger unless an abortion is performed."[71] (This restriction applied equally to religious and secular grantees.[72])

Both faith-based and secular organizations were eligible to apply to participate as grantees.[73] The FOA provided that:

> If an applicant has a religious objection to providing any of the services or referrals required in the program, it must explicitly describe the approach to meeting its grant obligations consistent with [the ORR's Administration for Children and Families]'s faith-based policy. The alternative approach must be one that accomplishes the goal of ensuring that trafficking victims understand the full range of services available to them, including reproductive health services, and that there is a mechanism by which victims requesting such services can receive appropriate referrals. The alternative approach must ensure timely referrals to all services for which the individual is eligible, not be burdensome to the client, and be operationally feasible for ORR.[74]

As discussed above, federal regulations provide that faith-based grantees may not engage in inherently religious activities. 45 C.F.R. §§ 87.1(c), 87.2(c) (2004) (amended Jan. 20, 2016); 45 C.F.R. §§ 87.1(c), 87.2(c) (Jan. 20, 2016) (amended May 4, 2016); 45 C.F.R. § 87.3(b) (May 4, 2016).

The FOA provided that ORR would use objective review panels comprised of experts with knowledge and experience in the area to review and evaluate grant applications.[75]

---

[70] *Id.* at 100–01.

[71] *Id.* at 131.

[72] HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 120-1 at 111 (p. 161).

[73] 2015 TVAP FOA – ECF No. 116-1 at 109.

[74] *Id.* at 120.

[75] *Id.* at 136; *accord* HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 120-1 at 97 at 104 (p. 80).

### 2.2.3 Grant awards

OTIP selected and entered into grant agreements with three grantees: the Bishops Conference, Tapestri, and the U.S. Committee for Refugees and Immigrants ("USCRI").[76] The Conference is a faith-based organization, whereas Tapestri and USCRI are secular.[77] The Conference received TVAP grants of approximately $2.1 million in fiscal year 2015, $1.6 million in fiscal year 2016, and $0 in fiscal year 2017.[78] USCRI received TVAP grants of approximately $3.8 million in fiscal year 2015, $4.4 million in fiscal year 2016, and $6.0 million in fiscal year 2017.[79]

The Bishops Conference's original grant proposal in 2015 stated that "USCCB/MRS is committed to acting in accordance with Catholic teaching in administering the program, including the determination of allowable and unallowable costs. In carrying out the program, sub-recipients will not provide or refer for abortion, sterilization, or artificial contraceptives and no project funds will be used for that purpose."[80] In response to that provision, OTIP emailed the Bishops Conference and asked:

> Per the FOA requirements, "a grantee may not take any steps to discourage program participants from making a request for a service available under the program, nor may a grantee direct subcontractor to refrain from providing services when the subcontractor has no religious objection to providing such services." Consistent with these requirements, no program-related documents, including, but not limited to, sub-recipient agreement documents, memoranda of understanding, program guidelines, or work plans, may limit the subcontractor's ability to provide any services, as specified in the TVAP FOA, for which victims are eligible.
>
> • Will USCCB be able to meet this FOA requirement?
>
> • USCCB stated: " ...sub-recipients will be directed to contact USCCB/MRS immediately in any cases that cannot be accommodated through existing program

---

[76] HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 120-1 at 97, 103 (pp. 34, 79)

[77] *See* HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 121-1 at 78 (p. 168) (re Tapestri); Bishops Conference Rule 30(b)(6) Dep. (Chester) – ECF No. 116-1 at 244 (p. 51) (re USCRI).

[78] Gov't Suppl. Interrog. Resps. – ECF No. 116-1 at 12.

[79] *Id.* at 13. The ACLU's interrogatories apparently did not ask for the grant levels for Tapestri, and hence this information was not included in the government's interrogatory responses that the parties filed with the court. *See id.* at 12–13.

[80] Bishops Conf., Proposal for Trafficking Victim Assistance Program – ECF No. 116-1 at 182 (ACF_ 000105).

guidance." What is USCCB's plan for cases involving a request for services that USCCB or a subcontractor cannot provide due to religious objection?[81]

The Conference responded:

If awarded a contract for the Trafficking Victim Assistance Program (TVAP), USCCB intends to include in its subcontracts with its sub-recipients the following language:

"In administering the program, USCCB/MRS is committed to acting in accordance with Catholic teaching which has moral and religious objections to direct sterilization, artificial contraception, and abortion. In carrying out the program, Sub-recipients will not provide or refer for abortion, sterilization, or artificial contraceptives and no project funds will be used for that purpose. Sub-recipients will provide all newly enrolled clients with a brochure that indicates all services for which they are eligible. . . ."[82]

The Conference noted that all of its subcontractors were affiliates of Catholic agencies or Bethany Christian Services that shared its religious objection to providing abortion or contraception.[83] The Conference said that it understood that there might be other social-services agencies that did not have a religious objection to providing abortion or contraception and that those agencies would have the opportunity to subcontract directly with one of the other TVAP grantees.[84] The Conference further said that in the event that one of its subcontractors could not provide a service (e.g., abortion) to a trafficking victim due to a religious objection, it would contact other TVAP grantees and/or OTIP to facilitate a transfer of the victim to another grantee.[85] The Conference said that unlike in the 2006–2011 time period — when the Conference was the only TVAP grantee — there were now other TVAP grantees, so any potential subgrantee that did not share the Conference's religious objections could apply for TVAP funding through the other grantees.[86]

---

[81] Email from HHS to Bishops Conf. (Sept. 17, 2015 6:02 PM) – ECF No. 116-1 at 226 (USCCB00000532).

[82] Email from Bishops Conf. to HHS (Sept. 18, 2015 5:42 PM) – ECF No. 116-1 at 222 (USCCB00000529).

[83] Id.

[84] Id.

[85] Id. at 223 (USCCB00000530).

[86] Email from Bishops Conf. to HHS (Sept. 25, 2015 4:29 PM) – ECF No. 116-1 at 235 (USCCB00000980).

OTIP responded that the language that the Bishops Conference proposed to include in its subgrant agreements would not meet the FOA requirements.[87] Citing *ACLU of Massachusetts I*, OTIP asserted that "grantees may not adopt rules, based on their own moral or religious beliefs, governing sub-grantee use of funds for a federal program."[88] In an effort to accommodate the Conference, OTIP proposed revising its proposed language to read, "Sub-recipients **sharing these religious objections may elect** ~~will~~ not to provide or refer for abortion, sterilization, or artificial contraceptives and **not to use** ~~no~~ project funds ~~will be used~~ for that purpose."[89] OTIP also stated that if potential subgrantees were referred to other TVAP grantees instead of the Conference, the Conference's budget would likely have to be adjusted.[90]

Following a call with OTIP, the Conference proposed removing that sentence entirely and instead adding a new sentence in its agreements with subgrantees that would state, "the (named agency) voluntarily agrees that it shares the religious objections of USCCB to providing or referring clients for abortion, sterilization and artificial contraception, and to the use of program funds for those purposes."[91] Following another call, the Conference agreed to removing its newly proposed sentence as well.[92] The Conference instead proposed including a statement in a program brochure that would be provided to both subgrantees and trafficking victims that would state, "This grantee (USCCB) is affiliated with the Catholic Church, which has moral and religious

---

[87] Email from HHS to Bishops Conf. (Sept. 22, 2015 11:47 AM) – ECF No. 116-1 at 222 (USCCB0000528); Email from HHS to Bishops Conf. (Sept. 28, 2015 12:30 PM) – ECF No. 116-1 at 233–34 (USCCB00000978–79).

[88] Email from HHS to Bishops Conf. (Sept. 28, 2015 12:30 PM) – ECF No. 116-1 at 234 (USCCB00000979).

[89] *Id.* (blacklining added).

[90] *Id.*; Email from HHS to Bishops Conf. (Sept. 22, 2015 11:47 AM) – ECF No. 116-1 at 221 (USCCB0000528).

[91] Email from Bishops Conf. to HHS (Sept. 28, 2015 4:18 PM) – ECF No. 121-1 at 103 (PRICE_PROD_00008569).

[92] Email from Bishops Conf. to HHS (Sept. 29, 2015 10:12 AM) – ECF No. 121-1 at 102 (PRICE_PROD_00008568).

1   objections to direct sterilization, contraception, and abortion. You are free to discuss all health

2   matters with your medical provider."[93]

3       OTIP and the Bishops Conference exchanged emails reconfirming that (1) both of the

4   sentences the Conference had proposed for subgrant agreements — that subgrantees "will not

5   provide or refer for abortion, sterilization, or artificial contraceptives and no project funds will be

6   used for that purpose" and that subgrantees "voluntarily agree[] that [they] share[] the religious

7   objections of USCCB to providing or referring clients for abortion, sterilization and artificial

8   contraception, and to the use of program funds for those purposes" — would be removed from any

9   TVAP-related documents and (2) the Conference would "refrain from including any language in

10  any program-related documents, including sub-agreements, limiting the ability of subcontractors

11  to provide any services, as provided in the TVAP FOA, for which victims are eligible."[94] With

12  that agreement, OTIP went forward with evaluating the Bishops Conference's grant application

13  and ultimately selected it as a grantee (along with Tapestri and USCRI).[95]

14      There is no evidence in the record that OTIP or any government actor selected the Bishops

15  Conference as a grantee to promote Catholicism, Catholic religious views, or Catholic social

16  teaching.[96] There is no evidence in the record that the Bishops Conference or any of its

---

[93] *Id.*

[94] Email from HHS to Bishops Conf. (Sept. 29, 2015 10:15 AM) – ECF No. 121-1 at 101–02 (PRICE_ PROD_00008567–68); Email from Bishops Conf. to HHS (Sept. 29, 2015 11:00 AM) – ECF No. 121-1 at 101 (PRICE_PROD_00008567).

[95] *See* HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 122-1 at 9 (p. 105) (confirming that the Bishops Conference had removed from its subgrant agreements the language prohibiting subgrantees from providing or referring for abortion or contraception).

[96] *Cf.* HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 120-1 at 110 (p. 160) ("Q. Okay. Was any TVAP grant awarded to any religiously affiliated grantee for the purpose of promoting religion? A. No. Q. Was any TVAP grant awarded to any religiously affiliated grantee for the purpose of promoting any specific religion or religious belief? A. No."); Bishops Conf. Rule 30(b)(6) Dep (Chester) – ECF No. 121-1 at 89 (pp. 98–99, 101) ("Q. Was the primary effect of the grant, as administered by USCCB, to promote or advance Catholicism? A. No. Q. Was the primary effect of the grant, as administered by USCCB, to provide funding for the Catholic Church? A. No. Q. Was the primary effect of the grant, as administered by USCCB, to promote Catholicism? A. No. Q. Was the primary effect of the grant, as administered by USCCB, to promote Catholic religious views? A. No. Q. Was the primary effect of the grant, as administered by USCCB, to promote Catholic social teaching? A. No. . . . Q. . . . In the course of the negotiations over the grant, did anyone at HHS ever communicate to you or anyone else at USCCB that one of the government's purposes in giving the grant to USCCB was to promote

subgrantees used any TVAP grant money to promote Catholicism or for religious education or proselytization, to maintain or improve churches or religious facilities, to purchase religious items, or to distribute religious literature.[97]

There is no evidence in the record that the Bishops Conference required any subgrantee to adopt its religious views.[98] This may be in part because, at the time the Conference was selected pursuant to the 2015 TVAP FOA, all of the Conference's network of would-be subgrantees already shared its religious views to begin with.[99] At one point, one organization that did not share the Conference's religious views applied to be a Conference subgrantee.[100] The Conference referred the organization to USCRI, one of the other national TVAP grantees, because (1) "it" was

---

Catholicism? A. No. Q. Did they communicate that it was the government's purpose to promote religion generally? A. No. Q. Did they communicate that it was the purpose to promote a specific religious belief with respect to abortion and contraception? A. No.").

[97] *Cf.* HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 120-1 at 110–11 (p. 160–61) ("Q. Are you aware of any grantee using TVAP grant funds for religious proselytization? A. Not that I'm aware of. Q. Are you aware of any grantee using TVAP grant funds for religious instruction? A. Not that I'm aware of. Q. Are you aware of any grantee using TVAP grant funds for the purpose — oh, excuse me. Scratch that. Are you aware of any grantee using TVAP grant funds for the purchase of religious items? A. Not that I'm aware of. Q. Are you aware of any grantee using TVAP grant funds for the purpose of purchasing or distributing religious literature? A. Not that I'm aware of."); Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 120-1 at 154 (p. 97) ("Q. Okay. Does USCCB use any funds from the grant to promote Catholicism? A. No. Q. Does USCCB use any funds from the grant for proselytization? A. No. Q. Does USCCB use any funds from the grant for religious education purposes? A. It is possible for a case manager, during the time that they are spending with the client, which would be presumably covered by the funds for the administrative reimbursement, to make referrals to a client's preferred religious organization or faith community for something like . . . ."); Bishops Conf. Rule 30(b)(6) Dep. (Chester) (cont'd) – ECF No. 121-1 at 89 (p. 98) (". . . religious education, but they can't technically pay for any courses or any curriculum or cost associated with a religious education. Q. Okay, and that would be the client's preferred provider, not USCCB's preferred provider? A. Correct. Q. Does USCCB use any funds from the grant to maintain or improve churches or other religious buildings? A. No. Q. Does USCCB use any funds from the grant to purchase religious items? A. No. Q. Does USCCB use any funds from the grant to purchase or distribute religious literature? A. No.").

[98] *Cf.* ACLU 2d Amend. Interrog. Resps. – ECF No. 116-1 at 61 ("Plaintiff does not allege that USCCB's subgrantees were compelled to adopt religious objections but rather that they are prohibited through funding agreements and MOUs from providing abortion or contraception care or referrals.").

[99] *See* Bishops Conf., Proposal for Trafficking Victim Assistance Program app'x F – ECF No. 116-1 at 215 (ACF_000138); *accord* Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 121-1 at 85 (pp. 48–49).

[100] Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 116-1 at 244 (p. 51).

secular,[101] and (2) the Conference did not have the staffing necessary to vet the organization.[102] (Any organization is free to apply to be a subgrantee of any of the three TVAP grantees — the Bishops Conference, Tapestri, and USCRI — provided that they contract with only one of the grantees.[103])

### 2.3    Access to abortion and contraception

The record does not reveal any instance of a trafficking victim who was receiving services from a Bishops Conference subgrantee asking the Conference or its subgrantee for an abortion or contraception. This may be because trafficking victims receiving TVAP services, unlike unaccompanied minors, are generally not in the physical custody of the federal government, the Conference, or its subgrantees, and thus can seek and obtain an abortion or contraception independently.[104]

---

[101] *Id.* It is unclear from the deposition testimony whether "it" refers to the prospective subgrantee or to USCRI.

[102] *Id.* at 250–51 (pp. 93–95).

[103] 2015 TVAP FOA – ECF No. 116-1 at 104 ("A TVAP grantee may subcontract with service provider organizations outside of the ACF Region(s) in which it provides full coverage. A subcontractor organization must work with only one primary TVAP grantee."); *accord* HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 116-1 at 158 (p. 58); Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 116-1 at 242, 244, 245 (pp. 11, 51, 55–56).

[104] *See* HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 120-1 at 111–12 (pp. 161–62) ("Q. The trafficking victims who receive care under this program, they are not in federal custody; is that correct? A. They — I can't know for every single victim, but generally they are not in federal custody. Q. And that generally means that wherever they live, they're free to come and go as they please, correct? A. It's a voluntary program. Q. So can any, can any grantee prevent a trafficking victim from independently seeking contraception? A. No. Q. Can any grantee prevent a trafficking victim from independently seeking access to an abortion? A. No."); Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 121-1 at 89–90 (pp. 100–01, 103) ("Q. . . . So for the trafficking victims for whom USCCB is providing care under the grant, does USCCB believe it has been delegated the authority to make ultimate determinations as to whether these trafficking victims are allowed to get an abortion or contraception? A. Because the clients actually reside in the community and we are providing the clients with, at the local level, referrals to a service, a medical service provider, again they are often given bus passes or funds to ride the bus or use public transportation, it isn't possible for our local case managers to prevent or prohibit a client from seeking those kinds of services. . . . Q. If a client met with their doctor and requested an abortion, would that information be reported back to the case worker? A. I don't believe so. Q. If the client had an abortion, would the case worker be informed of that procedure? A. I can't think of an official way that that would be communicated from a medical provider back to the case manager. Q. So is it entirely possible that a client could have an abortion without the case worker ever knowing about it? A. It's possible. Q. And would USCCB be aware of any client that has ever requested an abortion? A. Not that I'm aware of.").

United States District Court
Northern District of California

If a trafficking victim were to ask the Conference or its subgrantee for an abortion or contraception, the Conference or the subgrantee would notify HHS.[105] Unlike with unaccompanied minors (who are in custody), trafficking victims (who are generally not in custody) who ask for an abortion are not required to be transferred to another subgrantee.[106]

There is no evidence in the record that any trafficking victim who asked for an abortion or contraception was unable to obtain either because of the religious objections of the Conference or any subgrantee.[107]

## STANDARD OF REVIEW

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about

---

[105] HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 116-1 at 162 (p. 74).

[106] Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 121-1 at 90 (p. 104–05) ("Q. If a client requested an abortion and did happen to notify the case worker about it, would the subrecipient be required to transfer that client to another subrecipient? A. No. What we're advising the case managers to do is to redirect clients back to the medical provider that they have already been connected to or to connect them — if they haven't yet been connected — to a medical provider, and to have the client understand that those are the kind of conversations and discussions that need to be held between the client and the medical provider.").

[107] HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 120-1 at 106–08, 112–13 (pp. 132–34, 162–63) ("Q. Okay. Do you recall any cases during the implementation of the 2015 grant where a trafficking survivor requested access to abortion or contraception, and a subgrantee refused to provide on religious grounds? A. No, I'm not aware. . . . Q. . . . Do you recall a circumstance in which a beneficiary requested access to abortion and contraception and had issues accessing abortion or contraception because of a subgrantee's objection to providing those services? A. No. . . . Q. Okay. Are you aware of any trafficking victim being provided care by a TVAP grantee who sought contraception but was unable to obtain it due to the religious beliefs of the grantee? A. Not to my knowledge. Q. Are you aware of any trafficking victim being provided care by a TVAP grantee who sought an abortion but was unable to obtain it due to the religious beliefs of the grantee? A. Not to my knowledge."); *accord* ACLU 2d Amend. Interrog. Resps. – ECF No. 116-1 at 62 ("At this time, Plaintiff has not identified particular trafficking victims who have been prevented from obtaining contraceptives because of USCCB's policies. . . . As of now, Plaintiff has not identified particular trafficking victims who have been prevented from obtaining abortion because of USCCB's policies.").

United States District Court
Northern District of California

a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Instead, it views the evidence in the light most favorable to the non-moving party and draws all factual inferences in the non-moving party's favor. *E.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

**ANALYSIS**

The three-pronged test articulated in the Supreme Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), remains the dominant mode of Establishment Clause analysis. *Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1149 (9th Cir. 2018) (citing *Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1299 n.7 (9th Cir. 2015)). To avoid violating the Establishment Clause, (1) a government practice "must have a secular legislative purpose," (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) "it must not foster 'an excessive entanglement with religion.'" *Id.* (internal brackets omitted) (quoting *Lemon*, 403 U.S. at 612–13). "Context is critical when evaluating the government's conduct." *Id.*

### 1. Secular Purpose

The legislative purposes underlying the UACP and the TVAP, and the government's grant awards to the Bishops Conference to provide UACP and TVAP services, satisfy the first prong of the *Lemon* test. The ACLU concedes that the UACP and the TVAP as a whole have secular purposes,[108] and there is no evidence in the record that the government's UACP or TVAP grants to the Conference were made for any non-secular purpose.[109]

### 2. Principal or Primary Effect of Advancing Religion

#### 2.1 Grants to Religious Organizations

The ACLU acknowledges that the mere fact that a religiously affiliated organization like the Bishops Conference receives government grants, without more, does not have the principal or primary effect of advancing religion.[110] The Supreme Court's decision in *Bowen v. Kendrick*, 487

---

[108] ACLU Reply – ECF No. 124 at 16–17.

[109] *See supra* notes 21–22, 96–97.

[110] ACLU Reply – ECF No. 124 at 25 ("Plaintiff has never taken the position in this litigation or in the *ACLU of Massachusetts v. Sebelius* litigation that USCCB or other religiously affiliated entities should be prohibited from receiving grants.").

U.S. 589 (1988), is instructive on this point. That case involved a statutory government program that provided grants to organizations for services and research in the area of adolescent sexual relations and pregnancy. *Id.* at 593. Both religious and secular organizations were eligible to apply for and receive government grant funding. *Id.* at 608. The statute was neutral with respect to applicants' religious or secular statuses. *Id.* The Supreme Court held that the fact that religious institutions were allowed to participate as recipients of federal funds, without more, did not violate the Establishment Clause. *Id.* at 608, 613 ("The facially neutral projects authorized by the [Act] — including pregnancy testing, adoption counseling and referral services, prenatal and postnatal care, educational services, residential care, child care, consumer education, etc. — are not themselves 'specifically religious activities,' and they are not converted into such activities by the fact that they are carried out by organizations with religious affiliations."). The Court declined to adopt an argument that the government's funding of a religious organization creates a per se "symbolic link" between government and religion where the government funding is used solely for secular purposes. *Id.* at 613–14.[111]

The fact that religiously affiliated organizations like Bishops Conference received government UACP and TVAP funding, standing alone, does not establish that the government's actions had the principal or primary effect of advancing religion.

---

[111] The Supreme Court noted that a neutral statute could nonetheless have the effect of advancing religion if government funding, even if designated for specific secular purposes, flowed to an institution that is "pervasively sectarian," i.e., "'. . . an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission.'" *Bowen*, 487 U.S. at 609–10 (internal ellipsis omitted) (quoting *Hunt v. McNair*, 413 U.S. 734, 743 (1973)). Organizations whose purpose is "to advance their particular religions" are "pervasively sectarian." *Agostini v. Felton*, 521 U.S. 203, 218 (1997). But it is not enough to show that an organization "is affiliated with a religious institution" or that it is "religiously inspired" to show that it is "pervasively sectarian." *Bowen*, 487 U.S. at 621. The fact that an organization might have explicit corporate ties to a particular religious faith and by-laws or policies that prohibit any deviation from religious doctrine are relevant but not conclusive to the question of whether an organization is "pervasively sectarian." *Id.* at 620 n.16. Rather, the Court indicated, a pervasively sectarian organization is one whose secular purpose and religious mission are "inextricably intertwined." *Id.* The ACLU does not argue here, and does not identify evidence to support, that the Bishops Conference is "pervasively sectarian."

### 2.2    Endorsement of Religious Beliefs

The ACLU argues that the government violates the Establishment Clause when it goes beyond being neutral and "convey[s] or attempt[s] to convey a message that religion or a particular religious belief is *favored or preferred*."[112] The ACLU asserts that the government, in entering into grant agreements with the Bishops Conference despite the Conference's religious objections to abortion and contraception services, has effectively endorsed the Conference's religious views.[113]

"Governmental action has the primary effect of advancing or disapproving of religion" — and thus fails the second prong of the *Lemon* test — "if it is 'sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as disapproval, of their individual religious choices.' . . . from the point of view of a reasonable observer who is 'informed and familiar with the history of the government practice at issue.'" *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1256 (9th Cir. 2007) (internal brackets and ellipsis omitted) (quoting *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1378 (9th Cir. 1994)). The government's grant relationship and interactions with the Bishops Conference in the record in this litigation are not sufficiently likely to be perceived as an endorsement of the Conference's religious beliefs.

If anything, the government acted in a manner that is in opposition to the Conference's religious beliefs. The Conference has a moral and religious objection to abortion. In the UACP, the government took affirmative steps to transfer unaccompanied minors who wanted abortions to other UACP shelters that did not have objections to abortion and appears to have arranged for every such minor to have access to abortion services.[114] A reasonable observer would not view the government's taking affirmative steps to facilitate access to abortion as an endorsement of the

---

[112] ACLU Mot. – ECF No. 116 at 16 (emphasis in original) (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 593 (1989)).

[113] ACLU Reply – ECF No. 124 at 20–21.

[114] *See supra* notes 28–30.

Conference's anti-abortion religious beliefs. Similarly, in the TVAP, the government told the Conference that the various religious provisions that the Conference had proposed to include in its subgrant agreements did not comply with government requirements and made the Conference remove them.[115] A reasonable observer would not view the government's requirement that the Conference remove religious requirements as an endorsement of the Conference's religious beliefs.

### 2.3   Delegation of Governmental Functions

The ACLU argues that "delegating a government function to a religious entity unconstitutionally advances religion."[116] The ACLU asserts that the government delegated to the Bishops Conference (1) "the ability to determine which health services unaccompanied minors are permitted to access" in the UACP, and (2) "the ability to create its own network of subgrantees, and . . . to select those subgrantees based on their shared religious opposition to providing and referring to abortion and contraception, and to prohibit those subgrantees from using grant funds to pay for abortion counseling and services and abortive prescriptions" in the TVAP.[117] The ACLU's assertions are not supported by the evidence in the record.

#### 2.3.1   The UACP and the purported ability to determine which health services unaccompanied minors are permitted to access

The record does not support the ACLU's assertion that the government delegated to the Bishops Conference the ability to determine which health services, including abortion or contraception services, that unaccompanied minors are permitted to access. To the contrary, the record shows that (1) if unaccompanied minors wanted access to abortion services to which the Conference or its subgrantees objected on religious grounds, the government transferred them to other shelters where they could access those services, and (2) if unaccompanied minors wanted access to contraception services, they could obtain them directly from their medical providers

---

[115] *See supra* notes 80–93.

[116] ACLU Mot. – ECF No. 116 at 19.

[117] *Id.* at 20.

without the involvement of or denial by the Conference or its subgrantees.[118] There is no evidence in the record that any unaccompanied minor was denied access to any abortion or contraception services or that the government delegated to the Bishops Conference any power to determine whether or not unaccompanied minors would have access to any services.[119]

### 2.3.2 The TVAP and the purported ability to select subgrantees based on shared religious views and to prohibit subgrantees from using grant funds to pay for abortion services

The record does not support the ACLU's assertion that the government delegated to the Bishops Conference the ability to prohibit TVAP subgrantees from using grant funds to pay for abortion counseling and services and abortive prescriptions. The government did not delegate to the Conference the ability to prohibit subgrantees from using grant funds to pay for services such as abortion or contraception. Instead, the government required the Conference to agree to "refrain from including any language in any program-related documents, including sub-agreements, limiting the ability of subcontractors to provide any services, as provided in the TVAP FOA, for which victims are eligible."[120]

The Bishops Conference's alleged power to prohibit TVAP subgrantees from using grant funds to pay for certain services is further limited by the presence of the other two secular TVAP grantees, Tapestri and USCRI. At most, the Conference has the ability to select or veto the organizations that serve as its subgrantees. The Conference does not have the ability to select or veto organizations that serve as TVAP subgrantees generally, or to control the TVAP funding those organizations receive or what services they provide. Subgrantees with views that run contrary to the Conference's religious beliefs can enter into subgrant agreements with Tapestri and

---

[118] *See supra* notes 26–29, 61–64.

[119] *See supra* notes 30, 65.

[120] *See supra* notes 94–95. The government itself prohibited all TVAP grantees (religious and secular) from using TVAP funds for certain services, including for abortions other than in the case of rape, incest, or where the woman's life is in danger, *see supra* notes 71–72, but that was a government decision that involved no delegation of a governmental function to a religious organization.

USCRI.[121] The Conference thus cannot prevent subgrantees from receiving TVAP funding or providing services that the Conference might oppose.[122]

This distinguishes the government's arrangement here from the arrangement in *ACLU of Massachusetts I*. There, the Bishops Conference was the only TVAP grantee. The Conference thus could exercise the government's full power to exclude certain subgrantees and services from receiving any TVAP government funding at all. The District of Massachusetts held that this was an unconstitutional delegation of a governmental function to a religious organization. *See ACLU of Mass. I*, 821 F. Supp. 2d at 487 ("[T]he government defendants' delegation of authority to the USCCB to exclude certain services from government funding 'provides a significant symbolic benefit to religion,' in violation of the Establishment Clause."). Here, by contrast, the Conference cannot exclude subgrantees or services from government funding.

*Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), another case the ACLU cites, is distinguishable for the same reason. That case involved a law that gave churches an unqualified right to veto liquor-license applications for any premise located within 500 feet of the church. *Id.* at 117. The Supreme Court held that the law was unconstitutional, as the "power to veto certain liquor license applications . . . . is a power ordinarily vested in agencies of the government," and delegation of that power to churches — which could employ that power "for explicitly religious

---

[121] *See supra* note 103.

[122] While not dispositive, it is worth noting that the government provided USCRI with more TVAP funding than it did the Bishops Conference for each of fiscal years 2015, 2016, and 2017, *supra* notes 78–79, and the Conference has no control over how USCRI might allocate its funding.

The ACLU argues that the Bishops Conference has the highest reimbursement rate of the three grantees, and thus that "prospective subgrantees that are prohibited from subcontracting with USCCB because they do not share USCCB's religious beliefs are penalized." ACLU Mot. – ECF No. 116 at 18 (citing HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 116-1 at 165 (p. 157)). The parties do not definitively articulate how the three TVAP grantees' reimbursement rates are set. It appears that each grantee determines its own reimbursement rates. *See* HHS Rule 30(b)(6) Dep. (Chon) – ECF No. 116-1 at 165 (p. 157). It also appears that reimbursement rates to subgrantees differ based on differing levels of service. *See* Bishops Conf. Rule 30(b)(6) Dep. (Chester) – ECF No. 116-1 at 244 (p. 52). There is nothing in the record that suggests that the Conference has any control over setting Tapestri's or USCRI's reimbursement rates. This record, and the record of the government's requiring the Conference not to include any language in subgrant agreements limiting the services that subgrantees can provide, cannot be fairly characterized as the government's delegating to the Conference the power to "penalize" subgrantees who do not share the Conference's religious views.

goals, for example, favoring liquor licenses for members of that congregation or adherents of that faith" — violated the Establishment Clause. *Id.* at 122, 125–26. Here, by contrast, the Conference has no similar veto power over what organizations can be TVAP subgrantees, what funding they might receive, or what services they might provide.[123]

### 2.4 Harm to Third Parties

The ACLU argues that the government violates the Establishment Clause when it "authoriz[es] religiously affiliated grantees to impose their faith on marginalized populations in the context of a government program."[124] Citing the examples of Rosa, Maria, Michelle, and Zoe, the ACLU argues that (1) the Bishops Conference's objections to abortion has resulted in a "marginalized population" of unaccompanied minors having to be transferred away from faith-based shelters, and (2) these transfers have imposed harms on the minors, such as delays in receiving abortion services, the loss of connections with family members, attorneys, social workers, and others at the original shelter location, and shame and stigma.[125] This argument fails because the ACLU lacks standing to advance a claim based on the harms imposed on unaccompanied minors.

---

[123] The ACLU's citation to *Board of Education of Kiryas Joel School District v. Grumet*, 512 U.S. 687 (1994), does not change that outcome. That case involved an ad hoc "special" statute passed by the New York State Legislature that delegated the powers to control a school district to a village populated by "vigorously religious" residents. *Id.* at 691, 693. The issue there was less the village's exercise of the power to control the school district, as opposed to the government's ad hoc decision to delegate this power to this one religiously dominated village, without providing any assurances that the government would treat other future groups the same way. *See id.* at 703 ("[W]hereas in *Larkin* it was religious groups the Court thought might exercise civic power to advance the interests of religion (or religious adherents), here the threat to neutrality occurs at an antecedent stage. The fundamental source of constitutional concern here is that the legislature itself may fail to exercise governmental authority in a religiously neutral way. The anomalously case-specific nature of the legislature's exercise of state authority in creating this district for a religious community leaves the Court without any direct way to review such state action for the purpose of safeguarding a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion. Because the religious community of Kiryas Joel did not receive its new governmental authority simply as one of many communities eligible for equal treatment under a general law, we have no assurance that the next similarly situated group seeking a school district of its own will receive one . . . .") (internal citation omitted). Here, there is no evidence that the government engaged in any ad hoc decision to favor the Bishops Conference over any other grant applicant.

[124] ACLU Mot. – ECF No 116 at 17.

[125] *Id.*

To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "It requires allegations — and, eventually, proof — that the plaintiff 'personally' suffered a concrete and particularized injury in connection with the conduct of which he complains." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (internal brackets omitted) (citing *Spokeo*, 136 S. Ct. at 1547–48). "In a case arising from an alleged violation of the Establishment Clause, a plaintiff must show, as in other cases, that [it] is 'directly affected by the laws and practices against which [its] complaints are directed.'" *Id.* (quoting *Sch. Dist. v. Schempp*, 374 U.S. 203, 224 n.9 (1963)).

The ACLU has not suffered a concrete and particularized injury and is not directly affected by the practice of transferring unaccompanied minors or trafficking victims. The ACLU is not itself an unaccompanied minor or trafficking victim (and does not represent any unaccompanied minor or trafficking victim in this case). It thus does not have standing to bring a claim for any injuries that unaccompanied minors or trafficking victims might have suffered (e.g., injuries from any purported delays in receiving abortions) that it did not suffer itself.

The only injuries the ACLU alleges in this case that it suffered itself were putative injuries borne in capacity as a taxpayer. *ACLU of N. Cal. v. Burwell*, No. 16-cv-03539-LB, 2016 WL 6962871, at *1 (N.D. Cal. Nov. 29, 2016) (*ACLU of N. Cal. I*); *ACLU of N. Cal. v. Burwell*, No. 16-cv-03539-LB, 2017 WL 4551492, at *1 (N.D. Cal. Oct. 11, 2017) (*ACLU of N. Cal. II*).[126] The Supreme Court "explain[ed] that individuals suffer a particular injury for standing purposes when, in violation of the Establishment Clause and by means of 'the taxing and spending power,' their property is transferred through the Government's Treasury to a sectarian entity." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 139–40 (2011) (citing *Flast v. Cohen*, 392 U.S. 83, 105–

---

[126] Orders – ECF Nos. 25, 102; *see* FAC – ECF No. 57 at 5 (¶ 11), 21–22 (¶¶ 76–77, 80).

06 (1968)).[127] "[T]he 'injury' alleged in [taxpayer] Establishment Clause challenges to federal spending [is] the very 'extraction and spending' of 'tax money' in aid of religion[.]" *Id.* at 140 (internal brackets omitted) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 348 (2006)). A taxpayer can bring an Establishment Clause claim if there is "a resulting subsidy of religious activity . . . traceable to the government's expenditures." *Id.* at 143. There is nothing in the record here that supports that there was a subsidy of religious activity traceable to the government's spending of taxpayer dollars.

The record here shows that the government's UACP and TVAP grant money was used to provide general secular care services to unaccompanied minors and that no government money was used for proselytization, religious education, religious facilities, religious items, religious literature, or other religious activity.[128] There is no evidence that the ACLU, or any taxpayer, was forced to monetarily subsidize the Bishops Conference's religious beliefs. To the extent that the Conference declined to provide unaccompanied minors with access to abortion or contraception services, it did not use any government tax money to do so, and thus its actions are not properly the subject of a taxpayer-standing suit. *See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 794 (9th Cir. 1999) (en banc) ("Taxpayer standing protects against only one type of injury, namely the 'misuse of public funds.' If a plaintiff identifies no public funds that were spent solely on the challenged activity, then the plaintiff has not alleged a taxpayer injury.") (citations omitted). To the extent the government then had to spend additional taxpayer money to transfer unaccompanied minors to non-Conference-affiliated shelters in order to provide unaccompanied minors with access to abortion and contraception services, such money did not subsidize religious activity. To the contrary, that additional money was money used to achieve an outcome in opposition to the Conference's religious views.

---

[127] The *Flast* taxpayer-standing doctrine for cases involving Establishment Clause claims is a "narrow exception" to the general rule that "[a]bsent special circumstances, . . . standing cannot be based on a plaintiff's mere status as a taxpayer." *Winn*, 563 U.S. at 134, 138.

[128] *See supra* notes 22, 97.

The court expresses no opinion about whether an unaccompanied minor who may have suffered harm from being transferred or being delayed abortion services might be able to bring a claim. *Cf. Winn*, 563 U.S. at 145 ("[I]f a law or practice . . . disadvantages a particular religious [party] or a particular nonreligious [party], the disadvantaged party would not have to rely on *Flast* [taxpayer standing] to obtain redress for a resulting injury. . . . If an establishment of religion is alleged to cause real injury to particular individuals, the federal courts may adjudicate the matter."). But the ACLU cannot fit an unaccompanied minor's challenge to harm she suffered into a taxpayer-standing suit. Because there is no evidence that government tax money has been used to subsidize religion, the ACLU's third-party-harm theory fails and cannot serve as the basis for the its Establishment Clause claim.[129]

### 3. Excessive Entanglement With Religion

The Supreme Court has held that "grant monitoring" by the government of programs set up by recipients of federal grants, including "a review of . . . materials that a grantee proposes to use" or "hav[ing] Government employees visit the clinics or offices where [the grantee's] programs are being carried out to see whether they are in fact being administered in accordance with statutory and constitutional requirements. . . . does not amount to 'excessive entanglement,' at least in the

---

[129] At the motion-to-dismiss stage, the court allowed the ACLU's taxpayer-standing claim to go forward because the factual record was still unclear. For example, at the pleading stage, it was not clear whether the government's awarding of grants was intended to benefit religious organizations. *See ACLU of N. Cal. I*, 2016 WL 6962871, at *10. At summary judgment, however, the ACLU must support its taxpayer-standing claim with evidence that tax money was used to subsidize religion. *See Trump*, 138 S. Ct. at 2416. This it has failed to do.

The cases the ACLU cites in support of its "harm to third parties" theory are inapposite. Each case involved a party that was directly affected by the government practice at issue. *Cf. Larkin*, 459 U.S. at 117–18 (involving a restaurant whose liquor license was denied under a government law that gave churches and schools the right to veto applications); *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 6 (1989) (plurality op.) (involving a magazine publisher whose magazines were subject to a sales tax that the government imposed on secular but not religious periodicals); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 705–06 (1985) (involving an employer whose employee refused to work on Sundays, citing a government Sabbath law); *ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1475 (3d Cir. 1996) (en banc) (involving a student at a public high school regarding prayer at his school's graduation ceremony). The cases were not taxpayer-standing suits. The court expresses no opinion about whether those cases support an unaccompanied minor's claim about direct harm, but they do not support the taxpayer-standing claim that the ACLU advances here.

context of a statute authorizing grants to religiously affiliated organizations that are not necessarily 'pervasively sectarian.'" *Bowen*, 487 U.S. at 616–17.

The ACLU points to no evidence in the record and makes no real argument that the government's grant relationship and interactions with the Bishops Conference fosters an excessive entanglement with religion. To the extent that the government had to monitor the Conference to review whether it was acting in compliance with statutory and constitutional requirements, there is no evidence that it rose to the level of fostering excessive entanglement.

                              *        *        *

As the undisputed evidence presented to the court in this case shows that all three *Lemon* factors were satisfied with respect to the UACP and the TVAP, summary judgment for the defendants is appropriate.[130]

# CONCLUSION

The court denies the ACLU's motion for summary judgment and grants the defendants' cross-motions for summary judgment.

**IT IS SO ORDERED.**

Dated: October 11, 2018

_____
LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California

---

[130] In light of this determination, it is unnecessary to reach the Bishop Conference's arguments about religious accommodation or the Religious Freedom Restoration Act.